**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA**

| | | |
|---|---|---|
| JOSEPH RUPPERT, as trustee of and on behalf of FAIRMOUNT PARK, INC. RETIREMENT SAVINGS PLAN, and on behalf of all others similarly situated, | ) ) ) ) | Case No. 4:07-cv-00344-JAJ-TJS |
| | ) | Judge John A. Jarvey |
| Plaintiff, | ) ) | Chief Magistrate Judge Thomas J. Shields |
| vs. | ) ) | |
| PRINCIPAL LIFE INSURANCE COMPANY, | ) ) | |
| Defendant. | ) ) | |

**PRINCIPAL LIFE INSURANCE COMPANY'S
<u>ANSWER TO THE FIRST AMENDED COMPLAINT</u>**

Defendant Principal Life Insurance Company (the "Principal") hereby answers

Plaintiffs' First Amended Complaint as follows:

1.      Plaintiff Joseph Ruppert is a trustee of the Fairmount Park, Inc. Retirement Savings Plan.  Ruppert brings this action in his capacity as trustee of and on behalf of the Fairmount Plan.

**<u>ANSWER:</u>** Principal admits the allegations in the first sentence, and further admits that

Plaintiff purportedly brings this action as a trustee of and on behalf of the "Fairmount Plan."

2.      Defendant Principal Life Insurance Co. is an Iowa corporation with its principal place of business in Des Moines, Iowa.  Defendant advertises its services, solicits retirement plan business and serves as a full service retirement plan service provider for retirement plans located throughout the country.

**<u>ANSWER:</u>** Principal admits the allegations in the first sentence.  Principal admits that it

offers and provides a wide range of services and products to employer-sponsored retirement

plans, which services and products vary from plan to plan.

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1)(2) (29 U.S.C. § 1132 (e)(1)(2)).

**<u>ANSWER:</u>**    Admitted.

4.     Principal's principal place of business is located in this district, and many of the events or transactions alleged in this complaint occurred in this district.

**ANSWER:**   Principal admits that its principal place of business is located in this district and that many of the key events occurred in, and many of the key witnesses reside in, this district.

5.     Principal offers "full service" 401(k) retirement plans to employers who wish to provide retirement plans for their employees.

**ANSWER:**   Principal admits that it offers a range of services and financial products to employers who want to provide retirement plans to employees, with the range of services and financial products varying from plan to plan.  Except as expressly admitted or qualified herein, Principal denies all remaining allegations in this paragraph.

6.     Principal's employer-sponsored 401(k) retirement plans enable employees to invest pretax earnings in mutual funds.

**ANSWER:**   Principal admits that one aspect of employer-sponsored 401(k) retirement plans is the ability for employees to save for retirement by reducing current salary on a before tax basis and invest such monies in a wide range of investments.  Except as expressly admitted or qualified herein, Principal denies all remaining allegations in this paragraph.

7.     Principal selects from among the thousands of mutual funds available and offers those select mutual funds as part of its pre-packaged 401(k) retirement plans.

**ANSWER:**   Denied.  The mutual funds available to an employer-sponsored retirement plan vary plan to plan.  Except as expressly admitted or qualified herein, Principal denies all remaining allegations in this paragraph.

8.     When deciding which the mutual funds an employer wishes to be included in its 401(k) plan, the employer selects from among those pre-selected by Principal.  An employer may only choose from among those mutual funds Principal selected for inclusion in its pre-packaged 401(k) plans.  When deciding in which mutual funds to invest their retirement savings, employees then choose from among the group of mutual funds jointly selected by Principal and their employer.

**ANSWER:** Denied.

9.      After an employer selects the mutual funds which it will offer to its employees, Principal retains the authority to substitute other mutual funds for the chosen mutual funds.

**ANSWER:**   Denied.

10.      After an employer selects the mutual funds which it will offer to its employees, Principal also retains the authority to refuse an employer's or employee's choice of a particular mutual fund by closing the fund to new investments.

**ANSWER:**   Denied.

11.      As a full service plan provider, Principal provides all the services necessary for employers to provide retirement plans for their employees.

**ANSWER:**  Principal admits that it offers a wide range of services to employer-sponsored retirement plans.  Except as expressly admitted or qualified herein, Principal denies all remaining allegations in this paragraph.

