IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| JOSEPH RUPPERT, as Trustee of and on behalf of Fairmount Park, Inc. Retirement Savings Plan, and on behalf of all others similarly situated, | | No. 4:07-cv-0344-JAJ |
| Plaintiffs, | | |
| vs. | | |
| PRINCIPAL LIFE INSURANCE COMPANY, | | **ORDER** |
| Defendant. | | |

This matter comes before the court pursuant to plaintiff's April 21, 2008 motion to certify class [dkt. 113]. Defendant resisted plaintiff's motion on May 30, 2008 [dkt. 132], to which plaintiff replied on July 3, 2008 [dkt. 142]. The defendant, with leave of the court, filed a sur-reply brief on August 27, 2008 [dkt. 147]. As set forth below, plaintiff's motion is denied.

## I. Background[1]

### A. The Parties

Plaintiff, Joseph Ruppert ("Ruppert") is a trustee of the Fairmount Park, Inc. Retirement Savings Plan. Defendant Principal Life Insurance Company ("Principal") advertises its services, solicits retirement plan business, and serves as a full service retirement plan service provider for retirement plans located throughout the country. At all times relevant to this lawsuit, Principal was the service provider for the Fairmount

---

[1]Except as otherwise noted, the background information is taken from Plaintiff's first amended complaint, the allegations of which the court must accept as true for purposes of this motion. Estate of Mahoney v. R.J. Reynolds Tobacco Co., 204 F.R.D. 150, 153 (S.D. Iowa 2001)(noting further that the court may also look past the pleadings to determine whether the requirements of FED. R. CIV. P. 23 are satisfied) (citations omitted).

Park, Inc. Retirement Savings Plan.  Ruppert brings this action on behalf of a class of all retirement plans to which Principal was a service provider and for which Principal received and kept "revenue sharing" kickbacks from mutual funds, as well as "float" or the interest earned on deposits kept in Principal accounts overnight before being deposited into the designated mutual fund.

### B.  Plaintiff's Claims

Ruppert filed a three-count first amended complaint against Principal.  Count I alleges that Principal breached its fiduciary duty under ERISA section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A) in one or more of the following ways:

- failing to disclose (or to disclose adequately) to the plans such as the Fairmount Park Plan, to employers, or to participating employees the fact that Principal negotiates revenue sharing fees with the mutual funds (or their advisors) that are included in its pre-packaged 401(k) plans;

- failing to disclose (or to disclose adequately) to the plans such as the Fairmount Park Plan, to employers, or to participating employees the fact that Principal accepts revenue sharing fees from the mutual funds (or their advisors) that are included in its pre-packaged 401(k) plans;

- failing to disclose (or to disclose adequately) to the plans such as the Fairmount Park Plan, to employers, or to participating employees the amount of the revenue sharing fees that Principal accepts from the mutual funds (or their advisors) that are included in its pre-packaged 401(k) plans;

- keeping revenue sharing kickbacks from mutual funds (or their advisors) for Principal's own benefit;

- failing to use the revenue sharing kickbacks to defray the reasonable expenses of administering the plan; and/or

- failing to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity

2

and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

Count II alleges that Principal engaged in prohibited "self-dealing" under ERISA sections 406(b)(1) and (3), 29 U.S.C. § 1106(b)(1) and (3) in one or more of the following ways:

- using plan assets to generate revenue sharing kickbacks for Principal's own interest and for its own account; and/or

- keeping revenue sharing kickbacks from the mutual funds (or their advisors) that are included in Principal's pre-packaged 401(k) plans for Principal's own interest and for its own account.

Count III alleges that Principal both breached its fiduciary duty under ERISA and engaged in prohibited "self-dealing" by retaining and keeping the interest income generated by the one day that plan contributions sit in Principal's bank accounts before being invested in the chosen investment options. Ruppert further complains in Count III that Principal does not disclose, or adequately disclose, this practice to plan participants.

### C. The Proposed Class

Plaintiff moves that the following class be certified:

> All trustees and plan sponsors of (an on behalf of) 401(k) retirement plans governed by the Employee Retirement Income Security Act of 1974 (ERISA) to which Principal Life Insurance Company provided services and which included investment options from which Principal Life Insurance Company received revenue sharing payments.

