IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| JOSEPH RUPPERT, as trustee of and on behalf of FAIRMOUNT PARK, INC. RETIREMENT SAVINGS PLAN, and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>vs.<br><br>PRINCIPAL LIFE INSURANCE CO.,<br><br>        Defendant. | No. 4:07-cv-00344-JAJ-TJS<br><br><br><br><br><br><br>**ORDER** |

        This matter comes before the Court pursuant to Defendant Principal Life Insurance Co.'s ("Principal") March 30, 2009 Motion for Judgment on the Pleadings. [Dkt. No. 156.] Plaintiff Joseph Ruppert ( "Ruppert"), as trustee by and on behalf of Fairmount Park, Inc. Retirement Savings Plan, resisted Principal's motion on April 16, 2009. [Dkt. No. 159.] Principal filed a reply brief on April 23, 2009. [Dkt. No. 161.] Oral argument on Principal's motion was held on June 24, 2009. [Dkt. No. 179.]


### I. Federal Rule of Civil Procedure 12(c)

        Principal brings its motion for judgment on the pleadings pursuant to FED. R. CIV. P. 12(c). Rule 12(c) states, "After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." In deciding a motion for judgment on the pleadings, the court must "accept as true all facts pleaded by the non-moving party and grant all reasonable inferences from the pleadings in favor of the non-moving party." Faibisch v. Univ. of Minn., 394 F.3d 797, 803 (8th Cir. 2002) (quoting United States v. Any & All Radio Station Transmission Equip., 207 F.3d 458, 462 (8th Cir. 2000)). Judgment on the pleadings is appropriate when there are no remaining material issues of fact and the movant is entitled to judgment as matter of law. Id. In

considering a motion for judgment on the pleadings, the court must ignore matters outside the pleadings,[1] but may consider matters in the public record and "materials that are necessarily embraced by the pleadings." Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir. 1999). See also Noble Sys. Corp. v. Alorica Central, L.L.C., 543 F.3d 978, 982 (8th Cir. 2008) (noting that while a district generally may not consider materials outside the pleadings in ruling on a motion to dismiss under Rule 12(c), it may "consider some public records, materials that do not contradict the complaint, or materials that are "necessarily embraced by the pleadings." (quoting Porous, 186 F.3d at 107)).

In the present case, the parties attached several relevant documents to their pleadings: Hecker v. Deere, 556 F.3d 575 (7th Cir. 2009); the Secretary of Labor's *amicus curiae* brief in Hecker; and the Principal Financial Group Service and Expense Agreement with Fairmount Park, Inc.   Ruppert attached the Service and Expense Agreement in his Response to the Motion for Judgment on the Pleadings [Dkt. No. 159, Exh. 1] and both parties extensively discussed the precedential impact of Hecker and the Secretary's *amicus curiae* position in their pleadings. [Dkt. Nos. 156, 157, & 159.] The Court thus finds that all attached documents comply with the exception to Rule 12(d)'s general instruction to only include matters within the pleadings, and will not convert the

---

[1] However, where a court considers materials outside the pleadings, then the court should properly treat the motion for judgment on the pleadings as one for summary judgment. Surgical Synergies, Inc. v. Genesee Assoc., Inc., 432 F.3d 870, 873 (8th Cir. 2005).  Rule 12(d) states that, "[i]f, on a motion [for judgment on the pleadings], matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." FED. R. CIV. P. 12(d).  Summary judgment would then be appropriate if there were no genuine issues of material fact remaining and the movant was entitled to judgment as a matter of law.  Forest Park II v. Hadley, 408 F.3d 1052, 1057 (8th Cir. 2005).  "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

motion for judgment on the pleadings into a motion for summary judgment.

## II Plaintiff's Complaint

Ruppert's First Amended Complaint [Dkt. No. 128], the factual claims of which must be accepted as true, alleges in pertinent part, as follows:

### PARTIES

1. Plaintiff Joseph Ruppert is a trustee of the Fairmount Park, Inc. Retirements Savings Plan.  Ruppert brings this action in his capacity as trustee of and on behalf of the Fairmount Plan.

2.   Defendant Principal Life Insurance Co. is an Iowa corporation with its principal place of business in Des Moines, Iowa.  Defendant advertises its services, solicits retirement plan business and serves as a full service retirement plan service provider for retirement plans located throughout the country.

### GENERAL ALLEGATIONS COMMON TO ALL COUNTS

5.  Principal offers "full service" 401(k) retirement plans to employers who wish to provide retirement plans for their employers.

6.   Principal's employer-sponsored 401(k) retirement plans enable employees to invest pretax earnings in mutual funds.

7.  Principal selects from among the thousands of mutual funds available and offers those select mutual funds as part of its pre-packaged 401(k) retirement plans.

8.  When deciding which mutual funds an employer wishes to be included in its 401(k) plan, the employer selects from among those pre-selected by Principal.  An employer may only choose from among those mutual funds Principal has selected for inclusion in its pre-packaged 401(k) plans.  When deciding in which mutual funds to invest their retirement savings, employees then choose from among the group of mutual funds jointly selected by Principal and their employer.

9.   After an employer selects the mutual funds which it will offer to its employees, Principal retains the authority to substitute other mutual funds for the chosen mutual funds.

10.   After an employer selects the mutual funds which it will offer to its employees, Principal also retains the authority to refuse an employer's or employee's choice of a particular mutual fund by closing the fund to new investments.

11.   As a full service plan provider, Principal provides all the services necessary for employers to provide retirement plans for their employees.

12.   As a full service plan provider, Principal provides complete plan management services so that employers can "spend time managing [their] business, not [their] plans."

13.   Principal provides to employers promotional materials for promoting an employer's plan to its employees, materials and services to help employers meet education, plan and participation requirements (including an employee enrollment kit and educational materials), and ongoing support to communicate with employees.  As part of its ongoing support services, Principal provides an Internet homepage which gives plan participants access to their investment portfolio and more than 80 planning calculators, reports which advise plan participants about the status of their retirement savings and their investment performance, and asset allocation assistance.

14.   Principal also provides employers with complete plan administration services, legal compliance services and consulting services.  Those services include daily updates of plan pre-printed employee newsletters and signature-ready government forms.

15.   As part of its marketing pre-packaged plans, Principal touts to employers its "investment strategy . . . backed by over a century of financial expertise."

4

16.  Principal also touts its "investment philosophy, goals and strategies" to employers, and represents that its "investment strategies are designed to produce superior long-term results."

17.   Thus, Principal holds itself out to employers and employees as a highly-skilled financial expert, possessing special knowledge and expertise.

18.  Principal provides investment advice to employers and participating employees, including the implicit advice that the mutual funds Principal offers are sound retirement plan investments.

19.  Principal also provides more individualized investment advice to employees through Principal's "Investor Profile Quiz."  The quiz, available on Principal's Internet site and employee enrollment kids, helps employees determine their risk tolerance on a scale of 1 to 5.

20.   Principal represents to employers that it charges "competitive fees" and "low fees mean greater opportunity for returns;" "paying less in fees may be one way for your plan members to save more for retirement."

### *Principal's Selection of Mutual Funds*

21.  Investment advisors to mutual funds charge the funds they advise fees for the advisors' investment management services.

22.  As a condition for the fund to be included in Principal's pre-packaged 401(k) plans, Principal negotiates and requires each mutual fund advisor (or the fund's distributor) to pay a kickback to Principal, which Principal euphemistically describes as a "revenue sharing" fee.

23.  Principal selects for inclusion in its pre-packaged 401 (k) plans only those mutual funds whose advisors (or distributors) agree to make the kickback payment.

24.  The "revenue sharing" kickbacks are a percentage of any given retirement plan's assets invested in any given mutual fund or mutual fund family.

25.  When the mutual fund advisors (or distributors) agree to pay the "revenue sharing" kickbacks to Principal, they effectively agree to take a reduced fee, although the full amount of the fee is still charged to the mutual fun (and thus its shareholders).  However, the charge includes a "revenue sharing" component which represents the kickback payment to Principal.

26.  Principal exercises exclusive control and discretion over the negotiation of such investment management fees.

27.  Principal also exercises exclusive control and discretion over the selection of mutual funds available as investment options to plans and their participants.

28.  Principal also has the exclusive control and discretion to substitute or close mutual funds as investment options for a plan and its participants.

### Principal in an ERISA Fiduciary with Respect to Mutual Fund Investment Management Fees Charged to Plan Participants

29.  By providing complete plan management services so that employers can "spend time managing [their] business, not [their] plans," Principal assumes some of the responsibilities imposed upon employers as plan sponsors.

30.  A special relationship of confidence, trust, or superior knowledge or control existed both between Principal and employers who retained Principal for its pre-packaged 401(k) plans and between Principal and employees participating in a Principal 401(k) plan as a result of the following:

6

a.  Principal's holding itself out to employers and employees as highly-skilled financial experts, possessing special knowledge and expertise;

b.  Principal's encouragement of employers and participating employees to place their utmost trust and confidence in Principal's management of their 401 (k) plans;

c.  Principal's encouragement of employers and participating employees to place their utmost trust and confidence (with their retirement savings) in Principal's financial expertise and advice;

d.  Principal's assumption of a position of trust and confidence, with respect to both employers and employees, by servicing and managing employer-sponsored 401(k) plans;

e.  Principal's assumption of the responsibility to provide unbiased expertise and 401(k) plan management to employers and employees;

f.  Principal's assumption of the responsibility to provide unbiased, expert advice to employers and employees to the extent Principal provided investment advice to employers and employees, and/or

g.  Principal's assumption of the responsibility to employers and employees to negotiate favorable investment management fees with mutual funds and their advisors arising from Principal's exclusive control over the selection of mutual funds to be included and available in its 401(k) and from Principal's exclusive control over the negotiations of investment management fees with

7

mutual funds and their advisors.

