**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**

JOSEPH RUPPERT, as trustee of and on behalf )
of FAIRMOUNT PARK, INC. RETIREMENT )   Case No. 4:07-cv-00344-JAJ-TJS
SAVINGS PLAN, and on behalf of all others )
similarly situated, )   Judge John A. Jarvey
)
            Plaintiff, )   Chief Magistrate Judge Thomas J. Shields
)
vs. )
)
PRINCIPAL LIFE INSURANCE COMPANY, )
)
            Defendant. )

**PRINCIPAL LIFE INSURANCE COMPANY'S**
**ANSWER TO THE SECOND AMENDED COMPLAINT**

Defendant Principal Life Insurance Company ("Principal") hereby answers Plaintiffs'

Second Amended Complaint as follows:

1.      Plaintiff Joseph Ruppert is a trustee of the Fairmount Park, Inc. Retirement
Savings Plan.  Ruppert brings this action in his capacity as trustee of and on behalf of the
Fairmount Plan.

**ANSWER:**  Principal admits the allegations in the first sentence, and further admits that

Plaintiff purportedly brings this action as a trustee of and on behalf of the "Fairmount Plan."

2.      Defendant Principal Life Insurance Co. is an Iowa corporation with its principal
place of business in Des Moines, Iowa.  Defendant advertises its services, solicits retirement plan
business and serves as a full service retirement plan service provider for retirement plans located
throughout the country.

**ANSWER:**  Principal admits the allegations in the first sentence.  Principal admits that it

offers and provides a wide range of services and products to employer-sponsored retirement

plans, which services and products vary from plan to plan.

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 and
ERISA § 502(e)(1)(2) (29 U.S.C. § 1132 (e)(1)(2)).

**ANSWER:**  Admitted.

4.      Principal's principal place of business is located in this district, and many of the events or transactions alleged in this complaint occurred in this district.

**ANSWER:**  Principal admits that its principal place of business is located in this district and that many of the key events occurred in, and many of the key witnesses reside in, this district.

5.      Principal offers "full service" 401(k) retirement plans to employers who wish to provide retirement plans for their employees.

**ANSWER:**  Principal admits that it offers a range of services and financial products to employers who want to provide retirement plans to employees, with the range of services and financial products varying from plan to plan.  Except as expressly admitted or qualified herein, Principal denies all remaining allegations in this paragraph.

6.      Principal's employer-sponsored 401(k) retirement plans enable employees to invest pretax earnings in mutual funds.

**ANSWER:**  Principal admits that one aspect of employer-sponsored 401(k) retirement plans is the ability for employees to save for retirement by reducing current salary on a before tax basis and invest such monies in a wide range of investments.  Except as expressly admitted or qualified herein, Principal denies all remaining allegations in this paragraph.

7.      Principal selects from among the thousands of mutual funds available and offers those select mutual funds as part of its pre-packaged 401(k) retirement plans.  Principal refers to these investment options as "Access Funds."

**ANSWER:**  Principal denies the allegations in the first sentence.  The mutual funds available to an employer-sponsored retirement plan vary from plan to plan.  As to the second sentence, Principal admits that it refers to certain of the investment options as "Access Funds." Except as expressly admitted or qualified herein, Principal denies all remaining allegations in this paragraph.

8.      The mutual funds comprising the Access Funds are "investment companies" within the meaning of Investment Company Act of 1940, and they are "registered" with the Securities and Exchange Commission.

**ANSWER:**  Principal denies this allegation to the extent that it states a legal conclusion.

Principal admits that Access Funds are registered with the Securities and Exchange Commission.

Except as expressly admitted or qualified herein, Principal denies all remaining allegations in

this paragraph.

9.      In addition to the Access Funds, Principal also offers investment options that Principal refers to as "Foundation Options."

**ANSWER:**  Principal admits that it makes available to plans investment options that

Principal refers to as "Foundation Options."  Except as expressly admitted or qualified herein,

Principal denies all remaining allegations in this paragraph.

10.      The investment options comprising the Foundation Options are approximately sixty to seventy "separate accounts" created and owned by Principal.

**ANSWER:**  Principal admits that the Foundation Options platform includes

approximately sixty to seventy separate accounts created and monitored by The Principal. Except

as expressly admitted or qualified herein, Principal denies all remaining allegations in this

paragraph.

11.      The Foundation Options separate accounts are similar to the Access Funds mutual funds, but they are not "investment companies" within the meaning of Investment Company Act of 1940, and they are not "registered" with the Securities and Exchange Commission.  Except as otherwise noted below, "mutual funds" or "investment options" as used herein means either or both the Access Funds mutual funds and Foundation Options separate accounts.

