IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| JOSEPH RUPPERT, as trustee of and on behalf of FAIRMOUNT PARK, INC. RETIREMENT SAVINGS PLAN, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>PRINCIPAL LIFE INSURANCE CO.,<br><br>Defendant. | No. 4:07-cv-00344-JAJ-TJS<br><br><br>**ORDER** |

This matter comes before the Court pursuant to Defendant Principal Life Insurance Co.'s ("Principal") February 2, 2010 Motion for Summary Judgment on Count III. [Dkt. No. 196.]  Plaintiff Joseph Ruppert ("Ruppert") filed a response on February 23, 2010 [Dkt. No. 198], to which Principal replied on March 5, 2010.  [Dkt. No. 199.]  The Court grants the motion for summary judgment on Count V.

## I. STANDARD OF REVIEW

A motion for summary judgment may be granted only if, after examining all of the evidence in the light most favorable to the nonmoving party, the court finds that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. *HDC Med., Inc., v. Minntech Corp.*, 474 F.3d 543, 546 (8th Cir. 2007) (citation omitted); *see also Kountze ex rel. Hitchcock Found. v. Gaines*, 536 F.3d 813, 817 (8th Cir. 2008) ("[S]ummary judgment is appropriate where the pleadings, discovery materials, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law.").

Once the movant has properly supported its motion, the nonmovant "may not rest upon the mere allegations or denials of [its] pleading, but . . . must set forth specific facts

showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). "[A]n issue of material fact is genuine if the evidence is sufficient to allow a reasonable jury verdict for the nonmoving party." *Great Plains Real Estate Dev., L.L.C. v. Union Cent. Life Ins. et al.*, 536 F.3d 939, 944 (8th Cir. 2008) (citation omitted). "A genuine issue of fact is material if it 'might affect the outcome of the suit under the governing law.'" *Saffels v. Rice*, 40 F.3d 1546, 1550 (8th Cir. 1994) (citation omitted). The nonmoving party is entitled to all reasonable inferences that can be drawn from the evidence without resort to speculation. *Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1110 (8th Cir. 2001). "[A]lthough [the non-moving party] does not have to provide direct proof that genuine issues of fact exist for trial, the facts and circumstances that she [or he] relies 'upon must attain the dignity of substantial evidence and not be such as merely to create a suspicion.'" *Taylor v. White,* 321 F.3d 710, 715 (8th Cir. 2003) (citation omitted). The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. *Sprenger*, 253 F.3d at 1110.

## II. FACTS

Principal began providing services to a 401(k) plan known as the Fairmount Park, Inc. Retirement Savings Plan (the "Plan"), on April 1, 2000.[1] Ruppert is the Plan's trustee and selected Foundation Options—or non SEC-registered—separate accounts to be included in the investments available to Plan participants. In the April 1, 2000 "FIA Service and Expense Agreement" ("2000 Agreement") that Ruppert signed on the Plan's behalf, Principal did not make any disclosures or statements regarding its retention of float income. Float income is interest that Principal earns on overnight investments, such as the

---

[1]The Court reviews the facts in a light favorable to the non-moving party, or in this case, Ruppert. *HDC Med., Inc.*, 474 F.3d at 546.

2

Plan participant's contributions, before the contributions are routed to each participant's selected investments.

On October 28, 2004, the Plan entered into a new "FIA Service and Expense Agreement" ("2004 Agreement") with Principal.  In this new contract, Section 3.5 of the "Compensation" section includes a subsection entitled "Other Compensation."  This section provides:

> Other Compensation.  We may earn compensation in the form of short-term interest ("float") on things like uncashed distribution checks (from the date issued until the date cashed). We may also earn "float" on Deposits, loan payments, and other amounts awaiting investment, and on Transfers or distributions involving certain non-proprietary funds prior to processing.  The "float" earns money market rates.  "Float" is not directly credited to plans for which we provide services. Deposits and Transfers are normally allocated and invested the same day or as soon as possible afterwards, however, there are certain situations where the allocation of these funds will take a longer period of time. . . .

The "float" income is earned during the lag between the participant contributions and the actual investment into the designated security instrument.  Teresa Button, Principal's second vice president and chief accounting officer of retirement investor services, testified on behalf of Principal to explain its policies and practices for handling participant funds.

> . . . The first step would be the plan sponsor would accumulate the contributions from their employer—employees that are part of the plan into one deposit, or into one contribution.

> . . . [I]t's a fairly automated system . . . .

> There are two different bank accounts that that contribution could go into.  One would be a general account within Principal Life Insurance Company or the money could go to a

bank account in the name of Principal Trust Company.
. . .

. . . The next step, you have to go to this administrative system. It knows—the system knows by the coding and the transaction that's been proceeded that a contribution has come in to that account on behalf of that plan. So then that evening, it takes that contribution—and when I say "that evening," I'm saying that because most of the programs take all of the transactions throughout the day . . . .

That night we will create trades and we will execute those trades into the investment options, and what I mean by that is that we will create trade requests. If it's to an outside mutual fund, it's a trade request that is sent to our broker-dealer to make that trade. And the reason that comes first is because then the next morning we settle those trades, and that's when the money leaves the Principal Life Insurance Company general account and is transferred to the various investment entities, wherever that money needs to go.