12.      As a full service plan provider, Principal provides complete plan management services so that employers can "spend time managing [their] business, not [their] plans."

**ANSWER:**   Principal admits that it offers a wide range of services to employer-sponsored retirement plans, which services vary from plan to plan.  Except as expressly admitted or qualified herein, Principal denies all remaining allegations in this paragraph.

13.      Principal provides to employers promotional materials for promoting an employer's plan to its employees, materials and services to help employers meet education, plan and participation requirements (including an employee enrollment kit and educational materials), and ongoing support to communicate with employees.  As part of its ongoing support services, Principal provides an Internet homepage which gives plan participants access to their investment portfolio and more than 80 planning calculators, reports which advise plan participants about the status of their retirement savings and their investment performance, and asset allocation assistance.

**ANSWER:**  Principal admits that it provides marketing and educational materials for employer-sponsored retirement plans and their participants, which marketing and educational materials vary from plan to plan.  Except as expressly admitted or qualified herein, Principal denies all remaining allegations in this paragraph.

14.     Principal also provides employers with complete plan administration services, legal compliance services and consulting services.  Those services include daily updates of plan records, a program for distribution of benefits to employees, investment reports to employees, pre-printed employee newsletters and signature-ready government forms.

**ANSWER:**  Principal admits that it offers a wide range of services to employer-

sponsored retirement plans, which services provided vary from plan to plan.  Except as expressly

admitted or qualified herein, Principal denies all remaining allegations in this paragraph.

15.     As part of its marketing of pre-packaged plans, Principal touts to employers its "investment strategy ... backed by over a century of financial expertise."

**ANSWER:**  Principal admits that some but not all marketing and promotional materials

include language similar but not identical to that quoted in the above paragraph.  Except as

expressly admitted or qualified herein, Principal denies all remaining allegations in this

paragraph.

16.     Principal also touts its "investment philosophy, goals and strategies" to employers, and represents that its "investment strategies are designed to produce superior long-term results."

**ANSWER:**  Principal admits that some but not all marketing and promotional materials

include the language quoted in the above paragraph.  Except as expressly admitted or qualified

herein, Principal denies all remaining allegations in this paragraph.

17.     Thus, Principal holds itself out to employers and employees as a highly-skilled financial expert, possessing special knowledge and expertise.

**ANSWER:**  Denied.

18.     Principal provides investment advice to employers and participating employees, including the implicit advice that the mutual funds Principal offers are sound retirement plan investments.

**ANSWER:**     Denied.

19.     Principal also provides more individualized investment advice to employees through Principal's "Investor Profile Quiz."  The quiz, available on Principal's Internet site and employee enrollment kits, helps employees determine their risk tolerance on a scale of 1 to 5.

**ANSWER:**  Principal admits that it provides an "Investor Profile Quiz," which is available on Principal's website.  Principal further admits that the Investor Profile Quiz includes a risk tolerance scale of 1 to 5.  Except as expressly admitted or qualified herein, Principal denies all remaining allegations in this paragraph.

20.     Principal represents to employers that it charges "competitive fees" and "low fees mean greater opportunity for returns;" "paying less in fees may be one way for your plan members to save more for retirement."

**ANSWER:**  Principal admits that some, but not all marketing and promotional materials include the language quoted in the above paragraph.  Except as expressly admitted or qualified herein, Principal denies all remaining allegations in this paragraph.

21.     Investment advisors to mutual funds charge the funds they advise fees for the advisors' investment management services.

**ANSWER:**  Principal admits that investment advisors to mutual funds may charge fees for investment management services, with such charges varying from advisor to advisor and plan to plan and changing over time.  Except as expressly admitted or qualified herein, Principal denies all remaining allegations in this paragraph.

22.     As a condition for the fund to be included in Principal's pre-packaged 401(k) plans, Principal negotiates and requires each mutual fund advisor (or the fund's distributor) to pay a kickback to Principal, which Principal euphemistically describes as a "revenue sharing" fee.

**ANSWER:**  Denied.

23.     Principal selects for inclusion in its pre-packaged 401(k) plans only those mutual funds whose advisors (or distributors) agree to make the kickback payment.

**ANSWER:**  Denied.

24.     The "revenue sharing" kickbacks are a percentage of any given retirement plan's assets invested in any given mutual fund or mutual fund family.