See Plaintiff's Motion for Class Certification [Dkt. 113]. See also Plaintiff's First Amended Complaint, ¶ 37 ("Plaintiff brings this class action in his capacity as trustee of the Fairmount Park Plan and on behalf of a class of all retirement plans to which Principal

3

was a service provider and for which Principal received and kept "revenue sharing" kickbacks from mutual funds.").[2]

## II.  Class Action Standard

To obtain class certification, plaintiffs have the burden of demonstrating that the requirements of Federal Rule of Civil Procedure 23 are met.  <u>Coleman v. Watt</u>, 40 F.3d 255, 258 (8th Cir. 1994).  More specifically, plaintiffs must meet the prerequisites of FED. R. CIV. P. 23(a) and one additional set of alternative requirements under FED. R. CIV. P. 23(b).  <u>Alpern v. UtiliCorp United, Inc.</u>, 84 F.3d 1525, 1539 (8th Cir. 1996).  An "exception to the usual rule that litigation is conducted by and on behalf of individual named parties only," a class action cannot be certified unless the court is convinced, "after a rigorous analysis," that the requirements of Fed. R. Civ. P. 23 are met.  <u>General Tel. Co. S.W. v. Falcon</u>, 457 U.S. 147, 155, 161 (1982).

Fed. R. Civ. P. 23 provides, in pertinent part:

> **(a) Prerequisites to a Class Action.**  One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

> **(b) Class Actions Maintainable.**  An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

---

[2]Throughout his briefing Ruppert alternatively argues that Principal's admitted fiduciary status with respect to its Foundation Options funds makes those funds well suited for class treatment, as does Principal's retention of "float."  Ruppert proposes no class, however, and has not satisfied his burden of demonstrating that the requirements of Rule 23 are met with respect to such alternate classes.

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

> (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

> (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

In his motion for class certification, Ruppert argues that his action satisfies the four requirements of Fed. R. Civ. P. 23(a), i.e., numerosity, commonality, typicality, and adequacy of representation, as well as either Rule 23(b)(1) or Rule 23(b)(3).  In his reply

brief, Ruppert argues that Rule 23(b)(2) is satisfied as well.  The court will first address the requirements of Rule 23(a).

### A.  Requirements of Rule 23(a).

#### 1.  Numerosity & Adequacy of Representation.

Ruppert argues that his proposed class would include 24,816 401(k) plans. Principal contends that the class, as proposed by Ruppert, would encompass 57,000 plans. Either way, Principal does not contest that the numerosity requirement is met.  The court agrees that the class, as proposed by Ruppert is "so numerous that joinder of all members is impracticable."

The "adequacy of representation" factor requires both that plaintiff's counsel be "qualified, experienced, and generally able to conduct the proposed litigation," and that the plaintiff not have interests "antagonistic to those of the class."  U.S. Fidelity & Guar. Co. v. Lord, 585 F.2d 860, 873 (8th Cir. 1978).  Principal does not dispute the qualifications of Ruppert's counsel and does not argue that Ruppert's interests are antagonistic to those of the class.  Based upon its own review of the record, the court is satisfied that the "adequacy of representation" factor is satisfied in this case.

#### 2.  Commonality & Typicality.

Although commonality and typicality are separate requirements under Rule 23(a), they "tend to merge" and are often addressed together.  General Tel., 457 U.S. at 157 n. 13.  The commonality requirement espoused in Rule 23(a)(2) requires the existence of "questions of law or fact common to the class."  "This requirement imposes a light burden on the plaintiff seeking class certification and does not require commonality on every single question raised in a class action."  In re Aquilla ERISA Litigation, 237 F.R.D. 202, 207 (W.D. Mo. 2006) (citing DeBoer v. Mellon Mort. Co., 64 F.3d 1171, 1174 (8th Cir. 1995); In re Hartford Sales Practices Litig., 192 F.R.D. 592, 602 (D. Minn. 1999)).  Commonality is satisfied if the "question of law linking the class members is

6

substantially related to the resolution of the litigation even though the individuals are not identically situated." Bublitz v. E.I. duPont de Nemours & Co., 202 F.R.D. 251, 256 (S.D. Iowa 2001) (quoting Paxton v. Union Nat. Bank, 688 F.2d 552, 561 (8th Cir. 1982)). See also Chorosevic v. MetLife Choices, 2007 WL 2159475 *8 (E.D. Mo. 2007) ("The commonality requirement is met if a common issue pervades all class members' claims."); In re Aquila ERISA Litig. 237 F.R.D. 202, 210 (W.D. Mo. 2006) (noting that the "appropriate focus" in determining commonality is on the "conduct of the defendant, not the plaintiffs").