31.   Principal regularly rendered advice to plans such as the Fairmount Park plan as follows:

> a.   through Principal's representation of its pre-selected mutual funds to be appropriate investments for the plan and its participants;

> b.   through Principal's unilateral control over which mutual funds would continue to be available to 401(k) plans;

> c.   through Principal's "Investor Profile Quiz" which it used to help employees determine their investment tolerance and matching specific mutual funds to the employees' tolerance; and/or

> d.   through Principal's recommendations regarding which of its pre-selected mutual funds should be included in a plan based on Principal's analysis of a plan's previous investments.

32.   Principal's services served as the primary basis for investment decisions by both the plans and their participating employees.

33.   Principal services included the rendering of individualized investment advice to plans or their participants based on the particular needs of the plans or participants regarding such matters as investment policies or strategies, overall portfolio composition and diversification of plan investments.

34.   Principal was therefore a fiduciary to plans such as the Fairmount Park Plan within the meaning of ERISA § 3(21)A) (29 U.S.C. § 1002(21)(a)).

35.   Accordingly, Principal owed certain fiduciary duties to plans such as the Fairmount Park Plan and their plan

8

participants under ERISA § 404(a)(1)(A) and (B) (29 U.S.C. § 1104(a)(1)(A) and (B)).

36.  Among the fiduciary duties Principal voluntarily assumed and owed to plans such as the Fairmount Park Plan and their participants, was a duty to negotiate mutual funds' (or their advisors') investment management fees so as to defray those expenses of administering the plans.

## COUNT I - BREACH OF FIDUCIARY DUTY

48.  Principal does not disclose, or does not adequately disclose, to the plans such as the Fairmount Park Plan, to employers, or to participating employees the fact that Principal negotiates revenue sharing fees with the mutual funds that are included in its pre-packaged 401(k) plans.

49.  Principal does not disclose, or does not adequately disclose, to the plans such as the Fairmount Park Plan, to employers, or to participating employees the fact that Principal accepts revenue sharing fees from the mutual funds that are included in its pre-packaged 401(k) plans.

50.  Principal does not disclose, or does not adequately disclose, to the plans such as the Fairmount Park Plan, to employers, or to participating employees the amount of the revenue sharing fees Principal negotiates with and receives from the mutual funds that are included in its pre-packaged 401(k) plans.

51.  Instead of passing along the "revenue sharing" kickbacks (or the lower investment management fees) to plans such as the Fairmount Park Plan and their plan participants, Principal keeps "revenue sharing" kickbacks from mutual funds.

52.  The "revenue sharing" kickbacks Principal takes bear no relationship to Principal's costs of providing services to plans or participants and are in addition to the fees Principal charges

9

for those services.

53.   The plans such as the Fairmount Park Plan and their participants receive no extra services from Principal in addition to the services for which the plan already pays in exchange for the revenue sharing payments Principal receives from the mutual funds.

54.   The "revenue sharing" kickbacks are thus windfalls to Principal which serve only to increase Principal's income at the expense of the plans such as the Fairmount Park Plan and ultimately at the expense of the participating employees.

55.   Principal breached the fiduciary duties it owed (by virtue of ERISA § 404(a)(1)(A) (29 U.S.C. § 1104(a)(1)(A)) to the plans such as the Fairmount Park Plan and its participants in one or more of the following ways:

> a.  failing to disclose (or to disclose adequately) to the plans such as the Fairmount Park Plan, to employers, or to participating employees the fact that Principal negotiates revenue sharing fees with the mutual funds (or their advisors) that are included in its pre-packaged 401(k) plans;

> b.  failing to disclose (or to disclose adequately) to the plans such as the Fairmount Park Plan, to employers, or to participating employees the fact that Principal accepts revenue sharing fees from the mutual funds (or their advisors) that are included in its pre-packaged 401(k) plans;

> c.  failing to disclose (or disclose adequately) to the plans such as the Fairmount Park Plan, to employers, or to participating employees the amount of the revenue sharing fees Principal negotiates with and receives from the mutual funds (or their advisors) that are included in its pre-packaged 401(k) plans;

10

    d.   keeping revenue sharing kickbacks from mutual funds (or their advisors) for Principal's own benefit;

    e.  failing to use the revenue sharing kickbacks to defray the reasonable expenses of administering the plan; and/or

    f. failing to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

## COUNT II - PROHIBITED TRANSACTIONS

59.  Because of the large number of 401(k) plans Principal serves, Principal effectively represents an extremely large sum of plan assets when it negotiates "revenue sharing" kickbacks which mutual funds and their advisors are eager to tap into. Thus, Principal's ability to extract revenue sharing deals with mutual funds (or their advisors) is a direct result of Principal's representation of such massive amounts of employer-sponsored 401(k) plan assets.

60.  ERISA § 406(b)(1) (29 U.S.C. § 1106(b)(1)) prohibits fiduciaries from "deal[ing] with the assets of the plan in his own interest or for his own account."

61.  ERISA § 406(b)(3) (29 U.S.C. § 1106(b)(3)) prohibits fiduciaries from "receiv[ing] any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

62.  Principal Defendant violated ERISA §§ 406(b)(1) and 406(b)(3) (29 U.S.C. § 1106(b)(1) & (3)) in one or more of the following ways:

a.  using plan assets to generate revenue sharing
kickbacks for Principal's own interest and for its
own account; and/or

b.  keeping revenue sharing kickbacks from the
mutual funds (or their advisors) that are included
in Principal's pre-packaged 401(k) plans for
Principal's own interest and for its own account.

### III. The Parties' Arguments

Principal argues that Ruppert's claims relating to revenue sharing payments[2] from affiliate and non-affiliate mutual fund companies (Counts I and II) are no longer viable after the recent decision of the United States Court of Appeals for the Seventh Circuit, Hecker v. Deere & Co., 556 F.3d 575 (7th Cir. 2009). According to Principal, Hecker, which is the only appellate court decision to address the viability of claims involving revenue sharing, makes clear that all of Ruppert's revenue sharing claims lack legal merit, and there is no principled basis for distinguishing the instant allegations from those in Hecker. As Principal interprets Hecker, the United States Court of Appeals for the Seventh Circuit ruled that (a) there is no duty to disclose intra-corporate revenue sharing, and (b) the payments used to make such payments are not plan assets.

Principal further argues that the Court should not distinguish the Hecker holding for the non-affiliate payments in the present case, because the outcome of revenue sharing is the same regardless of whether a third party or affiliate paid Principal. Principal states that the publication of the total fee is sufficient disclosure according to the Employee Retirement Income Security Act ("ERISA"). Principal points to an *amicus* brief in Hecker

---

[2]"Revenue sharing is a general term that refers to the practice by which mutual funds collect fees from mutual fund assets and distribute them to service providers, such as recordkeeper and trustees–services that the mutual funds would otherwise provide themselves." Tibble v. Edison Int'l, 2009 WL 2382340, at *2 (C.D. Cal. July 16, 2009).

from the Department of Labor ("DOL"), which said that the DOL was "skeptical" that revenue sharing requires disclosure. Principal also asserts that if the court interpreted the revenue sharing payments as coming from "plan assets," then such an interpretation would unduly enlarge the classification of plan assets, contrary to the clear statutory language of ERISA § 401(b)(1).

Ruppert resists Principal's motion, arguing that Principal is not entitled to judgment on the pleadings based on Principal's inability to establish that it is not a fiduciary as a matter of law. Instead of applying the conclusions of Hecker to the facts in the present case, Ruppert asserts that Haddock v. Nationwide Fin. Serv., Inc., 419 F.Supp.2d 156 (D. Conn. 2006) is the standard the Court should follow. Haddock held that revenue sharing payments did constitute "plan assets" under a functional approach, and thus, the revenue sharing payments were prohibited transactions.

Ruppert further distinguishes Hecker from the present case and contends that Hecker does not broadly hold that a retirement plan provider never has a duty to disclose revenue sharing payments. Instead, Ruppert argues that Hecker only disposed of plaintiff's claims against the plan provider on the basis that plaintiffs failed to allege facts that, if true, would make the plan provider an ERISA fiduciary. According to Ruppert, Hecker holds only that an employer has no duty to disclose a plan provider's revenue sharing fees to its employees, and does not address whether a service provider who is a fiduciary has a duty to disclose revenue sharing to other fiduciaries, such as sponsors or trustees. Ruppert claims that Hecker provides no guidance as to whether fiduciaries have a responsibility to disclose revenue sharing arrangements with other fiduciaries. Ruppert asserts that disclosure of the total expense fee is insufficient because revenue sharing is critical to the investment decision of the plan sponsor.

Additionally, while Ruppert concedes that revenue sharing payments may not constitute "plan assets" for purposes of making a recipient a fiduciary, Ruppert argues that

13

such payments *are* plan assets when they are received by a fiduciary.  This interpretation follows the functional approach espoused by <u>Haddock</u>, in that monies that are not plan assets *become* plan assets when a fiduciary receives them.  Finally, Ruppert argues that a "prohibited transaction" under ERISA § 406(b)(3) need only "involve" assets of the plan, so that the consideration the fiduciary receives in the transaction need not itself constitute plan assets.