**ANSWER:**  Principal denies this allegation to the extent that it states a legal conclusion.

Principal admits that Foundation Options separate accounts are not registered under the

Investment Company Act of 1940.  Principal further admits that Plaintiff purports to use "mutual

funds" or "investment options" herein to mean either or both of Access Funds and Foundation

Options separate accounts.  Except as expressly admitted or qualified herein, Principal denies all

remaining allegations in this paragraph.

12.     After an employer selects Principal to service its 401(k) plan, Principal then
proposes to the employer a menu of investment options Principal selects from its Access Funds
and/or Foundation Options.

**ANSWER:**  Denied.

13.     The employer selects from that menu the investment options it wishes to offer as
part of its 401(k) plan to its employees.

**ANSWER:**  Principal admits that an employer may select the investment options it

wishes to offer as part of its 401(k) plan to its employees.  Except as expressly admitted or

qualified herein, Principal denies all remaining allegations in this paragraph.

14.     An employer may only choose from among those investment options Principal
selected for inclusion in the menu Principal presented to the employer.  When deciding in which
investment options to invest their retirement savings, employees then choose from among the
group of mutual funds thus jointly selected by Principal and their employer.

**ANSWER:**  Denied.

15.     After an employer selects the investment options which it will offer to its
employees, Principal retains the authority to substitute other investment options for the chosen
investment options.

**ANSWER:**  Denied.

16.     After an employer selects the investment options which it will offer to its
employees, Principal also retains the authority to refuse an employer's or employee's choice of a
particular mutual fund by closing the fund to new investments.

**ANSWER:**  Denied.

17.     As a full service plan provider, Principal provides all the services necessary for
employers to provide retirement plans for their employees.

**ANSWER:**  Principal admits that it offers a wide range of services to employer-

sponsored retirement plans.  Except as expressly admitted or qualified herein, Principal denies all

remaining allegations in this paragraph.

18.     As a full service plan provider, Principal provides complete plan management services so that employers can "spend time managing [their] business, not [their] plans."

**ANSWER:**  Principal admits that it offers a wide range of services to employer-

sponsored retirement plans, which services vary from plan to plan.  Except as expressly admitted

or qualified herein, Principal denies all remaining allegations in this paragraph.

19.     Principal provides to employers promotional materials for promoting an employer's plan to its employees, materials and services to help employers meet education, plan and participation requirements (including an employee enrollment kit and educational materials), and ongoing support to communicate with employees.  As part of its ongoing support services, Principal provides an Internet homepage which gives plan participants access to their investment portfolio and more than 80 planning calculators, reports which advise plan participants about the status of their retirement savings and their investment performance, and asset allocation assistance.

**ANSWER:**  Principal admits that it provides marketing and educational material for

employer-sponsored retirement plans and their participants, which marketing and educational

materials vary from plan to plan.  Except as expressly admitted or qualified herein, Principal

denies all remaining allegations in this paragraph.

20.     Principal also provides employers with complete plan administration services, legal compliance services and consulting services.  Those services include daily updates of plan records, a program for distribution of benefits to employees, investment reports to employees, pre-printed employee newsletters and signature-ready government forms.

**ANSWER:**  Principal admits that it offers a wide range of services to employer-

sponsored retirement plans, which services provided vary from plan to plan.  Except as expressly

admitted or qualified herein, Principal denies all remaining allegations in this paragraph.

21.     As part of its marketing of pre-packaged plans, Principal touts to employers its "investment strategy…backed by over a century of financial expertise."

**ANSWER:**  Principal admits that some but not all marketing and promotional materials

include language similar but not identical to that quoted in the above paragraph.  Except as

expressly admitted or qualified herein, Principal denies all remaining allegations in this

paragraph.

22.     Principal also touts its "investment philosophy, goals and strategies" to employers, and represents that its "investment strategies are designed to produce superior long-term results."

**ANSWER:**  Principal admits that some but not all marketing and promotional materials include the language quoted in the above paragraph.  Except as expressly admitted or qualified herein, Principal denies all remaining allegations in this paragraph.

23.     Thus, Principal holds itself out to employers and employees as a highly-skilled financial expert, possessing special knowledge and expertise.

**ANSWER:**  Denied.

24.     Principal provides investment advice to employers and participating employees, including the implicit advice that the investment options Principal offers are sound retirement plan investments.

**ANSWER:**  Denied.

25.     Principal also provides more individualized investment advice to employees through Principal's "Investor Profile Quiz."  The quiz, available on Principal's Internet site and employee enrollment kits, helps employees determine their risk tolerance on a scale of 1 to 5.

**ANSWER:**  Principal admits that it provides an "Investor Profile Quiz," which is available on Principal's website.  Principal further admits that the Investor Profile Quiz includes a risk tolerance scale of 1 to 5.  Except as expressly admitted or qualified herein, Principal denies all remaining allegations in this paragraph.