. . . If it is to be invested in a proprietary separate account, one of Principal Life Insurance Company's separate accounts, then the money is transferred to the separate account itself. If it's an investment into an outside mutual fund, that means we need to transact that trade through the NSEC through our broker-dealer. We have to actually buy those shares. So the money can go various places depending on the investment option.
. . .

But it's just my understanding. Is that the corporate treasury area sweeps any balances from that [the daily contributions]—that are remaining in that account into some sort of an overnight investment. . . . I mean that my understanding is that they invest any remaining balances in that account overnight.

To summarize, Fairmount Park employees pay their wages into the Plan. In some

cases, Principal earns interest on the contributions overnight, then deposits the contributions into the investment of their choice on the following business day.  Principal receives most of the employee contributions by electronic funds transfers.  As a result, Principal can create and execute trades into the selected investment option on the same day if the funds are received by 3 p.m. on a business day.[2]  However, generally, the purchases are actually settled and deposited into the selected investment via electronic bank transfer on the following business day.  Before the settlement occurs—or during this gap in time—the money is pooled into a collective general corporate bank account.  This corporate bank account earns interest overnight and Principal states that the account receives a federal funds-based rate of interest, similar to money market fund rates.[3]  Principal retains the overnight interest earned on the investments[4] in the corporate bank account, even though a portion of the interest is generated from Plan participant contributions awaiting settlement.

### III. RUPPERT'S ALLEGATIONS

Ruppert asserts the following related to retention of float interest in his amended

---

[2]The facts are unclear as to whether all contributions received before 3 p.m. on a business day, are, in fact, invested on the same day.

[3]Ruppert disputes the exact interest rate earned, that Principal pegs at .25%. Ruppert states that Principal does not disclose the "total fees" the Plan earns.  But the rate is quantitatively a different measure of performance than the total fees earned, and is a better benchmark for ascertaining whether the total fee is reasonable, based upon the alleged rate used.  As the 2004 Agreement states "market interest rates" are earned, the Court errs on the side of caution  and finds that the interest rate is based upon the fluctuating federal funds rate, as established by the Federal Reserve on a daily basis.

[4]Principal states that from 2005 to mid-2009, it earned $100.33 in interest from monies received from the Plan.  It does not stipulate how much interest it earned prior to 2005.

complaint:

94. For the thousands of 401(k) plans which Principal services, Principal receives and thus commingles all 401(k) plan contributions in one of two bank accounts. Principal maintains one bank account for "trusteed plans" and another for "non-trusteed plans." Principal directs all plan contributions from "trusteed plans" to the account established for "trusteed plans" and directs all plan contributions from "non-trusteed plans" to the account established for "non-trusteed plans."

95. Principal has sole custody and control over each of those two accounts. No other entity has authority to direct transfers or otherwise withdraw or move funds from the accounts.

96. After Principal receives plans' contributions in one of these bank accounts, there is a one day lag before Principal transfers the contributions from its accounts and into the investment options that the plans' participants have chosen.

97. Principal takes the plans' contributions from its bank accounts and invests those sums overnight between the time Principal receives the contributions from the plans and the time Principal invests the plans' contributions in the various mutual funds.

98. Principal earns income on its overnight investments of the plans' assets, and Principal keeps that income for itself.

99. Principal does not disclose, or does not adequately disclose, to the plans that it earns income on the plans' assets while Principal is waiting to invest the funds.

100. Principal does not credit to the plans the income that it accrues from its overnight investment of plan assets.

101. As a result of the foregoing conduct, Principal breached the fiduciary duties it owed (by virtue of ERISA § 404(a)(1)(A) (29 U.S.C. § 1104(a)(1)(A))) to the plans such as

the Fairmount Park Plan and its participants, and is therefore
liable to the Fairmount Park Plan and the Class for its breaches
of fiduciary duties to make good to such plans all losses
resulting from each such breach, to restore to each such plan
all profits Principal realized as a result of each such breach,
and is subject to such other equitable and remedial relief as the
Court deems appropriate.

102.   Also as a result of the foregoing conduct, Principal
engaged in prohibited transactions and thus violated ERISA §§
406(b)(1) and 406(b)(3) (29 U.S.C. §§ 1106(b)(1) & (b)(1)
[sic])).

## IV. ANALYSIS

The parties dispute whether Principal disclosed or adequately disclosed the float
income to Plan participants.  Principal moves for summary judgment because it argues that
the 2004 Agreement adequately discloses the float compensation.  The compensation
disclosure in the 2004 Agreement, Principal asserts, corresponds to guidance from the
Department of Labor about acknowledging float income.  The Department of Labor
("DOL") published the Field Assistance Bulletin 2002-3 (Nov. 5, 2002) ("2002 FAB"),
and recommended that companies disclose information concerning (1) "the specific time
frames within which cash pending investment direction will be invested," and (2) the rate
of float or methodology for determining float income.  If the Court finds that the
compensation disclosure as to the retention of float income in the 2004 Agreement is in
compliance with the 2002 FAB, then Principal argues that there is no genuine issue of
material fact and it is entitled to summary judgment.

Ruppert disputes the adequacy of disclosure and alleges that the retention of float
income constitutes a prima facie case of self-dealing in violation of ERISA § 406(b)(1).
Ruppert asserts that Principal violated ERISA by engaging in a prohibited transaction when
it retained overnight interest from monies before depositing them into the appropriate

investment selections.  Principal is a fiduciary subject to the provisions of § 406(b)(1) because it controls the account into which the plan participant monies are received, it earns interest on that money it receives, and it also unilaterally establishes the compensation it earns.  Ruppert claims there is no provision of ERISA that excuses self-dealing based on "disclosure" and, in the case of the pre-2004 Agreement, there was a total failure to disclose the float earned.  When Principal "re-negotiated" the terms of the 2004 Agreement, Ruppert argues that Principal failed to demonstrate that Ruppert was fully informed of the overall compensation, including the float income.