**ANSWER:**  Denied to the extent that the allegations of this paragraph characterize lawful payments from mutual funds as "kickbacks."  Principal admits that payments from mutual

funds generally are calculated as a percentage of the assets that Principal's clients have invested

in these funds.  Except as expressly admitted or qualified herein, Principal denies all remaining

allegations in this paragraph.

25.      When the mutual fund advisors (or distributors) agree to pay the "revenue
sharing" kickbacks to Principal, they effectively agree to take a reduced fee, although the full
amount of the fee is still charged to the mutual fund (and thus its shareholders).  However, the
charge includes a "revenue sharing" component which represents the kickback payment to
Principal.

**ANSWER:**      Denied.

26.      Principal exercises exclusive control and discretion over the negotiation of such
investment management fees.

**ANSWER:**      Denied.

27.      Principal also exercises exclusive control and discretion over the selection of
mutual funds available as investment options to plans and their participants.

**ANSWER:**      Denied.

28.      Principal also has the exclusive control and discretion to substitute or close
mutual funds as investment options for a plan and its participants.

**ANSWER:**      Denied.

29.      By providing complete plan management services so that employers can "spend
time managing [their] business, not [their] plans," Principal assumes some of the responsibilities
imposed upon employers as plan sponsors.

**ANSWER:**  Principal denies this allegation to the extent that it states a legal conclusion.

Principal admits that it offers a wide range of services to employer-sponsored retirement plans,

with such services varying from plan to plan, and that select marketing and promotional

materials include the language quoted in the above paragraph.  Except as expressly admitted or

qualified herein, Principal denies all remaining allegations in this paragraph.

30.      A special relationship of confidence, trust, or superior knowledge or control
existed both between Principal and employers who retained Principal for its pre-packaged 401(k)
plans and between Principal and employees participating in a Principal 401(k) plan as a result of
the following:

a.   Principal's holding itself out to employers and employees as highly-skilled financial experts, possessing special knowledge and expertise;

b.   Principal's encouragement of employers and participating employees to place their utmost trust and confidence in Principal's management of their 401(k) plans;

c.   Principal's encouragement of employers and participating employees to place their utmost trust and confidence (with their retirement savings) in Principal's financial expertise and advice;

d.   Principal's assumption of a position of trust and confidence, with respect to both employers and employees, by servicing and managing employer-sponsored 401(k) plans;

e.   Principal's assumption of the responsibility to provide unbiased expertise and 401(k) plan management to employers and employees;

f.   Principal's assumption of the responsibility to provide unbiased, expert advice to employers and employees to the extent Principal provided investment advice to employers and employees, and/or

g.   Principal's assumption of the responsibility to employers and employees to negotiate favorable investment management fees with mutual funds and their advisors arising from Principal's exclusive control over the selection of mutual funds to be included and available in its 401(k) and from Principal's exclusive control over the negotiations of investment management fees with mutual funds and their advisors;

**ANSWER:**  Principal denies the allegations in paragraph 30, including all subparts.

31.   Principal regularly rendered advice to plans such as the Fairmount Park plan as follows:

a.   through Principal's representation of its pre-selected mutual funds to be appropriate investments for the plan and its participants;

b.   through Principal's unilateral control over which mutual funds would continue to be available to 401(k) plans;

c.   through Principal's "Investor Profile Quiz" which it used to help employees determine their investment risk tolerance and matching specific mutual funds to the employees' tolerance; and/or

d.   through Principal's recommendations regarding which of its pre-selected mutual funds should be included in a plan based on Principal's analysis of a plan's previous investments.

**ANSWER:**  Principal denies the allegations in paragraph 31, including all subparts.

32.     Principal's services served as the primary basis for investment decisions by both the plans and their participating employees.

**ANSWER:**  Principal lack knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 32.

33.     Principal services included the rendering of individualized investment advice to plans or their participants based on the particular needs of the plans or participants regarding such matters as investment policies or strategies, overall portfolio composition and diversification of plan investments.

**ANSWER:**  Principal admits that it offers a range of investment services to employer-

sponsored retirement plans, but that such services vary from plan to plan.  Except as expressly

admitted or qualified herein, Principal denies all remaining allegations in this paragraph.