The typicality requirement is met if the "claims or defenses of the representatives and the members of the class stem from a single event or are based on the same legal or remedial theory." Chorosevic, 2007 WL 2159475 *8 (citing Paxton, 688 F.2d at 561-62). "Typicality requires a demonstration that the members of the class have the same or similar grievances as the named plaintiff." Id. (citing Alpern v. UtiliCorp United, Inc., 84 F.3d 1525, 1540 (8th Cir. 1996)).

According to Ruppert:

> This case presents two overriding questions, not just with respect to Fairmount Park Plan, but with respect to every 401(k) retirement plan Principal services. First, is Principal an ERISA fiduciary to the retirement plans it serves? Second, has Principal breached its ERISA fiduciary duties to those retirement plans by retaining revenue sharing payments and not providing a dollar-for-dollar credit of those payments to the plans?

See Plaintiff's Brief in Support of Motion for Class Certification [dkt. 114] at 1.

Ruppert claims that Principal has admitted its fiduciary status with respect to those retirement plans which offer Principal's proprietary Foundation Options funds, from which Principal collects revenue sharing payments, and that virtually all of the 401(k) plans serviced by Principal include one or more Foundation Options funds. With respect to the non-Principal mutual funds, i.e., Access Funds, Ruppert argues that Principal's status as

a fiduciary is premised on two general categories of conduct, which is common to all plans and amenable to class wide proof, i.e., providing investment advice and controlling plan assets.  With respect to Principal's control over plan assets, Ruppert more specifically argues that Principal significantly restricts the universe of funds in which the plans' assets may be invested, chooses which class of investment fund shares it offers to a plan, and controls its own compensation via revenue sharing, which comes from plan assets.

Principal argues that Ruppert has failed to meet his burden of showing commonality.  Principal claims that the evidence regarding its alleged fiduciary status, its alleged breach of any fiduciary duty, the degree of revenue sharing, the method and adequacy of its disclosure of revenue sharing, the reasonableness of the monies is it received via revenue sharing, and the amount of damages (if any) will vary from plan to plan.

In reply, Ruppert argues that Principal has a business model which provides for common ways in dealing with the tens of thousands 401(k) plans at issue, i.e., templates.

When questioned by Ruppert's counsel, Principal executives testified as follows with respect to the variability among the plans:

> Q: At any given point in time, does The Principal have a list of mutual funds which The Principal offers to group annuity contract 401(k) plans?
>
> A: Yes, but the list changes.
>
> Q: Can you explain that to me?
>
> A: Yes.  We work with the plan advisers and with the plan sponsors to determine what their needs are.  So if we're working with a plan who has a need for a mutual fund that does not sit on our platform, we will bring that mutual fund on it if it meets certain criteria.
>
> . . .

8

Q: Are the group annuity contracts prewritten form contracts?

A: We have templates but they vary client-by-client.  They can vary client-by client.

. . .

Q:  Does every mutual fund on the access fund list have a revenue-sharing agreement with The Principal?

A: No.

. . .

Q: Are all 1300 access funds – which I understand changes from time to time – but approximately 1300 funds, are all of those made available to every 401(k) client of The Principal?

A: No.

Q: Explain to me how that works.

A: We are an adviser-driven company.  We work with plan advisors who represent plan sponsors.  Those advisors will come to us representing their client and will ask us or will work with us in terms of the fund offerings that they would recommend – "they," the adviser, would recommend to their plan sponsor.
　　There are – within there, there is a lot of variability depending on the size of the client, the needs of the client and the like.  So it depends on the specific client that you are looking at.

Q: How does it work that you have 1300 mutual funds available but those are not made available to all plan sponsors? [objection omitted]

A: There are some clients that are small that we make available a very robust foundation option platform to.  But for

9

those that are of greater size, we have a great deal of flexibility.

. . .

Q: . . . With respect to the access fund platform, do you provide to plan sponsors a list of mutual funds from that platform?

A: We do not publish a list as a selection for the adviser or the plan sponsor.  Instead, depending on the plan, on the adviser, we will work with that adviser to arrive at an investment menu that makes sense for that particular plan.

. . .

Q: Is there a menu or a subset of the access fund list or is that done on a plan-by-plan basis?

[objection omitted]

A: Plan-by-Plan basis per large plans.