## IV. Analysis

### A. Count I - Breach of Fiduciary Duty

ERISA requires that employee benefit plans be in written form and provide a Summary Plan Description ("SPD") to disclose information in an understandable format to plan beneficiaries.  <u>Barker v. Ceridian Corp.</u>, 122 F.3d 628, 633 (8th Cir. 1997).  One of the main purposes of ERISA is to provide adequate disclosure to plan beneficiaries. <u>Marolt v. Alliant Techsystems, Inc.</u>, 146 F.3d 617, 621 (8th Cir. 1998) (quoting <u>Barker</u>, 122 F.3d at 633).  While fiduciaries may not materially mislead those to whom fiduciary duties are owed, fiduciaries are also under a duty to communicate or disclose material facts to plan beneficiaries.  <u>Howe v. Varity Corp.</u>, 36 F.3d 746, 754 (8th Cir. 1994) (citations omitted), <u>aff'd</u>, <u>Varity Corp. v. Howe</u>, 516 U.S. 489 (1996) (holding that, "[i]n misleading respondents, Varity violated the fiduciary obligations that ERISA § 404 imposes upon plan administrators).  Fiduciaries are subject to and must comply with the common law of trusts, specifically, the duty of loyalty.  <u>Varity Corp.</u>, 516 U.S. at 506. The duty of loyalty requires an ERISA fiduciary to communicate any material facts which could adversely affect a plan member's interests.  <u>Shea v. Esensten</u>, 107 F.3d 625, 628 (8th Cir. 1997).  Information is "material if there is a substantial likelihood that it would mislead a reasonable employee in the process of making an adequately informed decision regarding benefits to which she might be entitled." <u>Braden v. Wal-Mart Stores, </u>Inc., 590

F. Supp. 2d 1159, 1167 (W.D. Mo. 2008) (internal citation omitted).  See also Howe, 36 F.3d at 754 (fiduciaries have an obligation to disclose circumstances that may "threaten interests relevant to the relationship.");  Bowerman v. Wal-Mart Stores, Inc., 226 F.3d 574, 590 (7th Cir. 2000) ("we have made clear that fiduciaries must communicate material facts affecting the interests of plan participants or beneficiaries and that this duty to communicate exists when a participant or beneficiary 'asks fiduciaries for information, and even when he or she does not") (quoting Anweiler v. Am. Elec. Power Serv. Corp., 3 F.3d 986, 991 (7th Cir. 1993)).  There is also a corresponding duty to "speak out if [the fiduciary] knows that silence might be harmful."  Shea, 107 F.3d at 629 (internal quotations omitted).

To establish a breach of fiduciary duty claim under ERISA, a plaintiff must show both a breach of a fiduciary duty and a "prima facie case of loss to the plan."  Eckelkamp v. Beste, 315 F.3d 863, 867 (8th Cir. 2002) (citations omitted).  Plaintiffs must also establish that the defendants are ERISA fiduciaries.  Ince v. Aetna Health Mgmt., 173 F.3d 672, 674 (8th Cir. 1999).  Once these elements are satisfied, the burden of persuasion shifts to the fiduciary to demonstrate that the loss was not caused by the breach. Eckelkamp, 315 F.3d at 867.  For purposes of this motion only, Principal has not denied its ERISA fiduciary status as to Counts I and II.

The crux of Ruppert's breach of fiduciary claim is that Principal did not disclose, or did not adequately disclose to the plans (such as the Fairmount Park Plan), to employers, or to participating employees, the fact that Principal negotiates or accepts revenue sharing fees with the mutual funds that are included in its pre-packaged 401(k) plans, nor the amount of the revenue sharing fees Principal received.  Ruppert does not allege that Principal made any intentionally misleading statements.  Thus, the only issue is whether Principal's alleged failure to disclose revenue sharing can represent a material omission.

1. ERISA Statutory Language

The Court first looks to the statutory language of ERISA § 401, *et seq.* (29 U.S.C. § 1101, *et seq.*) to determine whether revenue sharing is a material breach of fiduciary duty. Securities considered to be in plan assets include the "assets of such plan . . . but shall not, solely by reason of such investment, be deemed to include any assets of such investment company [registered under the Investment Company Act of 1940]." § 1101(b)(1). In relation to the plan assets, a fiduciary must execute his duties "solely in the interest of the participants and beneficiaries" in order to "provid[e] benefits" to such participants and to "defray[] reasonable" plan administration expenses. § 1104(a)(1)(A)(i)-(ii). It is a breach of fiduciary duties when the fiduciary does not act with the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims[.]"   § 1104(a)(1)(B). Fiduciaries thus have an obligation to always act in the best interests of the plan, and that includes determining whether expenses unreasonably detract from investment returns and overall portfolio performance.

At the same time, a fiduciary must also provide accurate and relevant information to plan participants and beneficiaries. According to the rules interpreting the statutory language of ERISA, a beneficiary or participant has sufficient information and opportunity to exercise control over his account when there is,

> [a] description of any transaction fees and expenses which affect the participant's or beneficiary's account balance in connection with purchases or sales of interests in investment alternatives (e.g., commissions, sales load, deferred sales charges, redemption or exchange fees) . . . [and] [a] description of the annual operating expenses of each designated investment alternative (e.g., investment management fees, administrative fees, transaction costs) which reduce the rate of return to participants and beneficiaries, and the *aggregate*

16

> amount of such expenses expressed as a percentage of average
> net assets of the designated investment alternative[.]

29 C.F.R. §§ 2550.404c-1(b)(2)(i)(B)(1)(v) and (B)(2)(i) (emphasis added). Both transaction and annual operating fees and expenses are relevant factors in a plan participant's investment decision. Additionally, if the fiduciary "conceal[s] material non-public facts", then a court should look to the "facts and circumstances of the particular case" to ascertain whether the fiduciary usurped the plan participant's independent control in the transaction. § 2550.404c-1(c)(2)(ii). Fiduciaries therefore must make full disclosure of any material information, inform the plan participants and beneficiaries of the aggregate amount of fees,[3] and also provide an associated breakdown of the cost allocation of some relevant assessed fees.

ERISA does not explicitly address the practice of revenue sharing. ERISA offers no guidance on whether revenue sharing should be disclosed because revenue sharing is not enumerated as either a transaction or annual operating fee requiring disclosure. §§ 2550.404c-1(b)(2)(i)(B)(1)(v) and (B)(2)(i). A proposed rule from the Department of Labor, revising Schedule C (Service Provider Information) of the Form 5500, see supra n.3, suggests more information disclosure should be available for plan fees and expenses. Proposed Rules, Department of Labor, Employee Benefits Security Administration, 71 Fed. Reg. 41,392, 41,294 (July 21, 2006). Specifically, the Department of Labor has advised that the Schedule C accompanying instructions should "clarify the requirements

---

[3] The fiduciary must disclose the total fees and commissions paid by the plan in the Annual Return/Report of Employee Benefit Plan. Department of Labor, Employee Benefits Security Administration, Annual Return/Report of Employee Benefit Plan, Form 5500, Sch. C (2008). Plans should report any person receiving $5000 or more in compensation, directly or indirectly. Department of Labor, Employee Benefits Security Administration, 2008 Instructions for Form 5500, at 23. The Instructions state that "[i]ndirect compensation includes, among other things, payment of "finder's fees" or other fees and commissions by a service provider to an independent agent or employee for a transaction or service involving the plan." Id.

regarding reporting of direct and indirect compensation (i.e., money or anything else of value) received during the year in connection with services rendered to the plan or the person's position with the plan." Id. at 41,293.

As it presently stands, the statutory language of ERISA and accompanying rules are silent on whether revenue sharing fees are a material fee the fiduciary must disclose to plan participants and beneficiaries.


2. Applicable Revenue Sharing Case Law

When faced with this issue of revenue sharing, the United States Court of Appeals for the Seventh Circuit held that, because the complaint did not allege any misrepresentation or fraudulent statements regarding the overall expense of the mutual fund fees, the investment advisor was not required to disclose how it decided to allocate the monies it collected. Hecker, 556 F.3d at 585. In Hecker, Deere & Company ("Deere") engaged Fidelity Management Trust Company ("Fidelity Trust") to serve as trustee of one of the two 401(k) plans ("the Plans") that Deere offered to its employees. Id. at 578. Fidelity Management & Research Company ("Fidelity Research") was the investment advisor for the mutual funds offered as investment options under Deere's plans. Id. The Plans each offered a broad range of investment choices, including the following: twenty-three different Fidelity mutual funds, a fund with Deere stock, two Fidelity Trust-managed investment funds, and access to BrokerageLink, a Fidelity-operated facility providing access to 2500 additional funds managed by other companies. Id. at 578. Each fund had a fee or expense ratio ranging from .07% to 1%. Id. at 581. Fidelity Research advised the Plan's Fidelity mutual funds, but each plan participant individually decided where to invest his 401(k) money, subject to the limitation that the investment be included within the Plan's available investment options. Id. at 578.

The named plaintiffs asserted that Fidelity Research improperly shared its revenue

it collected (from advising twenty-three out of the twenty-six available funds) with Fidelity Trust, its affiliate.   Id.   Thus, the plaintiffs alleged that Fidelity Trust received compensation through the shared fees, "rather than through a direct charge to Deere for its services as trustee," resulting in an "impermissible lack of transparency in the fee structure, because the mutual fund fees were devoted" to the cost of managing the funds and also to administering Deere's 401(k) plans.   Id.