26.     Principal represents to employers that it charges "competitive fees" and "low fees mean greater opportunity for returns;" "paying less in fees may be one way for your plan members to save more for retirement."

**ANSWER:**  Principal admits that some, but not all marketing and promotional materials include the language quoted in the above paragraph.  Except as expressly admitted or qualified herein, Principal denies all remaining allegations in this paragraph.

27.     Investment advisors to mutual funds charge the funds they advise fees for the advisors' investment management services.

**ANSWER:**  Principal admits that investment advisors to mutual funds may charge fees for investment management services, with such charges varying from advisor to advisor and plan to plan and changing over time.  Except as expressly admitted or qualified herein, Principal denies all remaining allegations in this paragraph.

28.   As a condition for the fund to be included in Principal's pre-packaged 401(k) plans, Principal negotiates and requires each mutual fund advisor (or the fund's distributor) to pay a kickback to Principal, which Principal euphemistically describes as a "revenue sharing" fee.

**ANSWER:**  Denied.

29.   Principal selects for inclusion in its pre-packaged 401(k) plans only those mutual funds whose advisors (or distributors) agree to make the kickback payment.

**ANSWER:**  Denied.

30.   The "revenue sharing" kickbacks are a percentage of any given retirement plan's assets invested in any given mutual fund or mutual fund family.

**ANSWER:**  Denied to the extent that the allegations of this paragraph characterize lawful payments from mutual funds as "kickbacks."  Principal admits that payments from mutual funds generally are calculated as a percentage of the assets that Principal's clients have invested in these funds.  Except as expressly admitted or qualified herein, Principal denies all remaining allegations in this paragraph.

31.   When the mutual fund advisors (or distributors) agree to pay the "revenue sharing" kickbacks to Principal, they effectively agree to take a reduced fee, although the full amount of the fee is still charged to the mutual fund (and thus its shareholders).  However, the charge includes a "revenue sharing" component which represents the kickback payment to Principal.

**ANSWER:**  Denied.

32.   Principal exercises exclusive control and discretion over the negotiation of such investment management fees.

**ANSWER:**  Denied.

33.     Principal also exercises exclusive control and discretion over the selection of mutual funds available as investment options to plans and their participants.

**ANSWER:**  Denied.

34.     Principal also has the exclusive control and discretion to substitute or close mutual funds as investment options for a plan and its participants.

**ANSWER:**  Denied.

35.     Principal also charges and/or receives "revenue sharing" payments with respect to the Foundation Options separate accounts (which, as alleged above, are owned by Principal). How Principal charges and/or receives payments from the Foundation Options separate accounts is within Principal's exclusive control and knowledge.

**ANSWER:**  As to the first sentence, assuming that plaintiff is using the term "revenue sharing" to refer to payment from unaffiliated third party mutual funds, Principal denies the allegations of that sentence.  Principal admits, however, that it makes an internal accounting allocation among Principal-affiliated companies of the amounts received as part of the fully-disclosed fees associated with Foundation Option separate accounts.  As to the second sentence, Principal denies the allegations of that sentence.

36.     By providing complete plan management services so that employers can "spend time managing [their] business, not [their] plans," Principal assumes some of the responsibilities imposed upon employers as plan sponsors.

**ANSWER:**  Principal denies this allegation to the extent that it states a legal conclusion. Principal admits that it offers a wide range of services to employer-sponsored retirement plans, with such services varying from plan to plan, and that select marketing and promotional materials include the language quoted in the above paragraph.  Except as expressly admitted or qualified herein, Principal denies all remaining allegations in this paragraph.

37.     A special relationship of confidence, trust, or superior knowledge or control existed both between Principal and employers who retained Principal for its pre-packaged 401(k) plans and between Principal and employees participating in a Principal 401(k) plan as a result of the following:

      a.     Principal's holding itself out to employers and employees as highly-skilled financial experts, possessing special knowledge and expertise;

      b.     Principal's encouragement of employers and participating employees to place their utmost trust and confidence in Principal's management of their 401(k) plans;

      c.     Principal's encouragement of employers and participating employees to place their utmost trust and confidence (with their retirement savings) in Principal's financial expertise and advice;

      d.     Principal's assumption of a position of trust and confidence, with respect to both employers and employees, by servicing and managing employer-sponsored 401(k) plans;

      e.     Principal's assumption of the responsibility to provide unbiased expertise and 401(k) plan management to employers and employees;

      f.     Principal's assumption of the responsibility to provide unbiased, expert advice to employers and employees to the extent Principal provided investment advice to employers and employees, and/or

      g.     Principal's assumption of the responsibility to employers and employees to negotiate favorable investment management fees with mutual funds and their advisors arising from Principal's exclusive control over the selection of mutual funds to be included and available in its 401(k) and from Principal's exclusive control over the negotiations of investment management fees with mutual funds and their advisors;