Furthermore, Ruppert argues that Principal has not adequately complied with the 2002 FAB.  Based upon Ruppert's interpretation of the 2002 FAB, Ruppert asserts that the 2004 Agreement gave Principal too much discretion on how it can earn float.  Principal only discloses a 'target revenue'—not the total fees earned—and does not credit any surplus from the float income back to the Plan.  It does not adequately comply with the 2002 FAB's time frame and rate methodology disclosures.  In addition to inadequate disclosure, Ruppert asserts that the 2002 FAB did not guarantee that complying with the recommended disclosures would prevent all self-dealing.  Finally, Ruppert asserts that Ms. Button's declaration in the summary judgment motion and deposition testimony regarding the process and policies of float collection, contradict each other.  Ruppert argues that this contradiction creates a genuine issue of material fact.  With Ms. Button's questionable testimony, Ruppert contends that business records for the underlying float transactions are the best evidence to determine how Principal collected and retained the float income.

Principal replies that it is entitled to summary judgment for five reasons.  First, the 2002 FAB expressly describes how float income can be earned so as to avoid self-dealing, and Principal has complied accordingly.  Ruppert's case discussions also fail to demonstrate how the 2002 FAB could be erroneous because Ruppert's cited cases do not address the issue of float.  Next, Principal argues that the 2002 Bulletin clearly states that

appropriate disclosures can foreclose self-dealing with respect to float earnings. Likewise, the 2002 FAB does not suggest that the total dollar value of overall compensation is a mandatory disclosure. Fourth, Principal contradicts Ruppert that Ms. Button's statements and prior deposition testimony are conflicting. Disclosing the exact "sweep" process is not material because her testimony acknowledges that Principal earns money from uninvested funds. Finally, Principal claims that the pre-2004 disclosures are irrelevant because a claim about inadequate disclosure as to float compensation is time-barred by the three-year statute of limitations pursuant to 29 U.S.C. § 1113(2).

### A. "Float" on Overnight Investments

Ruppert and Principal dispute whether Principal adequately disclosed the float interest income as compensation.[5] Principal argues that the Court should grant summary judgment because it complied with the 2002 FAB for disclosure of float interest income. Ruppert counters that the 2002 FAB does not carve out an exemption for self-dealing if float interest income is disclosed. Further, if the Court finds that the 2002 FAB is applicable, Ruppert argues that Principal failed to fully comply with all of the provisions for disclosure.

The Court begins with an analysis of the 2002 FAB[6] and cases related to the

---

[5]Ruppert attempts to have the Court re-establish Principal as a plan fiduciary by citing to a related earlier order and related cases. *Ruppert v. Principal Life Ins. Co.*, 2009 WL 5667708, at *24–25 (S.D. Iowa 2009); *Cent. States, Se. and Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 470 U.S. 559, 572–73 (1985); *Firstier Bank, N.A. v. Zeller*, 16 F.3d 907, 910–11 (8th Cir. 1994). But the Court finds that because Principal is a fiduciary with respect to the plan, there is no need for a further discussion on Principal's duties as a fiduciary.

[6]The Department of Labor may revise the overall reporting and disclosure requirements of float income, as there is some suggestion that float income reporting should be "[e]liminate[d] or narrow[ed]". Revision of Annual Information

retention of float interest income.  The background section of the 2002 FAB explained that
the Department of Labor recognized the need for guidance as to float compensation
income. Banks, such as Principal, may "maintain general or 'omnibus' accounts to
facilitate the transactions of employee benefit plans" and these accounts may "retain
earnings ("float") resulting from the anticipated short-term investment of funds held in
such accounts." Department of Labor, Field Assistance Bulletin 2002-3 (Nov. 5, 2002)
[*hereinafter* DOL 2002 Field Assistance Bulletin].  The 2002 FAB referenced back to an
earlier advisory opinion,[7] in which it had stated that failing to disclose float would
constitute prohibited self-dealing. *Id.*  This opinion had stated that self-dealing could only
be cured if the bank fiduciary had "openly negotiated" as part of fee negotiations and had
provided "full and fair disclosure regarding the use of float". *Id.*  Likewise, the 1993 FAB

------

Return/Reports, 72 Fed. Reg. 64731, 64,738 (Nov. 16, 2007).  The report continued that:

> Certain commenters described omnibus accounting as "best
> practice" in the industry.  They suggested that efficiencies in
> data exchanges and settlement transactions between funds and
> retirement plan record keepers generated by omnibus
> accounting are used to reduce plan service costs.  These
> savings were described as based in part upon the service
> provider maintaining omnibus trading accounts with
> investment-related service compensation based upon a
> percentage of the total assets in an investment fund.  A
> commenter representing the mutual fund industry asserted that
> it would be extremely difficult to parse out by plan (in dollars)
> specific components of a fund's expenses for purposes of Form
> 5500 reporting. . . . systematically performing such a task
> each year for each investing plan would be difficult . . . .

*Id.* at 64,740.