34.     Principal was therefore a fiduciary to plans such as the Fairmount Park Plan within the meaning of ERISA § 3(21)(A) (29 U.S.C. § 1002(21)(a)).

**ANSWER:**  Denied.

35.     Accordingly, Principal owed certain fiduciary duties to plans such as the Fairmount Park Plan and their plan participants under ERISA § 404(a)(1)(A) and (B) (29 U.S.C. § 1104(a)(1)(A) and (B)).

**ANSWER:**  Denied.

36.     Among the fiduciary duties Principal voluntarily assumed and owed to plans such as the Fairmount Park Plan and their participants, was a duty to negotiate mutual funds' (or their advisors') investment management fees so as to defray those expenses of administering the plans.

**ANSWER:**  Denied.

37.     Plaintiff brings this class action in his capacity as trustee of the Fairmount Park Plan and on behalf of a class of all retirement plans to which Principal was a service provider and for which Principal received and kept "revenue sharing" kickbacks from mutual funds.

**ANSWER:**  Principal admits that Plaintiff brings this action individually and purports to

seek certification of a class as described in paragraph 37.  Principal denies that there is any basis

in fact or law for the certification of any class, and denies the remaining allegations of paragraph

37.

38.     Plaintiff is a class member and will fairly and adequately assert and protect the
Class's interests.

**ANSWER:**   Denied.

39.     Plaintiffs interests are coincident with, and not antagonistic to, those of other
Class members.

**ANSWER:**   Denied.

40.     Plaintiff's claims are typical of those of the Class.

**ANSWER:**   Denied.

41.     Plaintiff has retained counsel who is experienced in ERISA class action litigation.

**ANSWER:**  Principal lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 41.

42.     Members of the Class are so numerous that joinder of all members is
impracticable.  While Plaintiff cannot ascertain the exact number and identity of Class members
prior to discovery, on information and belief, there are thousands of Class members and their
identity can be ascertained from Principal's books and records.

**ANSWER:**  Denied.

43.     Plaintiff and the Class sustained damages from Principal's conduct.

**ANSWER:**   Denied.

44.     This case presents questions of law or fact which are common to all class
members, and those common questions predominate over any questions affecting only individual
members of the Class, including:

      i.      Whether Principal held itself out to plans and their participants as a
highly-skilled financial expert, possessing special knowledge and
expertise;

      ii.     Whether Principal encouraged employers and participating employees to
place their utmost trust and confidence in Principal's management of their
401(k) plans;

iii.  Whether Principal encouraged employers and participating employees to place their utmost trust and confidence (with their retirement savings) in Principal's financial expertise and advice;

iv.  Whether Principal assumed a position of trust and confidence, with respect to both employers and employees, by servicing and managing employer-sponsored 401(k) plans;

v.  Whether Principal assumed the responsibility to provide unbiased expertise and 401(k) plan management to employers and employees;

vi.  Whether Principal assumed the responsibility to provide unbiased, expert advice to employers and employees to the extent Principal provided investment advice to employers and employees;

vii.  Whether Principal assumed the responsibility to employers and employees to negotiate favorable investment management fees with mutual funds and their advisors as a result of Principal's exclusive control over the selection of mutual funds to be included and available in its 401(k) and from Principal's exclusive control over the negotiations of investment management fees with mutual funds and their advisors;

viii.  Whether Principal regularly rendered advice to plans such as the Fairmount Park plan and their participants;

ix.  Whether Principal was a fiduciary to plans like the Fairmount Park Plan and their participants;

x.  Whether Principal breached a fiduciary duty to plans like the Fairmount Park Plan and their participants by demanding and keeping "revenue sharing" payments from mutual funds;

xi.  Whether plans like the Fairmount Park Plan and their participants sustained damages as a consequence of Principal's misconduct; and/or

xii.  The amount of any such damages.

**ANSWER:**  Principal denies the allegations of paragraph 44, including all subparts.

45.  The class action method is a superior means for the fair and efficient adjudication of this action, because individual actions would or might:

i.  result in inconsistent or varying adjudication with respect to individual class members;

ii.  result in adjudications with respect to individual class members that could, as a practical matter, be dispositive of the interests of other members not

> parties to the adjudication or substantially impair or impede their ability to protect their interests; or
>
> iii.    produce a multiplicity of cases creating a substantial but unnecessary burden for the courts.