. . .

Q: Does The Principal disclose to all plan sponsors that The Principal receives revenue-sharing payments from mutual funds?

A: Yes.

Q: When does The Principal disclose to plan sponsors that the Principal receives revenue-sharing payments from mutual funds?

A: At the point of sale, the mutual fund information is included in prospectus – that information is included in the prospectus.  The plan sponsors and the advisers are steered toward the prospectus.

Q: Any other time?

A: That information is included in service agreements as well.

. . .

Q: Who writes the service agreements?

A: Templates are written by our compliance area in conjunction with our law department, but service agreements can be modified for the unique needs of a client.

. . .

Q: If I wanted to find out something about the nature of services that The Principal offers to the 401(k) plans that it services and I wanted to compare that to the nature of the services The Principal offers to all of its 401(k) plans, in that information available?

[objection omitted]

A: It is on a plan-by-plan basis because every plan is unique to the adviser and to the plan sponsor, so what you would need to do is read narratives that are build into those systems.

. . .

Q: Getting back to the marketing pieces we were talking about, does The Principal mass produce marketing materials that target marketing segments as you have defined them in today's and your earlier deposition?

A:  Mass-produced materials for a segment?  I can't think of an example other than the fiduciary guide where we have mailed information to a whole segment.  We usually become much more specific and try to target plans based on their unique characteristics.

11

. . .

Q: Are those marketing materials that are more specific based on a template?

A: Yes, marketing materials are based on a template.

. . .

Q: What is done to those templates to make them specific?

A: It's who we mail the material to that is specific and how – in fact, if it's mailed or if it's hand-delivered and explained by the service team, it's very specific.  We don't do a lot of just mass mailings.  Only occasionally will we do that.

. . .

Q:  What do you do to them to make them more specific?

A: The material itself, the printed material, doesn't change. It's a matter of since we're working through advisers, do we meet face-to-face with that adviser, describe what we're trying to market, the service, the product, and together go to the client, do we have their direction to go directly to the client. The marketing piece doesn't change.  It's the delivery and the use of the piece that is very specific.

. . .

Q: After the new plan is created, the next step in the process is that the employer then executes a group annuity contract? Explain to me what the process is at this point.

A: Yeah.  There are – once the plan adviser, the advisers and the plan sponsor have decided on what services they're interested in, what the investment platform should look like and the like, they will communicate that to us and we produce two documents for signature.

12

One is the plan document itself; which describes – it's the establishment of the plan, the way the plan works in conjunction with our product, and then there's a service agreement that prescribes the specific services that Principal will provide.

Q: Are there any other documents that are executed?

A: There may be, depending on the unique nature of the sale. They're usually encompassed right into the service agreement. But, for example, self-directed brokerage accounts will require different wording within the service agreement.  But each service agreement has to be specially designed for that client that we're dealing with.

. . .

Q: But let's assume we're dealing with a small plan that doesn't have that [a custom plan document] and the plan that you are referring to as "custom" is simply another company's, one of your competitor's prototype plan documents; for instance, Fidelity.  You have a Fidelity customer, a Fidelity client, who is looking to switch service providers and they have an existing plan document.

Does The Principal accept the existing plan document or does it require any sort of changes by the plan sponsor?

A: It depends.  It depends on the client.  If a client wants to go into our prototype, then it's definitely our document.  If a client has a plan document that is unique to them and they're asking us to abide by that, we will, but that's considered a custom plan document.  It's a custom plan document that the plan needs to work with their counsel to make sure that it is compliant with the applicable laws.

. . .

Q: Of those documents we just discussed – plan documents, the adoption agreement here, Exhibit 19, service agreements,

13

group annuity contracts – which of those are prepared by The Principal?

A: The plan document may or may not be.

Q: I asked about prototype plan documents.

A: Oh, the prototypes are produced by The Principal.  They are just that, Principal prototypes.

Q: So the prototype plan documents are all produced by The Principal.  What about the adoption agreements.

A: They are a Principal document.

Q: What about the service agreements.

A: They are produced by The Principal but customized to the client.

Q: Are they templates?

A: They are very flexible templates on some cases.  In other cases you almost have to start from a blank sheet of paper.

Q: In the case of the kinds of plans I've been talking to you about – the turnkey plans, the plan sponsors who require the comprehensive services of The Principle – what are those service agreements like?