Fidelity Research, Fidelity Trust, and Deere ("Defendants") argued that revenue sharing did not require disclosure and that they were nevertheless protected by the ERISA § 404(c), 29 U.S.C. § 1104(c), "safe harbor" affirmative defense that was available to them.[4]   Alternatively, the Defendants suggested that the safe harbor affirmative defense would apply in the event that the court found there was a fiduciary duty to inform participants of the actual expenses incurred.

However, the Hecker court found that Fidelity Trust or Fidelity Research were not fiduciaries or "functional fiduciaries," thereby eliminating the need for the § 404(c) protection.   Hecker, 556 F.3d at 584-85.   The court was unconvinced by the plaintiffs' arguments that revenue sharing violated an ERISA statute or regulation.   As the court stated bluntly, the allegation wholly "depends on the proposition that there is something wrong, for ERISA purposes, [with revenue sharing]."   Id. at 585.   The court understood that the plaintiffs could feel "misled" with the characterization of the actual administrative costs of the plans, but nevertheless rejected the plaintiffs' allegations that revenue sharing

---

[4]According to § 404(c), plan managers are exempt from fiduciary duty liability only when a participant or beneficiary directly "exercise[s] control over the assets in his account."  Id. at 587 (quoting 29 U.S.C. §  404(c)(1)(A)).  Providing certain conditions are met, then "no person who is otherwise a fiduciary shall be liable . . . for any loss . . . which results from such participant's or beneficiary's exercise of control . . . ."  § 404(c)(1)(A)(ii).  To apply the § 404(c) safe harbor, the participant must have independent control over investment choices in his account, § 404(c)(1)(A), and there must be a broad range of investment opportunities available, 29 C.F.R. § 2550.404c-1(b)(1)(ii).

was an ERISA violation.  Id.  The court's decision mirrored the position taken in the Secretary of Labor's *amicus curiae* brief, in which the Secretary stated that she was "skeptical" with "plaintiffs' more sweeping suggestions that the fiduciaries of participant-directed plans must always, or even usually, disclose revenue sharing arrangements as a matter of general fiduciary duty."  Brief for the Secretary of Labor, Elaine L. Chao at 20, as Amicus Curiae Supporting Plaintiffs-Appellants, Hecker v. Deere & Co., 556 F.3d 575 (7th Cir. 2009) (No. 07-3605, 08-1224).

In determining that ERISA already extensively described and enumerated the required disclosure of fees and expenses, id. at 589, the court further noted:

> [t]he only question is thus whether the omission of information about the revenue sharing arrangement is material.  Deere disclosed to the participants the total fees for the funds and directed the participants to the fund prospectuses for information about the fund-level expenses.  This was enough. The total fee, not the internal, post-collection distribution of the fee, is the critical figure for someone interested in the cost of including a certain investment in her portfolio and the net value of that investment. . . . The later distribution of the fees by Fidelity Research is not information the participants needed to know to keep from acting to their detriment. . . . The information is thus not material, and its omission is not a breach of Deere's fiduciary duty.

Id. at 586 (internal citations omitted).  Thus, the court held that because fee distribution or revenue sharing was not an ERISA required fee disclosure, then revenue sharing was not subject to the material disclosure requirement.  Hecker, 556 F.3d at 589.  It was incumbent on the fiduciary to disclose the total fee assessed, but not the internal breakdown of the fee, including any revenue sharing payments made to other parties.  Id.

Several district courts faced with this question have reached the same conclusion. In Tussey v. ABB, Inc., 2008 WL 379666 (W. D. Mo. 2008), the plaintiffs brought a breach of fiduciary duty case alleging that the defendants concealed the true nature of the

fees and expenses incurred by failing to disclose the details of the revenue sharing agreements to plan participants.  The court ultimately denied defendants' motion to dismiss based on the safe harbor protection of ERISA § 404(c), because the court found that § 404(c) is an affirmative defense which must be pleaded and proved at trial and is not appropriately resolved in a motion to dismiss.  Nevertheless, the court concluded that the defendants had no duty to disclose the revenue sharing agreements.  Id. at *2-3.  As ERISA itself does not require that revenue sharing be specifically identified and disclosed, the district court in Tussey concluded that "the ABB Defendants could not have breached their fiduciary duty by failing to disclose the portion of the Plan's fees and expenses attributable to revenue sharing."  Tussey, 2008 WL 379666, at *3 (noting that the fact that the "DOL is considering amending its regulations to require the disclosure of revenue sharing is further evidence that revenue sharing need not be disclosed under today's ERISA.").  The court thus "defer[red] to ERISA and the DOL's specific disclosure and reporting requirements" that do not require revenue sharing disclosure.  Id.

The Tussey court also relied on Jensen v. Sipco, Inc., 38 F.3d 945 (8th Cir. 1994), in coming to its conclusion that ERISA allows revenue sharing.  In Jensen, the United States Court of Appeals for the Eighth Circuit addressed an analogous matter, i.e., whether the employers' failure to disclose that a welfare plan's benefits are not vested was a material misrepresentation or a breach of the plan administrator's duties.  Id. at 952.  The Eighth Circuit noted:

> Adequate disclosure to employees is one of ERISA's major purposes.  Recognizing that employee benefit plans are usually lengthy and highly technical documents, Congress required plan administrators to furnish [Summary Plan Descriptions ("SPDs")] to each plan participant and beneficiary.  See 29 U.S.C. § 1022(a)(1).  Congress also stated very specifically what an SPD must contain . . . .

Id.  The Eighth Circuit reasoned that because the Department of Labor is very thorough

with disclosure requirements, it was not an "inadvertent omission" that SPDs were not required to disclose non-vesting.  Id.  The court thus concluded that there was "neither a material misrepresentation nor a breach of the plan administrator's fiduciary duties."  Id. See also Anderson v. Resolution Trust Corp., 66 F.3d 956, 960 (8th Cir. 1995) (holding that ERISA's general prudence requirement may not be invoked to create a more stringent disclosure requirement if the statute already dictates what notice is required).

Other courts agree that revenue sharing payments do not require disclosure to plan beneficiaries or other fiduciaries.  Braden v. Wal-Mart Stores, Inc., 590 F. Supp. 2d 1159, 1168 (W.D. Mo. 2008) ("Following the Court's logic in Tussey, Wal-Mart and the RPC did not breach their fiduciary duty by failing to disclose a portion of the expense fees was attributable to revenue sharing."); Abbott v. Lockheed Martin Corp., 2009 WL 839099 (S.D. Ill. 2009) (granting defendants' motion for summary judgment, noting that plaintiffs were informed of the total fees though SPDs and other plan documents, which is the critical figure, and that the omission of information about the revenue sharing arrangement is not material); Taylor v. United Technologies Corp., 2009 WL 535779, at *10-12 (D. Conn. 2009) (granting defendants' motion for summary judgment based on plaintiffs' failure to demonstrate the materiality of the alleged nondisclosure concerning investment fund fees and sub-transfer fees, noting that several district courts in the Second Circuit have concluded that sub-transfer agent fees do not affect the share price and therefore are not material to an objectively reasonable investor); Tibble v. Edison Int'l, 2009 WL 2382340, at *34 (C.D. Cal. July 16, 2009) ("The Court agrees with the Seventh Circuit that there is nothing inherently wrong with using revenue sharing from mutual funds in order to offset some of the administrative costs that might otherwise be borne by the plan sponsor.  The problem occurs only when the relevant fiduciaries make investment decisions not because they are in the best interest of the Plan participants, but in order to maximize the amount of revenue sharing that is generated for the benefit of the plan

sponsor.").

Similarly, by analogy, securities filed with the Securities and Exchange Commission ("SEC") require disclosure of the total fee paid, rather than how the fee is thereafter disbursed:

> Where the total amount of fees paid by a mutual fund for various services is disclosed, other information about the fees, such as their allocation or the transfer agent's profit margin, is not material. . . . An individual who knows the amount of fees paid by a fund can compare it to its competitors in deciding whether to invest. . . . This is because it is the amount of fees, not their allocation or a transfer agent's profit margin, that is relevant to the price and value of the funds. . . . [the] motivation behind the fee arrangement is immaterial to a decision to purchase fund shares because it could have no effect on share price.

In re Smith Barney Fund Transfer Agent Litig., No. 05 Civ. 7583(WHP), 2007 WL 2809600, at *3 (S.D.N.Y. Sept. 26, 2007).  In re Smith Barney cited In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig., No. 03 Civ. 8208(RO), 2006 WL 1008138, at *9 (S.D.N.Y. Apr. 18, 2006), for the proposition that fee allocation was irrelevant in mutual fund share prices, because unlike stock shares, mutual fund shares are calculated according to a net asset value statutory formula.  In re Smith Barney, 2007 WL 2809600, at *3. When the entire expense or fee of a mutual fund is disclosed the court reasoned that investors have all pertinent information relevant to an investment decision.  Id.  Requiring the mutual fund to provide further transparency to an investor by explaining fee allocation or profit margins would only result in providing irrelevant material to investors.  Id.

The Court grants Principal's motion for judgment on the pleadings as to Count I of Ruppert's First Amended Complaint. [Dkt. No. 128.]  Ruppert's complaint, the factual allegations of which this Court is bound by and follows, does not claim that Principal made a false or misleading statement.  Rather, Ruppert alleges that Principal's various revenue

sharing agreements were material and that Principal, as a fiduciary, had a duty to disclose such agreements to Ruppert, as the Plan Trustee. [Dkt. No. 128 at 9-12.] Ruppert only asserts that Principal's negotiation, acceptance, failure to disclose the amount of, and keeping of the revenue sharing payments, violated Principal's fiduciary duty to plan beneficiaries and participants. [Dkt. No. 128 at 10-11.]