**ANSWER:**  Principal denies the allegations in paragraph 37, including all subparts.

38.    Principal regularly rendered advice to plans such as the Fairmount Park plan as follows:

      a)     through Principal's representation of its pre-selected mutual funds to be appropriate investments for the plan and its participants;

      b)     through Principal's unilateral control over which mutual funds would continue to be available to 401(k) plans;

      c)     through Principal's "Investor Profile Quiz" which it used to help employees determine their investment risk tolerance and matching specific mutual funds to the employees' tolerance; and/or

      d)     through Principal's recommendations regarding which of its pre-selected mutual funds should be included in a plan based on Principal's analysis of a plan's previous investments.

**ANSWER:**  Principal denies the allegations in paragraph 38, including all subparts.

39.     Principal's services served as the primary basis for investment decisions by both the plans and their participating employees.

**ANSWER:**  Principal lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 39.

40.     Principal services included the rendering of individualized investment advice to plans or their participants based on the particular needs of the plans or participants regarding such matters as investment policies or strategies, overall portfolio composition and diversification of plan investments.

**ANSWER:**  Principal admits that it offers a range of investment services to employer-

sponsored retirement plans, but that such services vary from plan to plan.  Except as expressly

admitted or qualified herein, Principal denies all remaining allegations in this paragraph.

41.     Principal was therefore a fiduciary to plans such as the Fairmount Park Plan within the meaning of ERISA § 3(21)(A) (29 U.S.C. § 1002(21)(a)).

**ANSWER:**  Denied.

42.     Accordingly, Principal owed certain fiduciary duties to plans such as the Fairmount Park Plan and their plan participants under ERISA § 404(a)(1)(A) and (B) (29 U.S.C. § 1104(a)(1)(A) and (B)).

**ANSWER:**  Denied.

43.     Among the fiduciary duties Principal voluntarily assumed and owed to plans such as the Fairmount Park Plan and their participants, was a duty to negotiate fees so as to defray those expenses of administering the plans.

**ANSWER:**  Denied.

44. Plaintiff brings this class action in his capacity as trustee of the Fairmount Park Plan and on behalf of a class of all retirement plans to which Principal was a service provider and for which Principal received and kept "revenue sharing" kickbacks from mutual funds.

**ANSWER:**  Principal admits that Plaintiff brings this action individually and purports to

seek certification of a class as described in paragraph 44.  Principal denies that there is any basis

in fact or law for the certification of any class, and denies the remaining allegations of paragraph

44.

45. Plaintiff is a class member and will fairly and adequately assert and protect the Class's interests.

**ANSWER:**  Denied.

46. Plaintiff's interests are coincident with, and not antagonistic to, those of other Class members.

**ANSWER:**  Denied.

47. Plaintiff's claims are typical of those of the Class.

**ANSWER:**  Denied.

48. Plaintiff has retained counsel who is experienced in ERISA class action litigation.

**ANSWER:**  Principal lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 48.

49. Members of the Class are so numerous that joinder of all members is impracticable. While Plaintiff cannot ascertain the exact number and identity of Class members prior to discovery, on information and belief, there are thousands of Class members and their identity can be ascertained from Principal's books and records.

**ANSWER:**  Denied.

50. Plaintiff and the Class sustained damages from Principal's conduct.

**ANSWER:**  Denied.

51. This case presents questions of law or fact which are common to all class members, and those common questions predominate over any questions affecting only individual members of the Class, including:

    i.      Whether Principal held itself out to plans and their participants as a highly-skilled financial expert, possessing special knowledge and expertise;

    ii.     Whether Principal encouraged employers and participating employees to place their utmost trust and confidence in Principal's management of their 401(k) plans;

    iii.    Whether Principal encouraged employers and participating employees to place their utmost trust and confidence (with their retirement savings) in Principal's financial expertise and advice;

    iv.    Whether Principal assumed a position of trust and confidence, with respect to both employers and employees, by servicing and managing employer-sponsored 401(k) plans;

    v.    Whether Principal assumed the responsibility to provide unbiased expertise and 401(k) plan management to employers and employees;

    vi.    Whether Principal assumed the responsibility to provide unbiased, expert advice to employers and employees to the extent Principal provided investment advice to employers and employees;

    vii.    Whether Principal assumed the responsibility to employers and employees to negotiate favorable investment management fees with mutual funds and their advisors as a result of Principal's exclusive control over the selection of mutual funds to be included and available in its 401(k) and from Principal's exclusive control over the negotiations of investment management fees with mutual funds and their advisors;

    viii.    Whether Principal regularly rendered advice to plans such as the Fairmount Park plan and their participants;

    ix.    Whether Principal was a fiduciary to plans like the Fairmount Park Plan and their participants;

    x.    Whether Principal breached a fiduciary duty to plans like the Fairmount Park Plan and their participants by demanding and keeping "revenue sharing" payments from mutual funds and payments from separate accounts;

    xi.    Whether Principal engaged in a prohibited transaction by demanding and keeping "revenue sharing" payments from mutual funds and payments from separate accounts;

    xii.    Whether plans like the Fairmount Park Plan and their participants sustained damages as a consequence of Principal's misconduct; and/or

    xiii.    The amount of any such damages.