[7]Department of Labor, Field Assistance Bulletin 93-24A (Sept. 13, 1993)
[*hereinafter* 1993 FAB].

had lain the groundwork intending service providers to "provide sufficient information" to enable plan fiduciaries to make "informed assessments" of investments.  *Id.*  The second key concern for the Department of Labor in the area of compliance and disclosure of float income, was emphasizing the importance for the "service provider's compensation [to be] determined and approved by a fiduciary independent of the service provider so that prohibited self-dealing is avoided."  *Id.*  Nearly ten years later, the Department of Labor revised its guidance concerning float income by supplementing the earlier opinion with the 2002 FAB.

In the revised advisory opinion, the 2002 FAB, the Department of Labor distinguished between disclosure requirements for plan fiduciaries and service providers. Both parties agree that, in this context, Principal is a service provider according to the 2002 FAB's disclosure requirements.  Pertinent to service providers such as Principal, the 2002 FAB states that service providers engaging in float arrangements have the duty to disclose to plan beneficiaries "sufficient information concerning the administration of its accounts holding float so that the customer can reasonably approve the arrangement based on an understanding of the service provider's compensation."  *Id.*  Proper disclosure, alone, is not enough as the service provider must still monitor itself so that it does not have broad discretion over compensation—violating section 406(b)(1) of ERISA—or too much "discretionary authority or control sufficient" to cause plan fiduciaries to pay inflated fees to the service provider.  *Id.*

It follows that the 2002 FAB requires three[8] disclosures in order to "avoid self-dealing with respect to such earnings" for float interest income pending investment:

> 1. Disclose the specific circumstances under which float will be earned and retained.

---

[8]The 2002 FAB provides a separate directive for disclosure pending disbursement. But because Ruppert has not alleged Principal improperly retained investment interest income on funds awaiting disbursement, the Court will not address this point.

2. In the case of float on contributions pending investment direction, establish, disclose and adhere to specific time frames within which case pending investment direction will be invested following direction from the plan fiduciary, as well as any exceptions that might apply.

. . .

4. Disclose the rate of the float or the specific manner in which such rate will be determined. For example, earnings on cash pending investment and earnings on uncashed checks are generally at a money market interest rate.

We note that the disclosure of and adherence to the foregoing by service providers will not only reduce the likelihood of prohibited self-dealing, but also will assist plan fiduciaries in discharging their obligations under sections 404(a)(1), 406 and 408(b)(2).

DOL 2002 Field Assistance Bulletin.

Here, the Court must analyze the disclosures in both the 2000 and 2004 Agreements Principal made with Ruppert. The Court finds that because Principal made no disclosures about float income in the 2000 Agreement, the Court cannot grant summary judgment in Principal's favor as to this float income based upon FAB compliance. Moreover, Principal failed to comply with the 1993 FAB, which recommended full and fair disclosure of float income, by not "openly negotiating" float income as part of its compensation. The Court addresses whether this claim is time-barred by the statute of limitations *infra*.

However, in the 2004 Agreement, Principal disclosed float income under "Other Compensation." In this section, Principal specifically discloses that it earns compensation from float. In order to be in compliance with the 2002 FAB, Principal must satisfactorily make all three relevant disclosures. First, Principal discloses the specific circumstances

in which it earns and retains float.[9]   Next, Principal states the time frames for investment and the circumstances when allocation of funds is anticipated to take longer.[10]   Finally, Principal states that the float "earns money market rates," which the example in the 2002 FAB specifically directs is sufficient disclosure.   Complying with the 2002 FAB, according to the Department of Labor, would "reduce the likelihood of prohibited self-dealing".

Ruppert argues that Principal did not fully inform him of float compensation in the "re-negotiation" of the 2004 Agreement.   But the 2002 FAB very neatly sets forth the disclosure requirements and the "Other Compensation" section was clearly present in the 2004 Agreement.   The advisory opinion does not mandate that a service provider must specifically direct a fiduciary's attention to the disclosure about float income.   To do so would impose a burden on a service provider that would be subjectively difficult to ascertain whether the level of disclosure was sufficient.   For example, such a requirement could develop stratified layers of disclosure whereby Principal would have to conduct additional meetings, informational sessions, or produce extra literature for some plan fiduciaries, whereas other plan fiduciaries may understand everything presented in plain language in the contract.   The Court finds that the 2002 FAB created objective, and not subjective, disclosure requirements.   Taken at face value, Principal's re-negotiation of the 2004 Agreement to include float income was sufficient.   It is the duty of a plan fiduciary, like Ruppert, to closely and carefully read terms and conditions of compensation.

Ruppert also takes issue at certain details of Principal's disclosure.   For example,

---

[9]"We may also earn "float" on Deposits, loan payments, *and other amounts awaiting investment,* and on Transfers or distributions involving certain non-proprietary funds prior to processing." 2004 Agreement (emphasis added).

[10]"*Deposits* and transfers *are normally allocated and invested the same day or as soon as possible afterwards*, however, there are *certain situations* where the allocation of these funds will take a *longer period of time . . . .*" 2004 Agreement (emphasis added).