**ANSWER:**  Denied.

46.    A trial of this case as a class action will be manageable because the claims and defenses will be subject to class-wide proof.

**ANSWER:**  Denied.

47.    Plaintiff repeats and incorporates by reference the allegations contained in paragraphs 1 through 46 above as if fully set forth here.

**ANSWER:**  Principal incorporates by reference its responses to paragraphs 1 through 46 as stated above.

48.    Principal does not disclose, or does not adequately disclose, to the plans such as the Fairmount Park Plan, to employers, or to participating employees the fact that Principal negotiates revenue sharing fees with the mutual funds that are included in its pre-packaged 401(k) plans.

**ANSWER:**  Denied.

49.    Principal does not disclose, or does not adequately disclose, to the plans such as the Fairmount Park Plan, to employers, or to participating employees the fact that Principal accepts revenue sharing fees from the mutual funds that are included in its pre-packaged 401(k) plans.

**ANSWER:**  Denied.

50.    Principal does not disclose, or does not adequately disclose, to the plans such as the Fairmount Park Plan, to employers, or to participating employees the amount of the revenue sharing fees Principal negotiates with and receives from the mutual funds that are included in its pre-packaged 401(k) plans.

**ANSWER:**  Denied.

51.    Instead of passing along the "revenue sharing" kickbacks (or the lower investment management fees) to plans such as the Fairmount Park Plan and their plan participants, Principal keeps "revenue sharing" kickbacks from mutual funds.

**ANSWER:**  Denied.

52.   The "revenue sharing" kickbacks Principal takes bear no relationship to Principal's costs of providing services to plans or participants and are in addition to the fees Principal charges for those services.

**ANSWER:**   Denied.

53.   The plans such as the Fairmount Park Plan and their participants receive no extra services from Principal in addition to the services for which the plan already pays in exchange for the revenue sharing payments Principal receives from the mutual funds.

**ANSWER:**   Denied.

54.   The "revenue sharing" kickbacks are thus windfalls to Principal which serve only to increase Principal's income at the expense of the plans such as the Fairmount Park Plan and ultimately at the expense of the participating employees.

**ANSWER:**   Denied.

55.   Principal breached the fiduciary duties it owed (by virtue of ERISA § 404(a)(1)(A) (29 U.S.C. § 1104(a)(1)(A))) to the plans such as the Fairmount Park Plan and its participants in one or more of the following ways:

    a.   failing to disclose (or to disclose adequately) to the plans such as the Fairmount Park Plan, to employers, or to participating employees the fact that Principal negotiates revenue sharing fees with the mutual funds (or their advisors) that are included in its pre-packaged 401(k) plans;

    b.   failing to disclose (or to disclose adequately) to the plans such as the Fairmount Park Plan, to employers, or to participating employees the fact that Principal accepts revenue sharing fees from the mutual funds (or their advisors) that are included in its pre-packaged 401(k) plans;

    c.   failing to disclose (or to disclose adequately) to the plans such as the Fairmount Park Plan, to employers, or to participating employees the amount of the revenue sharing fees that Principal accepts from the mutual funds (or their advisors) that are included in its pre-packaged 401(k) plans;

    d.   keeping revenue sharing kickbacks from mutual funds (or their advisors) for Principal's own benefit;

    e.   failing to use the revenue sharing kickbacks to defray the reasonable expenses of administering the plan; and/or

    f.   failing to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like alms.

**ANSWER:**  Principal denies the allegations in paragraph 55, including all subparts.

56.     The Fairmount Park Plan and class members sustained and continue to sustain damages as a direct and proximate result of Principal's breaches of fiduciary duty.

**ANSWER:**     Denied.

57.     Pursuant to ERISA § 409(a) (29 U.S.C. § 1109(a)), Principal is liable to the Fairmount Park Plan and the Class for its breaches of fiduciary duties to make good to such plans all losses resulting from each such breach, to restore to each such plan all profits Principal realized as a result of each such breach, and is subject to such other equitable and remedial relief as the Court deems appropriate.

**ANSWER:**     Denied.

58.     Plaintiff repeats and incorporates by reference the allegations contained in paragraphs 1 through 57 above as if fully set forth here.

**ANSWER:**  Principal incorporates by reference its responses to paragraphs 1 through 57

as stated above.