A: They're templates with built-in flexibility so they can be modified to the unique needs of the client.

Q: But they are based on a template?

A: They are based on a template, yes.

Q: Of the 25,000 or so plans that The Principal currently services, how many of those use prototype documents?

14

A: This is an estimate.  For the under-5-million-dollar market, about 85 percent of those plans use our prototype plan document.  In the dynamic market, I would estimate about 50 percent of the plans use the prototype and that's between 5 and 25 million.

For the over-25-million-dollar market, I would guess only 10 percent use our prototype, and the rest are custom.

. . .

Q: Does The Principal provide plan sponsors with a packet of materials for educating plan participants?

A: No.  They provide a service rep to sit down with the adviser and the plan sponsor to talk about what is available and then they tailor-make an education plan to the participants based on the needs of that particular plan and their participants.

October 2, 2007 Deposition of Renee Schaaf, Vice President of Retirement and Investor Services and Vice President of Marketing and Strategy Development [14:16-15:8, 18:25-19:3, 29:9-12, 19-30, 37:14-21; 40:5-9, 46:8-22, 50:9-13, 96: 4-22, 168:20-170:14, 174:13-175:9, 176:21-177:15, 180:3-181:20, 196:12-20].

A: You know, I guess the thing to know about our block of business is that every client is unique.  Every relationship that we have is unique.  The financial professionals that represent them are unique and so when you are dealing – when you have seen one retirement plan, you've seen one retirement plan.

Q: How are they all unique?

A: Let me describe that.  They're unique from the standpoint that – a good retirement plan has as its purpose helping participants save for retirement.  That's the whole purpose of a retirement plan.  So with that as a premise, you find unique characteristics around every plan based on the demographics of the participants, the location of their plans, the type of

15

business that they're in, the education level, the level of – whether they're Spanish speaking, English speaking.

It just starts from there and it just goes forward.  So every plan sponsor is unique; every financial professional is unique.

. . .

Q: Would the service agreement look the same from one plan to another even though they're, as you say, "unique"?

A: Not always do they look the same.

Q: No?

A: No.

Q: How would they look different?

A: Again, based on the specific services that are being provided to that plan sponsor.

February 8, 2007 deposition of Renee Schaaf [82:7-83:2, 83:14-22].

Q: What is the standard revenue-sharing fee?

A: Again, it depends on how the mutual fund is organized and how their expenses are handled within the fund.  I don't really think there is really a standard fee.

Q: You didn't just testify moments ago that there is a standard fee and it's no longer negotiated?

[objection omitted]

A: It's going to vary fund company to fund company.

Q: What is standard about it then?

A: It's not negotiated.  It's a set.

. . .

Q: Whose document do you start out with when you begin drafting a revenue-sharing payment – or a revenue sharing agreement: Is that a Principal document or is that a mutual fund company's document?

[objection omitted]

A: It could be either company.

Q: You do it both ways?

A: Yes.

October 12, 2007 deposition of Mark Stark, Director, Investment Services [163:23-164:12, 165:3-12].

Q: After that plan becomes a client of The Principal, does Principal ever send a statement to that plan that shows how much the plan is paying to Principal in fees on its investment options?

A: I don't know.

Q: Who would know that?

A: Well, you're talking about thousands of clients and there would be lots and lots of people who would be dealing with those clients and requests from those clients for how fees would be displayed.  There would be a lot of people who might have knowledge of that.
. . .
A: When we started accepting revenue-sharing from the outside funds, we applied those revenues as a direct offset against the nonproprietary asset fee.  So when we first started taking revenues, what we would do is we would calculate the

17

nonproprietary asset fee.   And then if a fund provided us revenue-sharing, we would reduce the nonproprietary asset fee by the amount of revenue-sharing we were getting from that outside fund.

Q: On a plan-by-plan basis?

A: Plan-by-plan.

. . .

Q: When Principal prepares a proposal for a plan sponsor, new plan, or a takeover of an existing plan, does Principal have a standard share class or unit value of funds that it will propose to that plan sponsor?

A: We don't have a standard.   We have guidelines based on plan characteristics.

Q: What are those guidelines?

A: The guidelines are based on plan characteristics, total assets, plan participants, and the guidelines would tell us to put together a possible list of investment options that the plan sponsor and their advisor can consider.   Typically that investment lineup would be designed to match up with the investments that are already in the plan that is being shopped.