Additionally, Ruppert does not allege that he was not informed of the total fee, and based on the aforementioned cases, that is sufficient to find against Ruppert. Ruppert stated in his complaint that Principal "provides an Internet homepage which gives plan participants access to their investment portfolio and more than 80 planning calculators, reports which advise plan participants about the status of their retirement savings and their investment performance, and asset allocation assistance." [Dkt. No. 128 at 3.] Similarly, Ruppert admits that the revenue sharing component is the equivalent of the mutual fund advisor (or distributor) accepting a reduced fee, "although the full amount of the fee is still charged to the mutual fund (and thus its shareholders." [Dkt. No. 128 at 4-5.] Nowhere in his complaint does Ruppert state that Principal misrepresents the amount of the total fee charged. The Principal Service and Expense Agreement is also candid in disclosing that "[f]ees will be in the amount and collected as described in under 'Fee Payment Summary.'" [Dkt. No. 159, Exh. 1.]

In finding for Principal on Count I, the Court acknowledges that Hecker is not binding precedent. Nevertheless, the Court "adhere[s] to the policy that a sister circuit's reasoned decision deserves great weight and precedential value." United States v. Auginash, 266 F.3d 781, 784 (8th Cir. 2001). Similarly, opinions of district courts within or from another circuit "may [be] accord[ed] precedential weight." Id. The Court agrees with the reasoning of the Seventh Circuit Court of Appeals in Hecker, in which the court determined that the internal and subsequent distribution of the fees collected are irrelevant for ERISA disclosure purposes. Hecker, 556 F.3d at 586. Ruppert would have the Court

limit <u>Hecker</u>'s holding by finding that fiduciaries have no duty to disclose revenue sharing payments to plan participants, while still requiring fiduciaries to disclose the payments to plan sponsors or other fiduciaries.  This Court rejects such a narrow and limited reading of <u>Hecker</u>.  Fiduciaries do not have a greater right to information than the plan participants for whom they serve.  Such a divergence in treatment would undermine the rationale behind <u>Hecker</u>.  For example, if revenue sharing disclosure to fiduciaries was deemed to be material, then the fiduciaries would have a fiduciary duty to inform the plan participants and beneficiaries of the revenue sharing; precisely the outcome that <u>Hecker</u> held against. <u>See id.</u>  Furthermore, if each fund prospectus provides access to and discloses the expense ratio, then fiduciaries, beneficiaries, and plan participants have all the "relevant information . . . to determine the affect of the funds' expenses." <u>Taylor</u>, 2009 WL 535779, at *14.

It is illogical to draw a distinction between affiliate and non-affiliate mutual funds, at least in terms of whether disclosure of revenue sharing is a fiduciary duty.  Whether or not a mutual fund is an affiliate or non-affiliate to the plan provider should not be the threshold characteristic for determining whether plan participants, beneficiaries, sponsors, etc., are entitled to disclosure of the revenue sharing information.  There is no legitimate reason to distinguish revenue sharing payments made by affiliate funds from payments made by non-affiliate funds, so long as the fiduciary still properly considers the fees charged and the net return after management expenses. <u>See generally</u> <u>Taylor</u>, 2009 WL 535779, at *10; <u>Hecker</u>, 556 F.3d at 586.  Accordingly, this Court extends the holding of <u>Hecker</u>, such that plan sponsors do not have a fiduciary duty to disclose revenue sharing payments from affiliates or non-affiliates alike.

The aforementioned cases supporting revenue sharing payments and the absence of binding rules and regulations from the Department of Labor, are persuasive authority for this Court to find that Principal did not violate its § 1104 fiduciary duties when it engaged

in transactions involving revenue sharing payments. This Court will not mandate disclosure of intra- or inter-corporate revenue sharing payments that fall outside the cumulative and exhaustive ERISA statutes and regulations on material disclosure requirements. To do so would be contrary to the well-reasoned opinions of other district courts and the Seventh Circuit. Additionally, there is no basis to impose disclosure requirements for revenue sharing payments when the Department of Labor has already announced proposed rules to modify existing disclosure requirements. Applying the law to this case, Principal has no duty to disclose revenue sharing payments made from affiliates (Foundation Options mutual funds) or non-affiliates (Access Funds).

In conclusion, the Court finds that the allocation of mutual fund fees, i.e., revenue sharing, is not material and Principal's failure to disclose revenue sharing payments breached no fiduciary duty. Accordingly, the Court hereby grants judgment on the pleadings in favor of Principal on Count I.

## B. Count II - Prohibited Transactions

Congress enacted ERISA § 406 (29 U.S.C. § 1106) in order to prohibit "categorically a transaction that is likely to injure the pension plan." Lockheed Corp. v. Spink, 517 U.S. 882, 888 (1996) (citing Commissioner v. Keystone Consol. Indus., Inc., 508 U.S. 152, 160 (1993)). By prohibiting any transaction between the trust or pension plan and a "party in interest" or fiduciary, Congress intended to prevent the fiduciary from "being put in a position where he has dual loyalties, and, therefore, he cannot act exclusively for the benefit of a plan's participants and beneficiaries." N.L.R.B. v. Amax Coal Co., a Div. of Amax, Inc., 453 U.S. 322, 333-34 (1981) (internal quotations omitted).

Ruppert's prohibited transaction claim is that Principal improperly used "plan assets" for the revenue sharing payments. Ruppert takes the broader, functional approach,

view of plan assets. The functional approach only requires that plan assets "involve" assets of the plan, and such "plan assets" be used at the expense of participants or beneficiaries. Thus, Ruppert asserts that if plan assets were improperly used in the course of the revenue sharing payments, then Principal engaged in prohibited transactions when it earned fees at the expense of the plan participants. Monies invested in the Access Funds (non-affiliates) are registered securities under the Investment Company Act of 1940, whereas funds in the Foundation Options (affiliate) mutual funds commingle registered securities and non-registered separate accounts. Therefore, the issue before the Court is whether the revenue sharing payments made by the Access Funds and Foundation Options mutual funds were, in fact, assets of the plans. Additionally, if the revenue sharing payments were made from assets of the plan and thereby prohibited transactions, then the Court must determine if the payments were reasonable compensation for services performed.

## 1. ERISA Statutory Language

In transactions between a plan and a fiduciary, the fiduciary shall not "deal with the assets of the plan in his own interest or for his own account," or "receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b)(1), (3). Included within plan assets are "assets of such plan . . . but shall not, solely by reason of such investment, be deemed to include any assets of such investment company [registered under the Investment Company Act of 1940]." § 1101(b)(1). ERISA regulations define plan assets as,

> [g]enerally, when a plan invests in another entity, the plan's assets include its investment, but do not, solely by reason of such investment, include <u>any of the underlying assets of the entity</u>. However, in the case of a plan's investment in an equity interest of an entity that is neither a publicly-offered

27

> security nor a security issued by an investment company
> registered under the Investment Company Act of 1940 its
> assets include both the equity interest and an undivided interest
> in each of the underlying assets of the entity, unless it is
> established that–(i) The entity is an operating company, or (ii)
> Equity participation in the entity by benefit plan investors is
> not significant.

29 C.F.R. § 2510.3-101(a)(2)(i), (ii) (emphasis added). Assets of the plan in a "separate account of an insurance company" would include "an undivided interest in each of the underlying assets of the entity . . . ." § 2510.3-101(h)(1)(iii). "Significant" is defined as when "25 percent or more of the value of any class of equity interests in the entity is held by benefit plan investors." § 2510.3-101(f)(1). The Department of Labor also provides additional guidance as to the definition of "plan assets" through advisory opinions. An advisory opinion suggests that "if an insurance company issues a contract or policy of insurance to a plan and places the consideration for such contract or policy in its general asset account, the assets of such account shall not be considered to be plan assets." Department of Labor, Pension and Welfare Benefits Administration, F-1998A, 1982 WL 521472 (March 15, 1982). A subsequent transaction involving the general asset account would not then become a prohibited transaction. Id.

Section 1106 does allow for exemptions to the general rule of prohibited transactions in section 1108. For example, fiduciaries are protected if the transaction is "the direct or indirect receipt of fees or other compensation by the fiduciary advisor or an affiliate thereof (or any employee, agent, or registered representative of the fiduciary advisor or affiliate) in connection with the provision of the advice . . . ." § 1108(b)(14)(A)(iii). Fiduciaries are not prohibited from "receiving any reasonable compensation for services rendered, or for the reimbursement of expenses properly and actually incurred, in the performance of his duties with the plan; . . ." § 1108(c)(2). See also § 1108(g)(7)(C) ("the compensation received by the fiduciary advisor and affiliates

thereof in connection with the sale, acquisition, or holding of the security or other property is reasonable . . . .").