**<u>ANSWER:</u>**  Principal denies the allegations of paragraph 51, including all subparts.

    52.    The class action method is a superior means for the fair and efficient adjudication of this action, because individual actions would or might:

      i.      result in inconsistent or varying adjudication with respect to individual class members;

      ii.     result in adjudications with respect to individual class members that could, as a practical matter, be dispositive of the interests of other members not parties to the adjudication or substantially impair or impede their ability to protect their interests; or

      iii.    produce a multiplicity of cases creating a substantial but unnecessary burden for the courts.

**ANSWER:**  Denied.

53.     A trial of this case as a class action will be manageable because the claims and defenses will be subject to class-wide proof.

**ANSWER:**  Denied.

54.     Plaintiff repeats and incorporates by reference the allegations contained in paragraphs 1 through 53 above as if fully set forth here.

**ANSWER:**  Principal incorporates by reference its responses to paragraphs 1 through 53 as stated above.

55.     Principal does not disclose, or does not adequately disclose, to the plans such as the Fairmount Park Plan, to employers, or to participating employees the fact that Principal negotiates revenue sharing fees with the mutual funds that are included in its pre-packaged 401(k) plans.

**ANSWER:**  Denied.

56.     Principal does not disclose, or does not adequately disclose, to the plans such as the Fairmount Park Plan, to employers, or to participating employees the fact that Principal accepts revenue sharing fees from the mutual funds that are included in its pre-packaged 401(k) plans.

**ANSWER:**  Denied.

57.     Principal does not disclose, or does not adequately disclose, to the plans such as the Fairmount Park Plan, to employers, or to participating employees the amount of the revenue sharing fees Principal negotiates with and receives from the mutual funds that are included in its pre-packaged 401(k) plans.

**ANSWER:**  Denied.

58.      Instead of passing along the "revenue sharing" kickbacks (or the lower investment management fees) to plans such as the Fairmount Park Plan and their plan participants, Principal keeps "revenue sharing" kickbacks from mutual funds.

**ANSWER:**  Denied.

59.      The "revenue sharing" kickbacks Principal takes bear no relationship to Principal's costs of providing services to plans or participants and are in addition to the fees Principal charges for those services.

**ANSWER:**  Denied.

60.      The plans such as the Fairmount Park Plan and their participants receive no extra services from Principal in addition to the services for which the plan already pays in exchange for the revenue sharing payments Principal receives from the mutual funds.

**ANSWER:**  Denied.

61.      The "revenue sharing" kickbacks are thus windfalls to Principal which serve only to increase Principal's income at the expense of the plans such as the Fairmount Park Plan and ultimately at the expense of the participating employees.

**ANSWER:**  Denied.

62.      Principal breached the fiduciary duties it owed (by virtue of ERISA § 404(a)(1)(A) (29 U.S.C. § 1104(a)(1)(A))) to the plans such as the Fairmount Park Plan and its participants in one or more of the following ways:

    a.      failing to disclose (or to disclose adequately) to the plans such as the Fairmount Park Plan, to employers, or to participating employees the fact that Principal negotiates revenue sharing fees with the mutual funds (or their advisors) that are included in its pre-packaged 401(k) plans;

    b.      failing to disclose (or to disclose adequately) to the plans such as the Fairmount Park Plan, to employers, or to participating employees the fact that Principal accepts revenue sharing fees from the mutual funds (or their advisors) that are included in its pre-packaged 401(k) plans;

    c.      failing to disclose (or to disclose adequately) to the plans such as the Fairmount Park Plan, to employers, or to participating employees the amount of the revenue sharing fees that Principal accepts from the mutual funds (or their advisors) that are included in its pre-packaged 401(k) plans;

    d.      keeping revenue sharing kickbacks from mutual funds (or their advisors) for Principal's own benefit;

    e.      failing to use the revenue sharing kickbacks to defray the reasonable expenses of administering the plan; and/or

f.      failing to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

**ANSWER:** Principal denies the allegations in paragraph 62, including all subparts.

63.    The Fairmount Park Plan and class members sustained and continue to sustain damages as a direct and proximate result of Principal's breaches of fiduciary duty.