Ruppert asserts the following components of Principal's disclosure are insufficient to satisfy the 2002 FAB: Principal's "discretion" in setting the rate, failure to disclose the target revenue on float income, and failure to credit surplus back to the Plan. However, as the Court found previously, Principal is in compliance with the 2002 FAB because it discloses the rate it earns on float income. The advisory opinion does not mandate disclosure of target revenue or actual revenue earned based upon float income; it merely requires the service provider to disclose the anticipated rate at which it will earn interest. Likewise, float income is meant to be retained by the service provider, and as such, it seems peculiar that Ruppert argues that Principal should credit "surplus" back to the Plan. Crediting surplus would necessarily impose the burden on Principal of calculating "actual" versus "target" revenue. Nowhere in the 2002 FAB can the Court find that this is even impliedly a requirement.

Accordingly, the Court finds that Principal has sufficiently and adequately made all relevant disclosures about float income to Ruppert and has complied with the 2002 FAB. Considering that Principal has met all the relevant disclosures outlined in the 2002 FAB, the Court concludes that, based upon the *prima facie* disclosures suggested in the advisory opinion, Principal has not engaged in self-dealing. However, the Court next examines relevant case law to test the sufficiency of Principal's compliance with the requirement that it disclose float income.

There are several cases that are directly on point as to the issue of service providers retaining float income. The seminal case for float income as compensation comes from the Seventh Circuit Court of Appeals in *Associates in Adolescent Psychiatry v. Home Life Ins. Co.*, 941 F.2d 561 (7th Cir. 1991), *cert. denied*, 502 U.S. 1099 (1992). In *Associates in Adolescent Psychiatry*, the plaintiff claimed that Home Life improperly entered into an arrangement with Rhode Island Hospital Trust National Bank ("HTNB") whereby HTNB retained wired amounts intended for the plan for up to seven days. *Id.* at 569. HTNB

14

would earn float income for up to that seven-day period without paying the interest over to Home Life. *Id.* The court stated,

> Internal documents at Home Life pegged the total value of this float in 1980 at approximately $50,000 a year. Why this should be thought a breach of fiduciary duty eludes us. HTNB is entitled to compensation for its services as a trustee. It contracted with Home Life to receive a portion of its compensation in the form of short-term interest-free use of funds. [Associates in Adolescent Psychiatry] concedes that Home Life began crediting contributions with interest from the day that the funds were received–exactly as would have occurred had HTNB not been an intermediary. Home Life, and not the purchasers, lost the value of the float, and the existence of the float therefore did not make it imprudent for HTNB to designate Home Life as the trust administrator (the only discretion it possessed).

*Id.* This case occurred before the 1993 FAB, which mandated disclosure of float income compensation. However, the court concluded in *Associates in Adolescent Psychiatry* that retaining float was only one of many costs of doing business that would reduce "net returns payable to investors." *Id.* It found that, just as Home Life did not reveal other internal business expenses to investors, "Home Life had no duty to calculate and disclose each expense . . . so it violated no fiduciary duty by failing to inform [Associates in Adolescent Psychiatry] about the float." *Id.*

Recently, in *George v. Kraft Foods Global, Inc.*, 2010 WL 331695 (N.D.Ill. Jan. 27, 2010), the Northern District of Illinois analyzed the tension of disclosing float compensation by citing to the 2002 FAB and *Associates in Adolescent Psychiatry*. The plaintiffs in *Kraft Foods* argued that defendants breached their fiduciary duty by failing to monitor float. *Id.* at *21. The fee schedule expressly disclosed that float income interest would be included in overall compensation for State Street, the Plan's trustee. *Id.* State Street cited to its compliance with the 2002 FAB for adequate disclosure requirements, but

15

the plaintiff argued that State Street did not disclose information such that "Plan fiduciaries could make an informed decision on the float arrangement as part of State Street's compensation." *Id.* State Street asserted that it had disclosed the float when Plan fiduciaries "conducted negotiations with State Street's predecessor, Bankers Trust, in 2002, and [that] State Street [had] adhered to the same fee schedule as Bankers Trust." *Id.* Bank representatives had also explained the float income in a meeting in 2007. *Id.* Furthermore, an expert for State Street explained that float income was considered part of a bank's compensation and that "the bank's fees would be higher in the absence of float." *Id.* at *22. The court concluded that the fee schedule disclosure for float income was sufficient, "as well as the evidence of at least one meeting discussing this issue." *Id.* The court found that plaintiffs had also failed to present evidence that retention of the float income had "led to excessive fees or losses to participants in the Plan." *Id.* Accordingly, the court concluded that it was not a breach of fiduciary duty for the service provider to retain float income as a part of compensation. *Id.*

Additionally, courts have construed *Associates in Adolescent Psychiatry* to mean that the retention of float is an "issue of compensation, where it is clear that float will be created." *Guardsmark, Inc. v. Blue Cross and Blue Shield of Tenn.*, 313 F. Supp. 2d 738, 751 (W.D. Tenn. 2004). If the "course of events" for the retention of float income is any way "anticipated" by the parties, "that interest is an element of compensation" and the service provider is not a fiduciary as to that float interest income. *Id.* Likewise, sweeping investments into an account for the service provider to earn float income is not a breach of fiduciary duty when the float income is anticipated as part of compensation. *See Sirna v. Prudential Secs., Inc.*, 964 F. Supp. 147, 150 (S.D.N.Y. 1997) (the court disagreed with plaintiff's claim that service provider had a duty to "sweep" plan beneficiary assets into the investments on a more frequent basis than the contracted for frequency in order to reduce float income to service provider).