59.     Because of the large number of 401(k) plans Principal serves, Principal effectively represents an extremely large sum of plan assets when it negotiates "revenue sharing" kickbacks which mutual funds and their advisors are eager to tap into.  Thus, Principal's ability to extract revenue sharing deals with mutual funds (or their advisors) is a direct result of Principal's representation of such massive amounts of employer-sponsored 401(k) plan assets.

**ANSWER:**     Denied.

60.     ERISA § 406(b)(1) (29 U.S.C. § 1106(b)(1)) prohibits fiduciaries from "deal[ing] with the assets of the plan in his own interest or for his own account."

**ANSWER:**  Principal admits that Plaintiff quotes a portion of 29 U.S.C. § 1106(b)(1) but

denies that Principal has engaged in any prohibited conduct or transaction.

61.     ERISA § 406(b)(3) (29 U.S.C. § 1106(b)(3) prohibits fiduciaries from "receiv[ing] any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

**ANSWER:**  Principal admits that Plaintiff quotes a portion of 29 U.S.C. § 1106(b)(3) but

denies that Principal has engaged in any prohibited conduct or transaction.

62.     Principal Defendant violated ERISA §§ 406(b)(1) and 406(b)(3) (29 U.S.C. §§ 1106(b)(1) & (b)(1)) in one or more of the following ways:

a.      using plan assets to generate revenue sharing kickbacks for Principal's own interest and for its own account; and/or

b.      keeping revenue sharing kickbacks from the mutual funds (or their advisors) that are included in Principal's pre-packaged 401(k) plans for Principal's own interest and for its own account.

**ANSWER:**  Principal denies the allegations of paragraph 62, including all subparts.

63.      Plaintiff repeats and incorporates by reference the allegations contained in paragraphs 1 through 62 above as if fully set forth here.

**ANSWER:**  Principal incorporates by reference its responses to paragraphs 1 through 62 as stated above.

64.      After an employer establishes a 401(k) retirement plan, the employer transfers its employees' contributions to Principal.

**ANSWER:**  Principal admits that after some employers establish a 401(k) retirement plan, those employers transfer their employees' 401(k) contributions to Principal or arrange for such a transfer to take place.

65.      For the thousands of 401(k) plans which Principal services, Principal receives and thus commingles all 401(k) plan contributions in one of two bank accounts.  Principal maintains one bank account for "trusteed plans" and another for "non-trusteed plans."  Principal directs all plan contributions from "trusteed plans" to the account established for "trusteed plans" and directs all plan contributions from "non-trusteed plans" to the account established for "non-trusteed plans."

**ANSWER:**  Principal admits that it deposits 401(k) plan contributions from various 401(k) plans into one of two bank accounts and maintains an accounting system to track those contributions.  Principal admits that there are two different bank accounts that contributions are transferred into:  a general account within Principal Life Insurance Company for non-trusteed plans, and a bank account in the name of Principal Trust Company for trusteed plans.  Principal admits the allegations in the third sentence of paragraph 65.

66.      Principal has sole custody and control over each of those two accounts.  No other entity has authority to direct transfers or otherwise withdraw or move funds from the accounts.

**ANSWER:**     Principal admits that it executes transfers and withdraws and removes funds from the accounts according to the allocations of plan participants.  Except as expressly admitted or qualified herein, Principal denies all remaining allegations in paragraph 66.

67.     After Principal receives plans' contributions in one of these bank accounts, there is a one day lag before Principal transfers the contributions from its accounts and into the investment options that the plans' participants have chosen.

**ANSWER:**     Principal admits that after contributions from plans are transferred into the two bank accounts, Principal promptly creates and executes trades into the investment options, causing the money to be transferred to the investment entities chosen by the plan participants. Except as expressly admitted or qualified herein, Principal denies all remaining allegations in paragraph 67.

68.     Principal takes the plans' contributions from its bank accounts and invests those sums overnight between the time Principal receives the contributions from the plans and the time Principal invests the plans' contributions in the various mutual funds.

**ANSWER:**     Principal admits that, after it has settled any trades from those bank accounts, it invests remaining funds from the trusteed plans into an investment account, and any remaining funds from the non-trusteed plans into its general corporate account.  Except as expressly admitted or qualified herein, Principal denies all remaining allegations in paragraph 68.