Q: How long is the list that Principal prepares for the plan sponsor in the situation where you are taking over an existing plan or creating a new plan?

A: It depends entirely on the plan's current investments and any directions we have from the adviser or the plan sponsor about changes they want to their lineup.

Q: How long is the list the Principal prepares for the plan sponsor in the situation where you are taking over an existing plan or creating a new plan?

A: It depends entirely on the plan's current investments and any direction we have from the advisor or the plan sponsor about changes they want to make to their lineup.

Q: Is the list less than 1400 mutual funds and all of the foundation option investments?

A: The list would be – yes, the list would be designed to match up with the desires of the plan sponsor and the adviser and that would never be 1300 funds.

Q: Can you give me an estimate of how many funds you would give to a plan sponsor?

A: I can't because everyone is different.

Q: I understand that everyone is different.  But ballpark. We're not going to hold you to it if there's one that is 50 more than another.

A: It would be typical for an employer to use between ten and 15 investment options in their plan.

. . .

[On examination by Principal's counsel]

Q: Mr. Bowman, do you recall being asked questions from Mr. Bruno about underwriting guidelines?

A: Yes.

Q: Are those guidelines or rules?

A: They're guidelines.

Q: To what extent are those guidelines applied by human beings with any flexibility?

> A: They're applied with a fair amount of flexibility based on the facts and circumstances of the plan they are working on.
>
> . . .

[On examination by Ruppert's counsel]

> Q: Who prepares the list of funds for the advisers to show the plan sponsors?
>
> A: The list of funds shown in a proposal are prepared by – well, it varies.  In some cases it could be developed by the adviser themselves without any further work on the part of Principal.  In situations where sales engineering is involved, we might provide that list of funds in response to the information that we get from the adviser and from the plan sponsor.

November 8, 2007 deposition of Christopher Bowman, Vice President, Retirement and Investor Services [115:11-22, 152: 6-17, 215:25-217:13].

> Q: So would it be fair to say in the – given the legislative and regulatory environment that you just described, that most or all of your 386 customers in your market segment rely in some way on Principal's prototype plan document?
>
> [objection omitted]
>
> A: No.
>
> Q: Why?
>
> A: Because they still might have an attorney outside that they would look to.  It doesn't automatically mean they would look to Principal simply because we are their recordkeeping provider.  We offer that service, but not everyone looks to us in the larger market.
>
> . . .

Q: Do you know how many rely on Principal's prototype plan documents of your 386 customers in your market segment?

A: As I stated earlier, no, I do not.

Q: How would you track that if we wanted to find out?

A: I would literally have to ask some of my staff to literally go through all 386 to count them.

. . .

[On examination by Principal's counsel]

Q: Do I understand correctly that from time to time The Principal provides a report of some kind to plan sponsors about the performance of the mutual funds that they have offered to plan participants?

A: Yes.

Q: Does The Principal do that on some sort of regular basis?

A: Yes.

Q: Is that regularity the same for all clients in your market segment or does it vary from client to client?

A: It varies from client to client.  It depends on their retirement committee, depends on when they meet, depends on when an intermediary might be involved, when they're interested in having it, it literally depends per client.

. . .

Q:  Is this communication only in writing?

A: It's a combination of the two. While there is factual information in the report, the verbal discussion that goes on around it is what is of value.

Q: If we looked at two different clients in your market segment and took the package of written information that you have just been discussing for each of them, are they going to be exactly the same or would there be some differences between the two?

A: There would be a lot of differences between the two.

Q: Can you tell me what types of differences there are?

A: Well, every plan is different, so while the investment pieces that we have talked quite a bit about today, the investment – if there was a common investment fund in between each one, that is factual information that would be consistent. Around that is the uniqueness of the plan, whether it allows for loan provisions, hardship, what is the contribution formula, what is the matching formula. All of those things are different.

      Any one client, their objectives may be that they want to increase participation. Another one might be that they wan to increase deferrals, they might want to have a plant in Ohio contribute more. So we would focus that type of report around those objectives for each client.

. . .

Q: Let me ask you a couple questions about educational programs. In your market segment are the educational programs that you offer identical for all clients or does it vary from client to client?

A: It varies for every client.

Q: Can you explain that a little bit?

A: Again, because of our client base being a variety of different geographical locations, different sizes, they have their own different locations and such, they have different objectives of what they are trying to do with the plan, we have to customize to some degree the communication to each client to meet their objectives.