According to the ERISA regulations, a "service is necessary for the establishment or operation of a plan . . . if the service is appropriate and helpful to the plan obtaining the service in carrying out the purposes for which the plan is established or maintained . . . ." 29 C.F.R. § 2550.408b-2(b).  A plan may pay a party "reasonable compensation" for services rendered to the plan.  <u>See</u> § 2550.408-2(d); § 2550.408c-2(a).  Reasonable compensation "depends on the particular facts and circumstances of each case, but any compensation that is "excessive" will not be considered "reasonable compensation."  § 2550.408c-2(b)(1), (2), (5). <u>See also</u> ERISA Advisory Opinion Procedure 76-1, 41 Fed. Reg. 36281 (Aug. 27, 1976) (questions of what constitutes a necessary service, a reasonable contract or arrangement and reasonable compensation are inherently factual in nature);  Department of Labor, Pension and Welfare Benefits Administration, F-2042, 1981 WL 314500, at *1 (Dec. 4, 1981) ("expenses properly and actually incurred is an inherently factual question on which the Department ordinarily will not issue an advisory opinion . . . .").  Furthermore, a fiduciary may not use authority, control, or responsibility "to cause a plan to enter into a transaction involving plan assets whereby such fiduciary . . . will receive consideration from a third party in connection with such transaction." § 2550.408b-2(e)(1).  <u>See also</u> Department of Labor, Office of Pension and Welfare Benefits Programs, Opinion No. 2005-03A, Pension Plan Guide (CCH) P 19,990O, 2005 WL 1482886, at *5 (March 23, 2005).

Therefore, ERISA and its accompanying regulations provide scant guidance for determining the meaning of the term "assets of the plan."  Understanding the meaning of "assets of the plan" is essential for determining whether or not a prohibited transaction took place.  If assets of the plan were used for a prohibited transaction, then a court must still decide whether compensation paid was reasonable or excessive, based upon all of the

facts present.

## 2. Prohibited Transactions Case Law

Relatively few courts have decided what assets in a pension plan constitute "assets of the plan." However, many courts have followed the broad, functional approach of the Ninth Circuit Court of Appeals in its landmark decision of <u>Acosta v. Pacific Enter.</u>, 950 F.2d 611 (9th Cir. 1991).

In <u>Acosta</u>, the court noted that "ERISA does not expressly define the term 'assets of the plan.'" <u>Acosta</u>, 950 F.2d at 620 (quotations in original). Nevertheless, reference to ERISA's congressional history, with Congress's concern of "misuse and mismanagement of plan assets by plan administrators," led the court to conclude that "assets of the plan" should be broadly construed for determining whether or not a prohibited transaction occurred. <u>Id.</u> (quoting <u>Massachusetts Mut. Life Ins. Co. v. Russell</u>, 472 U.S. 134, 140 n.8 (1985)). The court formulated a two-part test for fiduciaries to categorize items as assets of the plan. First, "it is necessary to determine whether the item in question may be used to the benefit (financial or otherwise) of the fiduciary." <u>Id.</u> Second, the court must determine whether the item used was "at the expense of plan participants or beneficiaries." <u>Id.</u> Applying this test, the court determined that it would not "cabin the term" to only include financial contributions received by the plan administrators because the court recognized that some non-financial assets could benefit the plan or have some attributable value. <u>Id.</u> However, because in the present circumstance there was no actual evidence of self-dealing at hand on behalf of the fiduciary, the court did not decide whether a shareholder-participant list was a plan asset. <u>Id.</u> Hence, the <u>Acosta</u> court held that based upon a functional approach, plan assets could include more than items or assets of monetary concern.

Other courts since <u>Acosta</u> have agreed that "assets of the plan" is a term that courts

should broadly construe.  See e.g., Grindstaff v. Green, 133 F.3d 416, 432 (6th Cir. 1998) ("This broad analysis of the term 'asset' in ERISA comports with the general practice of the courts of appeals in their construction of the protective provisions of the statute." (quotation in original));  Lowen v. Tower Asset Mgmt., Inc., 829 F.2d 1209, 1213 (2d Cir. 1987) (courts should broadly construe Section 1106(b) for the "protection of beneficiaries and [to give] notice to fiduciaries"); Leigh v. Engle, 727 F.2d 113, 126 (7th Cir. 1984) ("The protective provisions [of § 1106] should be read broadly . . . .").  But it is not always prudent to automatically classify as "assets of the plan" all financial and non-financial assets of value.  For example, the Sixth Circuit rejected the request for a sweeping holding that all employee stock option plan ("ESOP") voting rights should be categorized as plan assets.  Instead, it held that courts should "focus on the purpose for which the voting right is exercised to be the more persuasive approach." Grindstaff, 133 F.3d at 424 (the court explicitly rejected a Department of Labor *amicus* brief advocating that ESOP stock voting rights always "constitute an ERISA plan asset").  Additionally, many courts have focused solely on categorizing items of financial concern as "plan assets" and have not used the Acosta two-part test to extend "plan assets" to non-financial assets.  See e.g.,  Kayes v Pacific Lumber Co., 51 F.3d 1449, 1468 (9th Cir. 1995) (holding collateral for a bridge loan was a plan asset);  Phillips v. Amoco Oil Co., 799 F.2d 1464, 1471 (11th Cir. 1986) (holding that non-vested, contingent future retirement benefits were not ERISA assets); Michigan Elec. Employees Pension Fund v. Encompass Elec. & Data, Inc., 556 F. Supp. 2d 746, 779 (W.D. Mich. 2008) (finding that unpaid benefit contributions were assets of the plan);  Operating Engineers' Local 324 Fringe Benefit Funds v. Nicolas Equip., L.L.C., 353 F. Supp. 2d 851, 854 (E.D. Mich. 2004) (holding a company's contributions to benefit funds, as they become due, constitute plan assets under ERISA); Int'l Brotherhood of Painters and Allied Trades Union and Industry Pension Fund v. Duval, 925 F. Supp. 815, 826-27 (D.D.C. 1996) (genuine issue of

material fact regarding whether employee was paid out of plan assets, and whether his services were necessary and compensation reasonable precluded summary judgment claim); Reich v. Lancaster, 843 F.Supp.194, 202-03 (N.D. Tex. 1993), aff'd, 55 F.3d 1034 (5th Cir. 1995) (payment of commissions and fees paid to service providers constitutes transfer of plan assets because agent improperly purchased policies that offered him extra compensation); In re Consolidated Welfare Fund ERISA Litig., 839 F. Supp. 1068, 1073 (S.D.N.Y. 1993) (commission earned for investment plan management constitutes "plan assets" under ERISA).

a. Revenue Sharing Payments Generally not Assets of the Plan

Once it is determined whether assets of a plan were used in making revenue sharing payments, then it is possible to demarcate certain transactions as prohibited transactions. Ruppert asserts that the revenue sharing fees at issue are plan assets and this practice embodies a prohibited transaction. Generally, Ruppert espouses that the Acosta functional approach to "plan assets" should lead the Court to conclude that the revenue sharing payments are made "at the expense" of plan participants and "relate to" the plan assets.

Principal claims that section 1101 already defines plan assets and that once fees are collected, they are no longer assets of the plan. Additionally, Principal argues that if the Court accepted Ruppert's assertion that monies are plan assets upon the mere receipt by a fiduciary, then such a holding would undermine Hecker and § 1101's definition of plan assets. Principal points to the Secretary of Labor's *amicus* brief in Hecker for support. Furthermore, both parties disagree as to whether the affiliate and non-affiliate revenue sharing payments are made from plan assets and comprise a prohibited transaction.

Despite uniform agreement that "assets of the plan" should be interpreted broadly, Hecker, 556 F.3d at 589-90, and Haddock v. Nationwide Fin. Servs., Inc., 419 F. Supp. 2d 156 (D. Conn. 2006), offer conflicting interpretations of "assets of the plan" in relation

to classifying revenue sharing payments as prohibited transactions. <u>Hecker</u> relied on the statutory language of section 1101(b)(1), which states in relevant part, "such security shall not, solely by reason of such investment, be deemed to include any assets of such [mutual fund]." <u>Hecker</u>, 556 F.3d at 584. The <u>Hecker</u> court opined that the revenue sharing fees were not assets of the plan, because "[o]nce the fees are collected from the mutual fund's assets and transferred to one of the Fidelity entities, they become Fidelity's assets–again, not the assets of the Plan." <u>Id.</u> (citing <u>Chicago Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.</u>, 474 F.3d 463, 476 n.6 (7th Cir. 2007)).

However, the <u>Haddock</u> court advanced the opposite proposition that mutual fund assets that pay a fund's fees for administrative services are "plan assets" because they are made at the expense of the plan participants. <u>Haddock</u>, 419 F. Supp. 2d at 172. The court in <u>Haddock</u> held that revenue sharing payments were "plan assets" when,

> a defendant holds or receives [the assets]: (1) as a result of its status as a fiduciary or its exercise of fiduciary discretion or authority, and (2) at the expense of plan participants or beneficiaries. This two-pronged test conforms to the approach outlined by the Ninth Circuit in <u>Acosta</u>, where the first prong (i.e. the relationship between the item held and the entity's fiduciary status) was implied, and the second prong was explicit. . . . The plaintiffs have alleged that Nationwide receives payments from mutual funds in exchange for offering the funds as an investment option to the Plans and participants, i.e., as a result of its fiduciary status or function. . . . In addition, the Trustees have alleged that the payments were made at the expense of the Plan participants or beneficiaries. Specifically, . . . the mutual funds set the fees they charged Plans and participants to cover not only the fees they would have normally charged, but also the amount of the revenue-sharing payments they had to make to Nationwide.

<u>Id</u>. at 170-71 (internal citations omitted). The revenue sharing payments were made to and benefitted the fiduciaries. <u>Id.</u> The mutual funds also set the fees, then added the revenue

sharing payments Fidelity demanded on as a surcharge to the overall expense fee for each mutual fund. Id. The overall fee was then higher and was a direct expense and charge to the participants. Id. Thus, on a motion for summary judgment, the court held that there were triable issues as to whether the challenged revenue sharing payments were plan assets based on the Acosta functional approach. Id. at 172.