**ANSWER:** Denied.

64.    Pursuant to ERISA § 409(a) (29 U.S.C. § 1109(a)), Principal is liable to the Fairmount Park Plan and the Class for its breaches of fiduciary duties to make good to such plans all losses resulting from each such breach, to restore to each such plan all profits Principal realized as a result of each such breach, and is subject to such other equitable and remedial relief as the Court deems appropriate.

**ANSWER:** Denied.

65.    Plaintiff repeats and incorporates by reference the allegations contained in paragraphs 1 through 53 above as if fully set forth here.

**ANSWER:** Principal incorporates by reference its responses to paragraphs 1 through 53 as stated above.

66.    Because of the large number of 401(k) plans Principal serves, Principal effectively represents an extremely large sum of plan assets when it negotiates "revenue sharing" kickbacks which mutual funds and their advisors are eager tap into. Thus, Principal's ability to extract revenue sharing deals with mutual funds (or their advisors) is a direct result of Principal's representation of such massive amounts of employer-sponsored 401(k) plan assets.

**ANSWER:** Denied.

67.    ERISA § 406(b)(1) (29 U.S.C. § 1106(b)(1)) prohibits fiduciaries from "deal[ing] with the assets of the plan in his own interest or for his own account."

**ANSWER:** Principal admits that Plaintiff quotes a portion of 29 U.S.C. § 1106(b)(1) but denies that Principal has engaged in any prohibited conduct or transaction.

68.    ERISA § 406(b)(3) (29 U.S.C. § 1106(b)(3)) prohibits fiduciaries from "receiv[ing] any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

**ANSWER:**  Principal admits that Plaintiff quotes a portion of 29 U.S.C. § 1106(b)(3) but denies that Principal has engaged in any prohibited conduct or transaction.

69.     Principal violated ERISA §§ 406(b)(1) and 406(b)(3) (29 U.S.C. §§ 1106(b)(1) & (b)(1)) in one or more of the following ways:

      a.     using plan assets to generate revenue sharing kickbacks for Principal's own interest and for its own account; and/or

      b.     keeping revenue sharing kickbacks from the mutual funds (or their advisors) that are included in Principal's pre-packaged 401(k) plans for Principal's own interest and for its own account.

**ANSWER:**  Principal denies the allegations of paragraph 69, including all subparts.

70.     Plaintiff repeats and incorporates by reference the allegations contained in paragraphs 1 through 53 above as if fully set forth here.

**ANSWER:**  Principal incorporates by reference its responses to paragraphs 1 through 53 as stated above.

71.     Because Principal owns the Foundation Options separate accounts, it controls those separate accounts.

**ANSWER:**  Denied.

72.     Principal thus exercises exclusive control over the payments it charges and receives from the separate accounts.

**ANSWER:**  Denied.

73.     The assets in the separate accounts are "plan assets" within the meaning of ERISA.

**ANSWER:**  Principal states that the allegations of this paragraph constitute conclusions of law and therefore Principal denies them.

74.     Principal was thus a fiduciary to plans invested in the Foundation Options separate accounts because Principal controlled the plan assets in the separate accounts.

**ANSWER:**  Denied.

75.     Principal does not disclose, or does not adequately disclose, to the plans such as the Fairmount Park Plan, to employers, or to participating employees the fact that Principal negotiates charges and receives payments from the Foundation Options separate accounts.

**ANSWER:** Denied.

76.     Principal does not disclose, or does not adequately disclose, to the plans such as the Fairmount Park Plan, to employers, or to participating employees the amount of the payments Principal charges and receives from the separate accounts.

**ANSWER:** Denied.

77.     Instead of passing along those payments (or the lower investment management fees it negotiates for the separate accounts) to plans such as the Fairmount Park Plan and their plan participants, Principal keeps those payments.

**ANSWER:** Denied.

78.     The payments Principal charges and receives from the separate accounts bear no relationship to Principal's costs of providing services to plans or participants and are in addition to the fees Principal charges for those services.

**ANSWER:** Denied.

79.     The plans such as the Fairmount Park Plan and their participants receive no extra services from Principal in addition to the services for which the plan already pays in exchange for the payments Principal receives from the separate accounts.

**ANSWER:** Denied.

80.     The payments Principal receives from the separate accounts are thus windfalls to Principal which serve only to increase Principal's income at the expense of the plans such as the Fairmount Park Plan and ultimately at the expense of the participating employees.