16

In some circumstances, it is even more clear that the float earned is not even based on the property of plan beneficiaries. For example, in *Moeckel v. Caremark, Inc.*, a court found that a service provider could not be in breach of fiduciary duty "for retaining [float] interest earned on its own money and adhering to the specific contract terms." *Moeckel v. Caremark, Inc.*, 622 F. Supp. 2d 663, 690 (M.D. Tenn. 2007). Like the matter before this Court, *Moeckel* held that fiduciaries cannot claim a breach of fiduciary duty when the service provider is complying with a contracted for element of compensation. Here, the contracted for compensation was openly disclosed in the "Other Compensation" that Principal would earn float income on plan beneficiary contributions prior to investment.

However, Ruppert urges the Court to consider several cases to support his claim regarding Principal's failure to adequately disclose the float income compensation. These cases are not on point as to the issue of whether Principal may retain float interest income as compensation without breaching its fiduciary duty. The Court addresses each of these cases in turn. Ruppert's primary case is *Charters v. John Hancock Life Ins. Co.*, 583 F. Supp. 2d 189 (D. Mass. 2008), but the Court finds that this case bears little, if any resemblance, to the present dispute involving float interest income. In *Charters*, Hancock offered mutual funds for a defined contribution plan pursuant to ERISA and Charters acted as trustee of the plan. *Id.* at 191. Hancock's compensation included a fixed participant fee, an asset charge calculated on the amount of assets held in the plan, and an "administrative maintenance charge" for administering and maintaining sub-accounts. *Id.* Hancock had the sole discretion to adjust the administrative maintenance charge, provided it gave three-months prior written notice to Charters. *Id.* at 192. The court attempted to determine whether Hancock acquired ERISA fiduciary status "by virtue of its exercise of authority or control over the management or disposition of plan assets" when it "retained discretion to set its own compensation." *Id.* at 197. It found that insurance companies do

17

not become fiduciaries "with respect to their fees if they lack any authority to affect the timing or amount of their compensation," *id.* (*citing Schulist v. Blue Cross of Iowa*, 717 F.2d 1127, 1131–32 (7th Cir. 1983)), or if an insurance company negotiates at arms-length with a plan and "has no responsibility to the plan and no authority or control over whether the plan chooses to enter into the agreement." *Id.* (*citing F.H. Krear & Co. v. Nineteen Names Trs.*, 810 F.2d 1250, 1259 (2d Cir. 1987)). Likewise, the court in *Charters* concluded that an insurance company could become a fiduciary if it had "control over factors that determine the amount of its compensation". *Id.* (*citing Seaway Food Town, Inc. v. Med. Mut. of Ohio*, 347 F.3d 610, 619 (6th Cir. 2003); *Ed Miniat, Inc. v. Globe Life Ins. Group, Inc.*, 805 F.2d 732, 737 (7th Cir. 1986)). The court concluded that because Hancock had discretion to unilaterally change the administrative maintenance charge to its advantage, that was "sufficient to confer fiduciary status." *Id.* at 198.

The court in *Charters* rejected Hancock's alternative argument for similar reasons. Hancock argued that even if it were a fiduciary, that it breached no fiduciary duty to the plan because all of the fees were fully disclosed to Charters. *Id.* at 199. The court appeared to cite with favor to other courts that have held that "receiving agreed upon fees" is not a breach of fiduciary duty. *Id.* (internal citations omitted). But according to the court, the distinguishing factor in those cases, was that the insurance companies had "exercised no discretionary authority with respect to their fees." *Id.* (*citing Harris Trust and Savs. Bank v. John Hancock Mut. Life Ins. Co.*, 302 F.3d 18, 29 (2d Cir. 2002)). The inescapable fact in *Charters*, to Hancock's disadvantage, was that Hancock exercised discretionary authority and while Charters may have agreed to be charged a maximum rate, Hancock could not present evidence that Charters "agreed to be charged the maximum [rate] regardless of the amount of work Hancock [actually] performed". *Id.* As a result, *Charters* does not offer the Court any guidance on the practice of earning income on float interest.

18

The Court similarly finds that the handful of other cases Ruppert presents in support of his argument, do not pertain to the issue of whether float income compensation is a breach of fiduciary duty. *See, e.g.*, *F.H. Krear & Co.*, 810 F.2d at 1259 (a person may become a fiduciary if the plan gives a person control over such factors that determine the actual amount of its compensation); *Ed Miniat, Inc.*, 805 F.3d at 738 (may become a fiduciary with power to amend the contract and alter compensation); *Sixty-Five Sec. Plan v. Blue Cross & Blue Shield*, 583 F. Supp. 380, 387–88 (S.D.N.Y. 1984) (with respect to its own compensation where fees were based on a percentage of claims paid, Blue Cross was a fiduciary because it had complete discretion and control over the payment of claims). The cases do not address the retention of float, but, rather, detail instances in which a fiduciary may not unilaterally change or alter fees to its own benefit. The Court finds that these cases are inapposite to the present situation because compensation related to contractual administrative maintenance charges, or other associated fees, is dissimilar from compensation earned on float interest income overnight. Principal, additionally, did not possess the power to "unilaterally" change its fees, as the float income was disclosed and Principal stated that the income would be at a market rate of interest. A fluctuating market rate of interest is unrelated to the service provider discretion over compensation that the above-cited cases entailed.