69.     Principal earns income on its overnight investment of the plans' assets, and Principal keeps that income for itself.

**ANSWER:**     Principal admits that part of its revenue is the income earned from the overnight investment account.  Except as expressly admitted or qualified herein, Principal denies all remaining allegations in paragraph 69.

70.     Principal does not disclose, or does not adequately disclose, to the plans that it earns income on the plans' assets while Principal is waiting to invest the funds.

**ANSWER:**     Denied.

71.     Principal does not credit to the plans the income that it accrues from its overnight investment of plan assets.

**ANSWER:**     Principal admits that it does not directly credit to the plans the income that it accrues from its overnight investment of plan assets.  Except as expressly admitted or qualified herein, Principal denies all remaining allegations in paragraph 71.

72.     As a result of the foregoing conduct, Principal breached the fiduciary duties it owed (by virtue of ERISA § 404(a)(1)(A) (29 U.S.C. § 1104(a)(1)(A))) to the plans such as the Fairmount Park Plan and its participants, and is therefore liable to the Fairmount Park Plan and the Class for its breaches of fiduciary duties to make good to such plans all losses resulting from each such breach, to restore to each such plan all profits Principal realized as a result of each such breach, and is subject to such other equitable and remedial relief as the Court deems appropriate.

**ANSWER:**     Denied.

73.     Also as a result of the foregoing conduct, Principal engaged in prohibited transactions and thus violated ERISA §§ 406(b)(1) and 406(b)(3) (29 U.S.C. §§ 1106(b)(1) & (b)(1)).

**ANSWER:**     Denied.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

The Complaint fails to state a claim for which relief may be granted.

### Second Affirmative Defense

Plaintiff, as well as some or all members of the putative class, suffered no damages as a result of any conduct of Principal.

### Third Affirmative Defense

Some or all of Principal's conduct may be exempt under ERISA.

### Fourth Affirmative Defense

Some or all of the putative class members' causes of action are time-barred under the applicable statutes of limitations and/or statutes of repose.

### Fifth Affirmative Defense

Some or all of the putative class members' claims are or may be barred in whole or in part by waiver.

### Seventh Affirmative Defense

Some or all of the putative class members' claims may be barred for lack of standing.

### Eighth Affirmative Defense

Some or all of the putative class members' claims may be barred in whole or in part by estoppel.

WHEREFORE, Defendant Principal Life Insurance Company, having answered the allegations of the Amended Complaint and having set forth its affirmative defenses thereto, respectfully asks this Court to enter judgment with costs against Plaintiff and in favor of Principal.

Respectfully submitted,

PRINCIPAL LIFE INSURANCE COMPANY

By:    /s/ Eric S. Mattson_____
          One of its attorneys

Brian L. Campbell
Whitfield & Eddy, PLC
317 Sixth Avenue, Suite 1200
Des Moines, Iowa  50309
Email:  campbell@whitfieldlaw.com
Phone:  (515) 288-6041

Joel S. Feldman
Mark B. Blocker
Eric S. Mattson
Hannah R. Ruehlman
Sidley Austin LLP
One South Dearborn Street
Chicago, Illinois  60603
Email:  jfeldman@sidley.com
          mblocker@sidley.com
          emattson@sidley.com
          hruehlman@sidley.com
Phone:  (312) 853-7000

May 22, 2008

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing **Principal Life Insurance Company's Answer to First Amended Complaint** was served upon the attorneys listed below through the Court's CM/ECF electronic filing system on May 22, 2008.

Klint L. Bruno
Korein Tillery LLC
205 N. Michigan Ave.
Suite 1940
Chicago, IL  60601

Rosalind Robertson
Kenneth J. Brennan
John A. Bruegger
Stephen C. Jones
SimmonsCooper LLC
P.O. Box 521
707 Berkshire Blvd.
East Alton, IL  62024

Brent B. Green
Duncan Green Brown Langeness
& Eckley P.C.
400 Locust St.
Suite 380
Des Moines, IA  50309-2331

Robert L. King
505 N. Seventh St.
Suite 3600
St. Louis, MO  63101

John A. Libra
Howard B. Becker
Stephen M. Tillery
Korein Tillery LLC
505 N. Seventh St.
Suite 3600
St. Louis, MO  63101

/s/ Eric S. Mattson