. . .

Q: You mentioned the fact that the service agreement is similar from client to client, the agreement itself, right?

A: Correct.

Q: Are the services themselves that The Principal provides to the clients in your market segment the same across the board?

A: No.

Q: How do they differ?

A: Well, every client – first of all, the plan has a lot of changes in it.  Some offer loans, some of them don't.  Some do hardship withdrawals, some don't.  Some have different participation matches – I mean, contribution matches, et cetera, per group, so we have to adjust our services for every client.

October 10, 2007 deposition of Paul Brown, Vice President and Managing Director of the Institutional Market Segment within Retirement and Investor Services [72:21-73:23, 112:7-114:18, 119:11-24, 120:23-121:13].

Assuming, without deciding that Ruppert has standing to represent the class he proposes[3], Ruppert has failed to demonstrate both commonality and typicality.  Ruppert's

---

[3]See Ruppert v. Principal Life Ins. Co., 2007 WL 2025233 *4 ("[W]hile Ruppert is a
(continued...)

argument that Principal's use of templates as part of its business model is insufficient, from an evidentiary standpoint, especially in light of Principal's uncontroverted testimony that the templates it does utilize are varied and customized on a plan-by-plan basis.  See Chorosevic, 2007 WL 2159475 *8 ("[I]n order for there to be commonality and typicality with persons in other plans, plaintiffs must show that the relevant language controlling the coordination of secondary benefits in the MetLife Choices Plan is similar, if not identical, to language in other plans, which they have not done.").  Likewise, the evidence provided in this case demonstrates that the mutual funds offered to plan sponsors varies from plan to plan, depending on the involvement of the independent financial advisor and the size, needs, sophistication, etc. of the end client.  Moreover, the delivery and use of Principal's marketing materials varies from plan to plan as Principal utilizes no pre-packaged educational materials, and the amount of the revenue sharing fee varies depending on the fund company.  Principal's fiduciary status, to the extent it exists, "entails a functional, and thus subjective, analysis" and would have to be determined on a plan-by-plan basis, as would any breach of that status.  In re Express Scripts, Inc. PBM Litigation, 2008 WL 2952787 *18 (E.D. Mo. July 30, 2008).  See also Chrorsevic v. MetLife Choices, 2007 WL 2159475 *8-9 (E.D. Mo. 2007) (denying plaintiff's motion for class certification where proposed class included persons who are members in thousands of differing plans).  "[T]here is nothing to suggest that fiduciary status would be the same for all claims administrators of the multitude of plans that fall within the proposed class definition."  Id.

---

[3](...continued)
fiduciary of the Plan with standing to sue on behalf of the Plan, he does not have standing to sue on behalf of plans of which he is not a fiduciary.") (citations omitted); Hastings v. Wilson, 516 F.3d 1055, 1061 (8th Cir. 2008) (noting that the United States Court of Appeals for the Eighth Circuit has not adopted the rule that an individual in one ERISA benefits plan can represent a class of participants in numerous plans other than his own by virtue of having brought a class action under Rule 23 if "the gravamen of the plaintiff's challenge is to the general practices which affect all of the plans") (quoting Fallick v. Nationwide Mut. Ins. Co., 162 F.3d 410, 422 (6th Cir. 2008)).

> In addressing fiduciary status, this class will not give rise to common questions of law and fact. To address the fiduciary duty owed to each plan, the Court must conduct an individualized review of each contract and interpret, as a matter of law, the parties *entire* agreement. The subject contracts are representative of the distinct parties involved; each a product of the plan's sophistication, knowledge, understandings, prior dealings, and desired compensation schemes. In that way, the language adopted to formalize the parties' agreement is often distinct, undefined, or absent; and the foregoing considerations (which is no way constitutes an exhaustive list) may not be applicable or commonly addressed by a cursory and/or objective review.

See In re Express Scripts, Inc., 2007 WL 2952787 *22-23.

The proposed class involves 24,000 plus plans. Such individualized and fact-specific inquires into Principal's alleged fiduciary status and breach thereof would be unduly burdensome and the litigation unmanageable. The class, as proposed by Ruppert does not give rise to common questions of fact and law. Ruppert's motion for class certification is denied.

Upon the foregoing,

**IT IS ORDERED** that plaintiff's motion for class certification [dkt. 113] is denied.

**DATED** this 27th day of August, 2008.

JOHN A. JARVEY
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF IOWA