Again, the Secretary of Labor's *amicus* opinion in Hecker is helpful in illuminating whether sums paid are plan assets. Simply put, the Secretary does not support the viewpoint that intra-company revenue sharing payments come from plan assets. Brief for the Secretary of Labor, Elaine L. Chao at 22, as Amicus Curiae Supporting Plaintiffs-Appellants, Hecker v. Deere & Co., 556 F.3d 575 (7th Cir. 2009) (No. 07-3605, 08-1224). The Secretary's argument was made in the context of determining whether Fidelity was a fiduciary or not, but her analysis of plan assets is applicable here. Revenue sharing payments to affiliates "do not constitute plan assets." Id. (citing 29. U.S.C. § 1101(b)(1)). The Court notes, however, that all of the affiliate funds at issue in Hecker were also offered to the general public as registered mutual funds. Hecker, 556 F.3d at 581 (these mutual funds are not 'plan assets' because they are securities issued by an investment company registered under the Investment Company Act of 1940). And as this Court found previously, revenue sharing payments to non-affiliates, if from registered mutual funds, are also not plan assets.

Upon review of Hecker and Haddock, the Court adopts the Seventh Circuit's position in Hecker as to the meaning of ERISA plan assets for registered securities. This would include assets that a fiduciary receives in receipt of revenue sharing payments. The Secretary of Labor also attributes this meaning to revenue sharing payments and the Seventh Circuit accordingly complied with the Secretary's interpretation. Hecker, 556 F.3d at 584. Once plan assets are invested in a mutual fund registered as a security under the Investment Company Act of 1940, any subsequent revenue sharing payments will not

be deemed to have come from plan assets.  To hold otherwise would unduly enlarge the statutory language and encroach upon the Department of Labor's rule-making authority.

However, in the present case, there are both registered and unregistered mutual funds under consideration.  Insofar as Ruppert alleges the non-affiliate Access Funds are wholly registered mutual fund securities under the Investment Company Act of 1940, the Court holds that these securities are not assets of the plan.  However, the Court must accept as true Ruppert's assertion that monies in the affiliate Foundation Options funds commingle registered mutual funds and unregistered separate accounts. [Dkt. No. 159 at 16.] Section 1101(b)(1) explicitly excludes, as assets of the plan, only investment assets in registered mutual funds.  It does not, however, suggest an appropriate course of action for non-registered mutual fund securities.  The Court does not, however, ascribe to Haddock's sweeping assertion that non-plan assets become plan assets merely when a fiduciary receives them.  Haddock, 419 F. Supp. 2d at 170.  Such a reading violates section 1101(b)(1), which unequivocally states that "assets of such plan . . . shall not, solely by reason of such investment, be deemed to include any assets of such investment company [registered under the Investment Company Act of 1940]." § 1101(b)(1). Accordingly, the Court looks to the Ninth Circuit's decision in Acosta to categorize the non-registered plan assets using a functional approach.  See Acosta, 950 F.2d at 620.

According to Acosta, first, the Court must determine whether Principal used the revenue sharing payments to its own benefit.  See id.  Next, whether the use came at the expense or detriment of plan participants or beneficiaries.  See id.  On the face of the complaint, Ruppert alleges that Principal negotiated and kept revenue sharing fees "from mutual funds (or their advisors) for Principal's own benefit[.]" [Dkt. No. 128 at 10-11.] By accepting the fees, Principal did not apply the proceeds to "defray the reasonable expenses of administering the plan[.]" [Dkt. No. 128 at 11.] Without registered securities comprising the entirety of the Foundation Options mutual funds, the Court finds that the

<u>Acosta</u> functional approach would categorize the non-registered securities as assets of the plan. Principal does not dispute that Foundation Options funds invest in un-registered mutual funds. If the assets are commingled, then it would follow that all the invested monies are assets of the plan. Because this is a motion for judgment on the pleadings, the Court must accept Ruppert's allegations as true and "grant all reasonable inferences from the pleadings in favor of the non-moving party." <u>Faibisch,</u> 394 F.3d at 803. Accordingly, the Court finds that revenue sharing payments from monies invested in the Foundation Options mutual funds, did come from assets of the plan.

The Court next looks to whether the affiliate and non-affiliate revenue sharing payments were prohibited transactions to determine whether to grant Principal's motion for judgment on the pleadings as to Count II.

### b. Revenue Sharing Payments not a Prohibited Transaction

Ruppert's additional claim is that if the revenue sharing payments were made from plan assets, then it was a prohibited transaction and the fees paid were unreasonable. As an ancillary argument to the impropriety of the revenue sharing payments, the revenue sharing payments "diminish a plan's investment return" because they are tantamount to an excessive fee. [Dkt. No. 159 at 9.] "But for Principal's revenue sharing fee, the investors would receive the benefit of a reduced investment management fee and thus a correspondingly higher return on their investment." [Dkt. No. 159 at 9.] Ruppert concedes that when revenue sharing offsets overall expense ratios or fees, then the transaction is not prohibited and ERISA allows such fee sharing. But Ruppert alleges that in this case, Principal's retention of the revenue sharing payments results in an impermissible prohibited transaction.

Principal counters that if the revenue sharing payments are not made from plan assets, then it follows that there is no prohibited transaction. Principal also states that the

"total cost of investing in each mutual fund is fully disclosed in the applicable prospectus," [Dkt. No. 161 at 3], and presumably, that the fees are not excessive or unreasonable.

This Court has found that revenue sharing payments by mutual fund securities registered under the Investment Company Act of 1940–in this case, the Access Funds–are not assets of the plan and are not thereby prohibited transactions according to section 1106(b)(1), (3) (a fiduciary shall not "deal with the *assets of the plan* in his own interest or for his own account" or "receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the *assets of the plan*") (emphasis added).   Conversely, revenue sharing payments from unregistered mutual fund securities (Foundation Options) are assets of the plan because they do not fall into the section 1101(b)(1) exclusion.   Yet the Court must still determine if the fees paid by un-registered affiliate mutual fund securities were reasonable in light of the services performed, as unreasonable fees are demonstrative of a prohibited transaction.   If the revenue sharing fees are not unreasonable in relation to the provided services, then there are no section 1106(b)(1), (3) or 1108(b)(2) violations.   See Braden, 590 F. Supp. 2d at 1168.

Turning once again to Hecker, when using the approach that assets used to pay the revenue sharing fees are not assets of the plan, then necessarily, no prohibited transaction occurred.   See Hecker, 556 F.3d at 584.   Addressing the reasonableness of compensation, the court also concluded that ERISA does not "require plans to offer only cost-free investment vehicles," and fiduciaries need only "inform participants of the actual expenses incurred with respect to their individual accounts." Id. at 587.   Furthermore, a wide range of investment options "set against the backdrop of market competition" suggests a finding that fees are not excessive.   Id. at 586 (expense ratios ranged from .07% to "just over 1%").   Courts should caution against finding excessive fees on a case by case basis, particularly because mutual fund providers have no duty to "scour the market to find and

37

offer the cheapest possible fund." Id.

However, there is again a divergence between Hecker and Haddock in terms of
fleshing out the nuances of a prohibited transaction.  Haddock's substantially broader
approach to defining plan assets results in capturing a broader array of transactions that
constitute prohibited transactions.  For example, the Haddock court held that prohibited
transactions "must relate to transactions involving assets of the plan, although the
consideration received by the fiduciary need not itself constitute plan assets."  Haddock,
419 F. Supp. 2d at 171 (emphasis added).  According to Haddock, revenue sharing
payments do involve assets of the plan and are a prohibited transaction:

> . . . a reasonable fact-finder could conclude that Nationwide
> received consideration (i.e., the revenue-sharing payments)
> from a party dealing with the Plans (i.e., the mutual funds
> whose shares are available for investment by the Plans and
> participants) in connection with a transaction (i.e., the so-
> called service contracts) involving assets of the plan (i.e., the
> shares of the variable accounts, represented by the
> accumulation units).

Id.  Using this approach, a fiduciary receiving consideration presumably transforms the
consideration into plan assets simply because he is a fiduciary.   Beyond plainly
categorizing the revenue sharing payments as prohibited transactions, the Haddock court
also opined that whether or not actual services were performed in consideration for the
payments was a determinative factor and an unanswered issue in the facts before the court.
Id. at 171-72.  The court thus denied the motions for summary judgment.  Id. at 171.
Considering that Haddock fell short of analyzing the reasonableness of fees, it is
reasonable to suggest that had the Haddock court found the fees to be reasonable and based
on actual services, then the revenue sharing payments might have been saved by the
section 1108 exemption for reasonable fees and services.