**ANSWER:** Denied.

81.     Principal breached the fiduciary duties it owed (by virtue of ERISA § 404(a)(1)(A) (29 U.S.C. § 1104(a)(1)(A))) to the plans such as the Fairmount Park Plan and its participants in one or more of the following ways:

        a.     failing to disclose (or to disclose adequately) to the plans such as the Fairmount Park Plan, to employers, or to participating employees the fact that Principal negotiates payments for itself which are made from plan assets in the separate accounts;

        b.     failing to disclose (or to disclose adequately) to the plans such as the Fairmount Park Plan, to employers, or to participating employees the fact that Principal accepts payments from plan assets in the separate accounts;

        c.     failing to disclose (or to disclose adequately) to the plans such as the Fairmount Park Plan, to employers, or to participating employees the

amounts of the payments Principal receives from plan assets in the separate accounts;

d.      keeping payments for itself which are made from plan assets in the separate accounts for Principal's own benefit;

e.      failing to use the payments it receives from plan assets in the separate accounts to defray the reasonable expenses of administering the plans; and/or

f.      failing to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

**ANSWER:**  Principal denies the allegations in paragraph 81, including all subparts.

82.      The Fairmount Park Plan and class members sustained and continue to sustain damages as a direct and proximate result of Principal's breaches of fiduciary duty.

**ANSWER:**  Denied.

83.      Pursuant to ERISA § 409(a) (29 U.S.C. § 1109(a)), Principal is liable to the Fairmount Park Plan and the Class for its breaches of fiduciary duties to make good to such plans all losses resulting from each such breach, to restore to each such plan all profits Principal realized as a result of each such breach, and is subject to such other equitable and remedial relief as the Court deems appropriate.

**ANSWER:**  Denied.

84.      Plaintiff repeats and incorporates by reference the allegations contained in paragraphs 1 through 53 above as if fully set forth here.

**ANSWER:**  Principal incorporates by reference its responses to paragraphs 1 through 53

as stated above.

85.      Because Principal owns the Foundation Options separate accounts, it controls those separate accounts.

**ANSWER:**  Denied.

86.      Principal thus exercises exclusive control over the payments it charges and receives from the separate accounts.

**ANSWER:**  Denied.

87.     The assets in the separate accounts are "plan assets" within the meaning of ERISA.

**ANSWER:**  Principal states that the allegations of this paragraph constitute conclusions of law and therefore Principal denies them.

88.     Principal was thus a fiduciary to plans invested in the Foundation Options separate accounts because Principal controlled the plan assets in the separate accounts.

**ANSWER:**  Denied.

89.     ERISA § 406(b)(1) (29 U.S.C. § 1106(b)(1)) prohibits fiduciaries from "deal[ing] with the assets of the plan in his own interest or for his own account."

**ANSWER:**  Principal admits that Plaintiff quotes a portion of 29 U.S.C. § 1106(b)(1) but denies that Principal has engaged in any prohibited conduct or transaction.

90.     ERISA § 406(b)(3) (29 U.S.C. § 1106(b)(3)) prohibits fiduciaries from "receiv[ing] any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

**ANSWER:**  Principal admits that Plaintiff quotes a portion of 29 U.S.C. § 1106(b)(3) but denies that Principal has engaged in any prohibited conduct or transaction.

91.     Principal violated ERISA §§ 406(b)(1) and 406(b)(3) (29 U.S.C. §§ 1106(b)(1) & (b)(1)) in one or more of the following ways:

      a.     charging and receiving payments from the plan assets in the separate accounts for Principal's own interest and for its own account; and/or

      b.     charging and receiving payments, for Principal's own account, from parties dealing with the plans in connection with transactions involving the assets of the plans.

**ANSWER:**  Principal denies the allegations of paragraph 91, including all subparts.

92.     Plaintiff repeats and incorporates by reference the allegations contained in paragraphs 1 through 53 above as if fully set forth here.

**ANSWER:**  Principal incorporates by reference its responses to paragraphs 1 through 53 as stated above.

93.     After an employer establishes a 401(k) retirement plan, the employer transfers its employees' contributions to Principal.

**ANSWER:** Principal admits that after some employers establish a 401(k) retirement plan, those employers transfer their employees' 401(k) contributions to Principal or arrange for such a transfer to take place.

94.     For the thousands of 401(k) plans which Principal services, Principal receives and thus commingles all 401(k) plan contributions in one of two bank accounts. Principal maintains one bank account for "trusteed plans" and another for "non-trusteed plans." Principal directs all plan contributions from "trusteed plans" to the account established for "trusteed plans" and directs all plan contributions from "non-trusteed plans" to the account established for "non-trusteed plans."

**ANSWER:** Principal admits that it deposits 401(k) plan contributions from various 401(k) plans into one of two bank accounts and maintains an accounting system to track those contributions.  Principal admits that there are two different bank accounts that contributions are transferred into:  a general account within Principal Life Insurance Company for non-trusteed plans, and a bank account in the name of Principal Trust Company for trusteed plans.  Principal admits the allegations in the third sentence of paragraph 94.