Lastly, the Court rejects Ruppert's argument that a genuine issue of material fact is created by Ms. Button's inconsistent and conflicting testimony in her declaration and deposition testimony. Her testimony provides that Principal retains float income and whether she has personal knowledge that the investments are all swept into one bank account or left in a corporate account is disputed. The Court finds that Ms. Button's testimony definitively establishes the practice whereby Principal retains float income, and the exact details of that practice are insufficient to create a genuine issue of material fact, precluding summary judgment.

In conclusion, the Court finds that Principal has complied with all the disclosures the Department of Labor recommends in the 2002 FAB.  Here, as in *Associates in Adolescent Psychiatry* and the 2002 FAB, Principal credited the plan participants with the investments as soon as practicable.  It settled the investments the following business day and it was anticipated in the 2004 Agreement that float interest would be an element of compensation.  Case law also supports that such disclosures are adequate to avoid self-dealing and breach of fiduciary duty.  It is also a generally accepted industry practice that float income may be retained by service providers as an element of compensation.  *See Sirna*, 964 F. Supp. at 150; *Guardsmark*, 313 F. Supp. 2d at 751; *Kraft Foods*, 2010 WL 331695.  Accordingly, the Court grants summary judgment to Principal as to the float interest income earned pursuant to the 2004 Agreement.

## B. Statute of Limitations

The Court now considers the applicable statute of limitations for the float income compensation earned pursuant to the 2000 Agreement.  Ruppert claims that Principal also breached its fiduciary duty when it failed to disclose its float income in the 2000 Agreement.  Principal responds that, even if it did not disclose the float income, Ruppert's claim is time-barred based upon the relevant three-year statute of limitations.

ERISA provides for only one limitations period in any breach of fiduciary duty claim.

Plaintiffs must bring an action after the earlier of:

> (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or
>
> (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

> except that in the case of fraud or concealment, such action
> may be commenced not later than six years after the date of
> discovery of such breach or violation.

29 U.S.C. § 1113; *see also Brown v. Am. Life Holdings, Inc.*, 190 F.3d 856, 858–59 (8th Cir. 1999) (ERISA contains express statute of limitations barring fiduciary duty claims after earlier of 6 years from breach or 3 years from date plaintiff acquires actual knowledge of breach); *Fetterhoff v. Liberty Life Assur. Co.*, 282 Fed. Appx. 740, 742 (11th Cir. 2008) (as applied to an employee's claim against an employer and insurer of its long-term disability benefits plan); *S. Ill. Carpenters Welfare Fund v. Carpenters Welfare Fund of Ill.*, 326 F.3d 919, 924 (7th Cir. 2003) (ERISA's three-year statute of limitation applies for a breach of fiduciary duty claim related to excluding trustees from voting); *Million v. Trs. of Cent. States, Se. and Sw. Areas Pension Fund*, 50 Fed. Appx. 196, 199 (6th Cir. 2002) (ERISA statute of limitations applied when pension plan wrongfully adopted an amendment precluding use of self-contributions, thereby breaching its fiduciary duty); *Connell v. Trustees of the Pension Fund of the Ironworkers Dist. Council of N. N.J.*, 118 F.3d 154156–57 (3d Cir. 1997) (applies to claims that administrator breached her fiduciary duty to act solely in the interests of plan participants and beneficiaries).

A claim may be based upon either the date of actual knowledge or from the last action that constitutes a breach. *Id.* § 1113(1)–(2). For actual knowledge, the claim begins to run upon the date that the plaintiff knew of the alleged breach of fiduciary duty. *Tekse v. 3M Co.*, 163 Fed. Appx. 431, 432 (8th Cir. 2006). "Actual knowledge of a breach or violation requires that a plaintiff have actual knowledge of all material facts necessary to understand that some claim exists." *In re Ullico, Inc. Litig.*, 605 F. Supp. 2d 210, 219 (D.D.C. 2009) (citing *Gluck v. Unisys Corp.*, 960 F.2d 1168, 1177 (3d Cir. 1992)). The plaintiff does not have to "have actual knowledge of every last detail of a transaction, or knowledge of its illegality." *Hunter v. Custom Bus. Graphics*, 635 F. Supp. 2d 420, 428 (E.D. Va. 2009) (*quoting Trace v. Ret. Plan for Salaried Employees*,

419 F. Supp. 2d 847 (E.D. Va. 2006) (finding that "plaintiff had actual knowledge [on] . . . the date in which he was made aware of the facts or transactions that constituted the alleged violation at that time.")); *see also LaScala v. Scrufari*, 479 F.3d 213 (2d Cir. 2007) (actual knowledge is required to trigger ERISA's statute of limitations as against each trustee, despite an associated finding that certain other trustees had constructive knowledge).

In *Cherochak v. UNUM Life Ins. Co. of Am.*, 586 F. Supp. 2d 522 (D.S.C. 2008), the court found that the plaintiff had actual knowledge when he learned his claim for benefits was denied. *Id.* at 531. The claim began to run from the date of actual discovery. *Id.* Likewise, the six-year limitations period begins to run from the last action that constitutes part of the breach of fiduciary duty. *Starr v. JCI Data Processing, Inc.*, 767 F. Supp. 633, 638 (D.N.J. 1991) ("The last action constituting part of that breach, therefore, would be the last time contributions were credited to plaintiff's pension account . . . ."); *see also Tibble v. Edison Int'l*, 639 F. Supp. 2d 1074, 1104–05 (C.D. Cal. 2009) (court used six-year period for considering whether float was part of compensation in breach of fiduciary duty case where a service provider's flat fee was "artificially low on account of the fact that [Defendant] would be able to keep the float.").