Some courts have followed the reasoning of Haddock in holding that revenue

38

sharing payments are outright a prohibited transaction.  In one instance, a district court cited <u>Haddock</u> with approval, but failed to determine whether or not revenue sharing was a prohibited transaction as the allegation did not support a finding that the defendant was a fiduciary.  <u>Columbia Air Servs., Inc. v. Fidelity Mgmt. Trust Co.</u>, 2008 WL 4457861, at *5 (D. Mass. 2008).  Another court that followed <u>Haddock</u> did so on the premise that the amount of revenue sharing fees or consideration received was unreasonable and came from plan assets.  <u>See</u> <u>e.g.</u>, <u>Kanawi v. Bechtel Corp.</u>, 590 F. Supp. 2d 1213, 1228 (N.D. Cal. 2008) (denying summary judgment was appropriate because a reasonable fact finder "could conclude that FIA received consideration (fees), from a party dealing with the Plan (the Committee), in connection with a transaction (the service contracts) involving assets of the Plan.").  <u>But</u> <u>see</u> <u>Taylor</u>, 2009 WL 535779, at *11-12 (in terms of <u>Haddock</u>, "plaintiffs have failed to proffer evidence evincing that Fidelity's receipt of its negotiated base fee and sub-transfer agent fees was materially unreasonable and beyond the market rate . . .[other service providers] would have charged comparable sub-transfer fees.").

Lastly, Department of Labor Advisory Opinions concerning revenue sharing from plan assets, in the context of prohibited transactions, offer significant guidance to the Court.  <u>See</u> Department of Labor, Employee Benefits Security Administration, Advisory Opinion, 2005-10A (May 11, 2008) [hereinafter Opinion 2005-10A]; Department of Labor, Office of Pension and Welfare Benefits Program, Opinion No. 97-15A, Pension Plan Guide (CCH) P 19,986N, 1997 WL 277980 (May 22, 1997) [hereinafter Opinion 97-15A].  In Opinion 97-15A, the Department of Labor responded to an inquiry as to whether mutual fund fees paid to a plan trustee would constitute a prohibited transaction.  The trustee fully disclosed the fees and stated that the fees would "offset . . . on a dollar-for-dollar basis, against the trustee fee that the Plan is obligated to pay" or that the trustee would "credit the Plan directly with the fees [the trustee] receives based on the investment of Plan assets in the mutual fund."  <u>Id.</u> at *2.  The Department of Labor advised that

39

receiving the fees would be a prohibited transaction if the trustee received fees as a result of a mutual fund recommendation by him. Id. at *3. On the other hand, when the trustee did not provide any investment advice, then the trustee was not dealing with plan assets and "the mere receipt by the trustee of a fee or other compensation from the mutual fund in connection with such investment would not in and of itself violate section 406(b)(3)." Id. The compensation paid either directly or indirectly by the Plan to the trustee must also be reasonable, with the duty incumbent upon the fiduciary to ensure that such fees or compensation are reasonable. Id. at *4. Regardless, the advisory opinion stressed that if plan assets were used but the fees were used to benefit the plans by offsetting or lowering overall fees, then the trustee was not engaging in a prohibited transaction. Id.

Further, Opinion 2005-10A is directly on point as to whether or not revenue sharing payments are prohibited transactions. In Opinion 2005-10A, the Country Trust Bank ("the Bank") requested an exemption from the prohibited transaction provision of section 4975 of the Internal Revenue Code, in relation to services the Bank provided to individual retirement accounts ("IRAs"). Opinion 2005-10A, at *1. The Bank invested assets of participating IRAs in the Country Managed Portfolio Account Service ("CoMPAS") program, with the Bank serving as trustee of the IRAs. Id. at *1-2. The Bank correspondingly served as custodian and trustee for three Affiliated Funds and Third Party Funds registered under the Investment Company Act of 1940. Id. at *2-3. As a result, the Bank was responsible for all expenses incurred in connection with its fiduciary duties. Id. at *3. For compensation, the Bank received advisory fees, non-advisory fees, and a management fee from each IRA, id. at *3, with the "total fees . . . paid to the Bank and its affiliates constitut[ing] not more than reasonable compensation for the services provided to the IRA" and that fees received from other sources would not increase "the total compensation received by the Bank and its affiliates." Id. at *4. The Department of Labor concluded that so long as the management fee was reduced by the aggregate of the

advisory and non-advisory fees, then there was no prohibited transaction.  Id. at *7.  It
follows that,

> a fiduciary does not engage in an act described in section
> 4975(c)(1)(E) [also ERISA 406(a) and (b)] if the fiduciary does
> not use any of the authority, control or responsibility which
> makes such person a fiduciary to cause a plan to pay additional
> fees for a service provided by such fiduciary or to pay a fee
> for a service furnished by a person in which such fiduciary has
> an interest which may affect the exercise of such fiduciary's
> best judgment as a fiduciary.

Id.  If the Bank failed to offset the advisory and non-advisory fees from the annual asset
management fee charged to the IRAs, then a prohibited transaction would result.  Id.  The
Department of Labor explicitly noted that this same analysis would also apply to prohibited
transactions under ERISA section 406(a) and (b).  Id.

Here, the Court must determine whether the revenue sharing payments from affiliate
and non-affiliate mutual funds were a prohibited transaction.  In applying the law and
Department of Labor advisory opinions to the facts of this case, the Court again notes that
all favorable inferences must be drawn in Ruppert's favor.  Additionally, the Court accepts
as true Principal's status as a fiduciary, as Principal has made no arguments to the
contrary.  According to Ruppert's pleading, Principal only accepts non-affiliate mutual
funds that agree "to pay a kickback to Principal[.]" [Dkt. No. 128 ¶ 22.] This kickback
or revenue sharing fee is a "percentage of any given retirement plan's assets invested in
any given mutual fund or mutual fund family" [Dkt. No. 128 ¶ 24] and the participating
mutual fund essentially agrees to a reduced fee as a result of the kickbacks to Principal.
[Dkt. No. 128 ¶ 25.] Principal has exclusive control and authority to select the pool of
mutual funds from which participants then make their own investment decisions.  [Dkt.
No. 128 ¶ 27.] Additionally, Principal does not use the revenue sharing fees to reduce the
overall expense ratio, the fees "bear no relationship to Principal's costs of providing

41

services to plans or participants," and the plan participants "receive no extra services" as a result of the fees. [Dkt. No. 128 ¶¶ 51-53.] Principal admits that it performs no additional services as consideration for the revenue sharing fees. [Dkt. No. 159 at 18.] Ruppert thus categorizes the revenue sharing payments as a "windfall" to Principal. [Dkt. No. 128 ¶ 54.] However, nowhere in the pleadings does Ruppert allege that the mutual funds Principal selects for inclusion in the participants' pool of investment options have excessively high or unreasonable fees.

Although Ruppert sufficiently demonstrates that Principal selected non-affiliate funds because the funds agreed to pay the revenue sharing fee, that factor is not enough alone to result in a prohibited transaction. Again, the Court holds that any revenue sharing payments from either affiliates or non-affiliates, if made by registered mutual fund securities, do not involve assets of the plan. <u>See</u> <u>generally</u> 29 U.S.C. § 1106(b)(1), (3). Correspondingly, the non-affiliate revenue sharing payments were not a prohibited transaction.

However, in this case, the Court determined that assets used to pay affiliate mutual fund revenue sharing fees did come from assets of the plan, according to the <u>Acosta</u> functional approach. As such, these revenue sharing payments violated section 1106(b)(1) and (3) because the fees benefitted Principal and were used for its own beneficial interest. Despite a seemingly innocuous characterization that the affiliate fees from the Foundation Options funds were, in reality, intra-company accounting, the fact remains that the payments directly came from assets of the plan. Yet Opinion 97-15A suggests that if a fiduciary is not actively recommending mutual funds with the revenue sharing feature, then the "mere receipt" of the fee is not a prohibited transaction. Opinion 97-15A, at *3. So long as the fee is reasonable and used to reduce or offset the management fee or expense ratio, then there is no violation. Opinion 2005-10A, at *7; Opinion 97-15A, at *3.

In the Service and Expense Agreement, Principal states that "[w]hile this revenue

42

does not offset our Fees on a dollar for dollar basis, we do take it into consideration when we establish the rate of our Fees.  The return from the investment you have chosen is not diminished as a result of the payment of this revenue to Principal Life." [Dkt. No. 159, Exh. 1 at 18.] The language in the agreement is sufficiently unambiguous for the Court to conclude that, while not on a direct and explicit dollar-for-dollar basis, Principal factors the revenue sharing fees into the overall asset management fee it charges the plan beneficiaries and participants.  While Principal concedes that it does not actively perform any additional services for the revenue sharing fees, Ruppert does not allege that the revenue sharing fees contribute to gouging the plan participants and beneficiaries with unreasonable fees.  Additionally, Principal does not actively recommend any of the mutual funds to plan participants, as the participants choose for themselves the funds (from the available options) in which they wish to invest.  Without an allegation that the expense fees are unreasonably high or inflated because of the revenue sharing fees, Ruppert fails to plead that the fees constitute a prohibited transaction.  The Court therefore rejects Haddock, in that plan assets used for the benefit of a fiduciary are always a prohibited transaction.  Haddock, 419 F. Supp. 2d at 171.  Instead, the Court concludes that it is proper to consider whether or not the revenue sharing fees are used in any manner to lower or reduce the total fee of the mutual fund.  See generally 29 U.S.C. § 1108(b)(14), (c)(2)

Therefore, the Court finds that the revenue sharing fees from the affiliate and non-affiliate mutual funds are not a prohibited transaction.  Accordingly, the Court hereby grants judgment on the pleadings in favor of Principal on Count II.

Upon the foregoing,

**IT IS ORDERED**

Defendant Principal's Motion for Judgment on the Pleadings [Dkt. No. 156] on Count One is GRANTED.

Defendant Principal's Motion for Judgment on the Pleadings [Dkt. No. 156] on Count Two is GRANTED.

**DATED** this 5th day of November, 2009.

JOHN A. JARVEY
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF IOWA