95.     Principal has sole custody and control over each of those two accounts. No other entity has authority to direct transfers or otherwise withdraw or move funds from the accounts.

**ANSWER:** Principal admits that it executes transfers and withdraws and removes funds from the accounts according to the allocations of plan participants.  Except as expressly admitted or qualified herein, Principal denies all remaining allegations in paragraph 95.

96.     After Principal receives plans' contributions in one of these bank accounts, there is a one day lag before Principal transfers the contributions from its accounts and into the investment options that the plans' participants have chosen.

**ANSWER:** Principal admits that after contributions from plans are transferred into the two bank accounts, Principal promptly creates and executes trades into the investment options, causing the money to be transferred to the investment entitles chosen by plan participants. Except as expressly admitted or qualified herein, Principal denies all remaining allegations in paragraph 96.

97.     Principal takes the plans' contributions from its bank accounts and invests those sums overnight between the time Principal receives the contributions from the plans and the time Principal invests the plans' contributions in the various mutual funds.

**ANSWER:**  Principal admits that, after it has settled any trades from those bank

accounts, it invests remaining funds from the trusteed plans into an investment account, and any

remaining funds from the non-trusteed plans into its general corporate account.  Except as

expressly admitted or qualified herein, Principal denies all remaining allegations in paragraph 97.

98.     Principal earns income on its overnight investment of the plans' assets, and Principal keeps that income for itself.

**ANSWER:**  Principal admits that part of its revenue is the income earned from the

overnight investment account.  Except as expressly admitted or qualified herein, Principal denies

all remaining allegations in paragraph 98.

99.     Principal does not disclose, or does not adequately disclose, to the plans that it earns income on the plans' assets while Principal is waiting to invest the funds.

**ANSWER:**  Denied.

100.    Principal does not credit to the plans the income that it accrues from its overnight investment of plan assets.

**ANSWER:**  Principal admits that it does not directly credit to the plans the income that it

accrues from its overnight investment of plan assets.  Except as expressly admitted or qualified

herein, Principal denies all remaining allegations in paragraph 100.

101.    As a result of the foregoing conduct, Principal breached the fiduciary duties it owed (by virtue of ERISA § 404(a)(1)(A) (29 U.S.C. § 1104(a)(1)(A))) to the plans such as the Fairmount Park Plan and its participants, and is therefore liable to the Fairmount Park Plan and the Class for its breaches of fiduciary duties to make good to such plans all losses resulting from each such breach, to restore to each such plan all profits Principal realized as a result of each such breach, and is subject to such other equitable and remedial relief as the Court deems appropriate.

**ANSWER:**  Denied.

102.    Also as a result of the foregoing conduct, Principal engaged in prohibited transactions and thus violated ERISA §§ 406(b)(1) and 406(b)(3) (29 U.S.C. §§ 1106(b)(1) & (b)(1)).

**ANSWER:**  Denied.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

The Complaint fails to state a claim for which relief may be granted.

### Second Affirmative Defense

Plaintiff, as well as some or all members of the putative class, suffered no damages as a result of any conduct of Principal.

### Third Affirmative Defense

Some or all of Principal's conduct may be exempt under ERISA.

### Fourth Affirmative Defense

Some or all of the putative class members' causes of action are time-barred under the applicable statutes of limitations and/or statutes of repose.

### Fifth Affirmative Defense

Some or all of the putative class members' claims are or may be barred in whole or in part by waiver.

### Seventh Affirmative Defense

Some or all of the putative class members' claims may be barred for lack of standing.

### Eighth Affirmative Defense

Some or all of the putative class members' claims may be barred in whole or in part by estoppel.

WHEREFORE, Defendant Principal Life Insurance Company, having answered the allegations of the Second Amended Complaint and having set forth its affirmative defenses thereto, respectfully asks this Court to enter judgment with costs against Plaintiff and in favor of Principal.

Respectfully submitted,

PRINCIPAL LIFE INSURANCE COMPANY

By:    /s/ Mark B. Blocker
        One of its attorneys

Brian L. Campbell
Whitfield & Eddy, PLC
317 Sixth Avenue, Suite 1200
Des Moines, Iowa  50309
Email:  campbell@whitfieldlaw.com
Phone:  (515) 288-6041

Joel S. Feldman
Mark B. Blocker
Eric S. Mattson
Hannah Ruehlman Blase
Sidley Austin LLP
One South Dearborn Street
Chicago, Illinois  60603
Email:  jfeldman@sidley.com
       mblocker@sidley.com
       emattson@sidley.com
       hblase@sidley.com
Phone:  (312) 853-7000

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing **Principal Life Insurance Company's Answer to the Second Amended Complaint** was served on all attorneys through the Court's CM/ECF electronic filing system on May 14, 2010.


<u>/s/ Mark B. Blocker</u>