Here, Principal asserts that Ruppert had actual knowledge of the breach of fiduciary duty when Principal included the information about float income compensation in the 2004 Agreement. Courts are in accord that such disclosure would be sufficient to constitute actual knowledge of the breach. For example, transactions disclosed on ERISA-required reports, such as the Form 5500 for reporting direct and indirect income, "sufficiently disclosed these transactions to bring into play ERISA's three year limitations period." *Fink v. Nat'l Savings and Trust Co.*, 772 F.2d 951, 959 (D.C. Cir. 1985) (statute of limitations began to run from date of last report). The Eighth Circuit also affirmed a lower court's ruling that a claim was time-barred because the plaintiff knew of the alleged

breach, that his preretirement leave policy was being discontinued, when he was notified nearly six years before the suit. *Tekse*, 163 Fed. Appx. at 432.

Lastly, the Court finds some similarity in a case from the Third Circuit for interpreting the meaning of actual knowledge. *Kurz v. Phil. Elec. Co.*, 96 F.3d 1544 (3d Cir. 1995). In *Kurz*, Philadelphia Electric Co. announced a pension increase on July 2, 1987. *Id.* at 1551. Employees who retired before that date and had asked about benefits would have known that: (1) benefits had increased, (2) retired employees were not eligible for the new pension package, and (3) no one had proactively told retired employees of the changes. *Id.* The court found that "[t]his was not a technical violation of ERISA" because the company had "openly announced that certain employees would receive better benefits, and others would not." *Id.* The court continued that the announcement by the company had given plaintiffs "knowledge of all relevant facts at least sufficient" to inform a plaintiff that the company had violated ERISA or engaged in a breach of fiduciary duty. *Id.* The court determined that the three-year statute of limitations began to run on the date of the announcement of the pension increase, or July 2, 1987. *Id.*

Section 1113 states that the statute of limitations[11] commences upon the earlier of

---

[11]The Court notes that an argument based upon the six year period for fraud and concealment would similarly fail. Some circuits, such as the Second Circuit, have extended the scope of fraud and concealment to also include situations where a fiduciary makes a misrepresentation or omission of a material fact to induce an employee or beneficiary to act to his detriment, or when the fiduciary has engaged in acts to hinder the discovery of a breach of fiduciary duty. *Caputo v. Pfizer, Inc.*, 267 F.3d 181 (2d Cir. 2001). However, the Eighth Circuit requires a greater showing of fraud and concealment, such that the plaintiffs must show: (1) that defendants engaged in a course of conduct designed to conceal evidence of their alleged wrongdoing and that (2) [the plaintiffs] were not on actual or constructive notice of that evidence, despite (3) [the plaintiffs'] exercise of due diligence." *Schaefer v. Ark. Medical Soc'y*, 853 F.2d 1487, 1941–92 (8th Cir. 1988) (*quoting Foltz v. U.S. News & World Rep., Inc.*, 663 F. Supp. 1494, 1537 & n.66 (D.D.C. 1987)). Ruppert has not made any showing that Principal engaged in fraud or concealment of the float income compensation. The six-year statute of limitations based

either six years after the last action constituting a part of the breach or violation, or three years after the earliest date on which the plaintiff had actual knowledge of the breach. Ruppert had actual knowledge of the breach when Principal altered the compensation in the 2004 Agreement. Accordingly, the Court finds that the applicable statute of limitations is three years for the float interest income Principal earned pursuant to the 2000 Agreement. The 2004 Agreement disclosed the earning of float income in a separate compensation section entitled "Other Compensation." *Fink*, 772 F.2d at 959. This served as constructive notice to Ruppert that Principal's future compensation would include float income, whereas the 2000 Agreement was silent as to that matter. *Tekse*, 163 Fed. Appx. at 432. The Court finds that the 2004 Agreement provided actual knowledge to Ruppert that Principal had engaged in a breach of fiduciary duty with its failure to previously disclose such float income. *Kurz*, 96 F.3d at 1551. Ruppert had all the material information necessary to question Principal's practice of earning compensation tied to float interest. *Id.* Thus, the three-year period is applicable because Ruppert had actual knowledge of the breach of fiduciary duty when he agreed to and signed the 2004 Agreement disclosing the float income, on October 28, 2004. Ruppert filed his amended complaint, adding the claim of breach of fiduciary duty for retention of the float interest income, on May 5, 2008. However, this cause of action related to float interest income earned pursuant to the 2000 Agreement, expired on October 28, 2007. Therefore, the Court rejects Ruppert's assertion that his claim is still viable for the float interest income earned pursuant to the 2000 Agreement.

---

upon fraud or concealment fails because the Court has found that Ruppert did have actual or constructive knowledge of the breach of fiduciary duty when he signed the 2004 Agreement.

*C. Conclusion*

In conclusion, the Court finds that Principal adequately disclosed float interest income compensation in the 2004 Agreement.  Principal failed to adequately disclose interest income prior to 2004.  But the Court finds that any claim related to float interest income earned before 2004 is time-barred because Ruppert had actual knowledge of the change in compensation.

Upon the foregoing,

**IT IS ORDERED** that Defendant Principal's Motion for Summary Judgment on Count Five [Dkt. No. 196] is GRANTED.

**DATED** this 27th day of May, 2010.

JOHN A. JARVEY
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF IOWA